OFFICE OF THE ATTORNEY GENERAL
Joey P. San Nicolas (F0342)
Attorney General
Charles E. Brasington (F0476)
Assistant Attorney General
Hon Juan A. Sablan Mem. Bldg., 2nd Floor
Saipan, MP  96950-8907
Tel:    (670) 664-2393
Fax:    (670) 664-2349
e-mail: charles.brasington.law@gmail.com

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| **JOHN H. DAVIS, JR.**<br><br>                **Plaintiff,**<br>         v.<br><br>**COMMONWEALTH ELECTION COMMISSION; FRANCIS M. SABLAN, Chairperson of the Commonwealth Election Commission; ROBERT A. GUERRERO, Executive Director of the Commonwealth Election Commission; ELOY INOS, Governor of the Commonwealth of the Northern Mariana Islands.**<br><br>                **Defendants.** | CIVIL CASE No. 14-0002<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT**<br><br>**Judge:**  Ramona V. Manglona<br><br>**Date:**    April 24, 2014.<br><br>**Time:**    1:30 P.M. |

# TABLE OF CONTENTS

I.   STATEMENT OF UNDISPUTED FACTS ............................................................. 1

II.  STANDARD OF REVIEW ................................................................................. 3

III. ARGUMENT ...................................................................................................... 4

    A.   Historical Background........................................................................................4

    B.   Summary Judgment in Favor of Defendant Guerrero Inos and CEC .................6

    C.   Davis' Claims for Relief One Through Four Fail Because Davis Bases
       Them Solely on the United States Constitution...................................................7

    D.   42 U.S.C § 1971 Does Not Create a Private Cause of Action............................8

    E.   Commonwealth Constitution Article XVIII, § 5(C), PL 17-40 and the Acts of
       Defendants Sablan and Guerrero Do Not Violate the Fifteenth Amendment ......9

        1.   *Rice v. Cayetano* ......................................................................................9

        2.   *Article XII, § 4's definition is not a racial classificatio*n .........................11

    F.   Commonwealth Constitution Article XVII, § 5(C), PL 17-40 and the Acts of
       Defendants Sablan and Guerrero do not violate the Fourteenth Amendment....18

        1.   *Any vote on amending Article XII is a special limited purpose election
           that disproportionally impacts NMDs* ....................................................18

        2.   *Article XVII, § 5(c) and PL 17-40 are narrowly tailored to serve a
           compelling state interest* ......................................................................22

        3.   *The right to vote on proposed amendments to Article XII is not
           "fundamental in an international sense."* ................................................25

        4.   *Article XVII, § 5(c) and PL 17-40 do not violate the Fourteenth
           Amendment* ...........................................................................................29

    G.   Davis' Taxpayer Standing Action Fails as a Matter of Federal Law................30

        1.   *Davis lacks standing to bring a state taxpayer suit in federal court*........30

        2.   *The Northern Marianas Descent Registry has a other purpose
           unrelated to voter registration* ...............................................................34

IV. CONCLUSION ..................................................................................................35

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Allen v. Wright,*
    468 U.S. 737 (1984)) ..................................................................................... 31

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)) ...................................................................................... 4

*Arakaki v. Lingle,*
    477 F.3d 1048 (9th Cir. 2007) .................................................................. 31, 32

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ...................................................................................... 24

*Azul-Pacifico, Inc. v. City of Los Angeles,*
    973 F.2d 704 (9th Cir. 1992) ........................................................................... 7

*Ball v. James,*
    451 U.S. 355 (1981) ....................................................................... 18–21, 23, 30

*Bender v. Williamsport Area Sch. Dist.,*
    475 U.S. 534 (1986) ........................................................................................ 7

*Bowen v. Kendrick,*
    487 U.S. 589 (1988) ...................................................................................... 32

*Broyles v. Texas,*
    618 F. Supp. 2d 661 (S.D. Tex. 2009) ............................................................. 9

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ........................................................................................ 3

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ................................................................................. 30–34

*Davis v. Commonwealth Election Comm'n,*
    Civ. No. 1-12-CV-1 ........................................................................................ 6

*Doremus v. Brd. of Ed. of Borough of Hawthorne,*
    342 U.S. 429 (1952) ................................................................................. 30, 31

*Dorr v. United States,*
    195 U.S. 138 (1904)) .................................................................................... 27

*Duncan v. Louisiana,*
    391 U.S. 145 (1968). ..................................................................................... 27

*Ex parte Virginia,*
    100 U.S. 339 (1879) ........................................................................................ 8

*Flast v. Cohen,*
    392 U.S. 83 (1968) ................................................................................... 32, 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Fleming v. Dep't of Pub. Safety*,
    837 F.2d 401 (1988)................................................................5

*Frothingham v. Mellon*, decided with *Massachusetts v. Mellon*,
    262 U.S. 447 (1923)..............................................................31

*Gilmore v. Amityville Union Free Sch. Dist.*,
    305 F. Supp. 2d 271 (E.D.N.Y. 2004) ................................8

*Good v. Roy*,
    459 F. Supp. 403 (D. Kan. 1978)........................................8

*Griswold v. Connecticut*,
    381 U.S. 479 (1965)..............................................................23

*Guinn v. United States*,
    238 U.S. 347 (1915).............................................. 12, 15–17

*Healy v. Ratta*,
    292 U.S. 263 (1934)................................................................7

*Hill v. Stone*,
    421 U.S. 289 (1972)..............................................................23

*Hoohul v. Ariyoshi*,
    741 F.2d 1169 (9th Cir. 1984)............................................32

*Howlett v. Salish & Kootenai Tribes*,
    529 F.2d 233, 244 (9th Cir. 1976) ....................................24

*Konigsberg v. State Bar of Cal.*,
    366 U.S. 36 (1961)................................................................23

*Kramer v. Union Free Sch. Dist.*,
    395 U.S. 621 (1969)..............................................................23

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..............................................................31

*Magana v. Northern Mariana Islands*,
    107 F.3d 1436 (9th Cir. 1997)..............................................7

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...........................................................3, 4

*McKay v. Thompson*,
    226 F.3d 752 (6th Cir. 2000) ..............................................8

*Mixon v. Ohio*,
    193 F.3d 389 (6th Cir. 1999) ..............................................8

*Northern Mariana Islands v. Atalig*,
    723 F.2d 682 (9th Cir. 1984)............................... 5, 25, 27

iii

*Olagues v. Russoniello*,
   770 F.2d 791 (9th Cir. 1985)...................................................................8

*Rayphand v. Sablan*,
   95 F. Supp. 2d 1133 (D.N. Mar. I. 1999).................................5, 28–30

*Rayphand v. Tenorio*,
   2003 MP 12.......................................................................................13

*Reynolds v. Sims*,
   377 U.S. 533 (1964)...............................................................18, 20, 28

*Rice v. Cayetano*,
   528 U.S. 495 (2000),.....................................9, 10–12, 14–17, 26

*Roe v. Wade*,
   410 U.S. 113 (1973)..........................................................................23

*Salyer Land Co. v. Tulane Lake Basin Water Storage Dist.*,
   410 U.S. 719 (1973).....................................................................18–23

*Schwier v. Cox*,
   340 F.3d 1284 (11th Cir. 2003).............................................................8

*Spivey v. State*,
   999 F. Supp. 987 (N.D. Ohio 1998);....................................................8

*St. Francis Coll. v. Al-Khazraji*,
   481 U.S. 604 (1987)...........................................................................17

*United Mine Workers of Am. v. Gibbs*,
   83 U.S. 715 (1966).............................................................................33

*United States v. Richardson*,
   418 U.S. 166 (1974)...........................................................................31

*United Steelworkers of America v. Phelps Dodge*,
   865 F.2d 1539 (9th Cir. 1989)...............................................................4

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982)...........................................................................31

*Wabol v. Villacrusis*,
   958 F.2d 1450 (9th Cir. 1990)..............................21, 23–25, 27, 28, 30, 35

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989)...........................................................................25

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990)...........................................................................33

*Willing v. Lake Orion Community Sch. Bd. of Trustees*,
   924 F. Supp. 815 (E.D. Mich. 1996) ....................................................8

iv

## STATUTES

28 U.S.C. § 1367 ...................................................................................... 32, 34

42 U.S.C. § 1971 ...................................................................................... 8, 9, 11

42 U.S.C. § 1971(c) ...................................................................................... 8, 9

42 U.S.C. § 1983. ...................................................................................... 9, 19

48 U.S.C. § 1801 ...................................................................................... 1

## CONSTITUTIONS

NMI  Const. art. VII, § 1 ...................................................................................... 1

NMI Const. art. X § 9 ...................................................................................... 33, 35

NMI  Const. art. XII ...................................................................................... 4, 13, 20–30, 35

NMI  Const. art. XII, § 1 ...................................................................................... 2

NMI Const. art. XII, § 4 ...................................................................................... 2, 10, 11, 12–17

NMI Const. art. XVIII, § 5(c) .......................................... 2, 7, 9, 11, 17, 18, 21–26, 28–30, 35

U.S. Const. art. III ...................................................................................... 7, 30, 33

U.S. Const. amend. XIV, § 5 ...................................................................................... 7

U.S. Const. amend. XV, § 1 ...................................................................................... 9, 12, 17

U.S. Const. amend. XV, § 2 ...................................................................................... 8

## COVENANT

Covenant § 203(c) ...................................................................................... 5

Covenant § 501 ...................................................................................... 1, 5, 25, 26

Covenant § 501(a) ...................................................................................... 25

Covenant § 501(b) ...................................................................................... 25, 26

Covenant § 805 ...................................................................................... 1, 2, 11, 21, 24–26, 29

Covenant § 805(a). ...................................................................................... 21

## RULES

Fed. R. Civ. P. 56(a) ...................................................................................... 3

## PUBLIC LAWS

PL 17-40 ...................................................... 2, 3, 7, 9, 11, 17, 18, 22, 23–26, 28, 29, 34, 35

PL 17-40, § 2(a) ...................................................................................... 34

1   PL 17-40, § 2(c)(2) ................................................................................... 34

2   PL 17-40, § 3(b) ........................................................................................ 35

3   PL 17-40, § 3(c) ........................................................................................ 35

4                                    **OTHER AUTHORITIES**

5

6   10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure (2d ed. 1998) ................. 4

    Analysis of the Constitution of the Commonwealth of the Northern Mariana
7       Islands (Dec. 6, 1976) ...................................................................... 13, 14, 17, 22

8   Proclamation  No. 5564, 51 Fed. Reg. 40, 399 (Nov. 3, 1986) ................................ 13

9   Black's Law Dictionary 55  (9th deluxe ed. 2009) ..................................................... 14

    Black's Law Dictionary 558  (9th deluxe ed. 2009) ................................................... 13
10
    Howard P. Willens & Deanne C. Siemer, Northern Mariana Islands: Original
11      Historical Documents on Development as a U.S. Commonwealth,
        1960–1977 (N. Mar. Council for the Humanities, 2005) ....................................... 5
12
    Mar. Political Status Comm'n, Section–by–Section Analysis of the Covenant to
        Establish a Commonwealth of the Northern Mariana Islands (1975) ..................... 6
13
    Marianas Political Status Comm'n, Report of the Joint Drafting Comm. (1975)) ................. 2, 5
14
    Hearing to Approve "The Covenant to Establish a Commonwealth of the
15      Northern Mariana Islands" Before the Subcomm. on Territorial & Insular
        Affairs of the House Comm. on Interior & Insular Affairs, 94th Cong. 1st
        Sess. 376 (1975). ........................................................................................ 2

16

17

18

19

20

21

22

23

24

25

26

27

28

COMES NOW, Defendants, Commonwealth Election Commission ("CEC"), Francis M. Sablan, Chairperson of CEC, Robert A. Guerrero, Executive Director of CEC, and Eloy Inos, Governor of the Commonwealth of the Northern Mariana Islands (collectively "Defendants"), by and through counsel Charles E. Brasington, and both oppose Plaintiff John H. Davis, Jr.'s motion for summary judgment and move for summary judgment in Defendants' favor. Summary judgment is appropriate because there are no genuine issues of material fact, and Defendants are entitled to judgment as a matter of law. For the following reasons, the Court should deny Davis' motion for summary judgment and enter summary judgment in Defendants' favor.

## I.  STATEMENT OF UNDISPUTED FACTS

- Plaintiff John H. Davis, Jr. is a U.S. citizen, and a resident and registered voter of the Commonwealth of the Northern Mariana Islands ("Commonwealth"). (Davis' Decl., ¶ 2).

- Davis is not a person of Northern Marianas Descent ("NMD"). (*Id*. ¶ 3).

- Davis is eligible to vote pursuant to Article VII, § 1 of the Commonwealth Constitution. (*Id*. ¶ 4).

- Davis is a taxpayer in the Commonwealth. (*Id*. ¶ 6)

- Section 501 of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, 48 U.S.C. § 1801 note, ("Covenant") defines and governs the applicability of the U.S. Constitution to the Northern Mariana Islands. Covenant § 501.

- Section 805 of the Covenant authorizes the "Government of the Northern Mariana Islands" to "regulate the alienation of permanent and long term interests in real property so as to restrict the acquisition of such interests to persons of Northern Mariana Islands descent." Covenant § 805.

- The political union between the United States and the Commonwealth would not have

1

been possible without Covenant § 805. Marianas Political Status Comm'n, Report of the Joint Drafting Comm. 3 (1975), *reprinted in* Hearing to Approve "The Covenant to Establish a Commonwealth of the Northern Mariana Islands" Before the Subcomm. on Territorial & Insular Affairs of the House Comm. on Interior & Insular Affairs, 94th Cong. 1st Sess. 376 (1975).

- Article XII of the Commonwealth Constitution restricts ownership of long-term interests in land to "persons of Northern Marianas descent." NMI Const. art. XII, § 1.

- Article XII, § 4 of the Commonwealth Constitution defines a "person of Northern Marianas descent" as

    a person who is a citizen or national of the United States and who is at least one-quarter Northern Marianas Chamorro or Northern Marianas Carolinian blood or a combination thereof or an adopted child of a person of Northern Marianas descent if adopted while under the age of eighteen years. For the purposes of determining Northern Marianas descent, a person shall be considered to be a full-blooded Northern Marianas Chamorro or Northern Marianas Carolinian if that person was born or domiciled in the Northern Mariana Islands by 1950 and was a citizen of the Trust Territory of the Pacific Islands before the termination of the Trusteeship with respect to the Commonwealth.

    NMI Const. art. XII, § 4.

- Article XVIII, § 5(c) of the Commonwealth Constitution provides that voting on a proposed amendment to Article XII is "limited to eligible voters under Article VII who are also persons of Northern Marianas descent as described in Article XII, Section 4." NMI Const. art. XVIII, § 5(c).

- Article XVIII, § 5(c) was placed on the ballot by legislative initiative, and was approved by the voters of the Commonwealth, NMD and non-NMD alike, in 1999.

- Public Law 17-40 ("PL 17-40") implements and facilitates Article XVIII, § 5(c)'s mandate by establishing a "Northern Marianas Descent Registry," which catalogs individuals that would be eligible to vote on any proposed amendment to Article XII. *See*

2

PL 17-40.

- CEC has promulgated final regulations for the Descent Registry.

- Legislative Initiative 18-1, amending Commonwealth Constitution Article XII, will be decided in the next general election or a special election in the near future.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the party moving for summary judgment bears the ultimate burden of proof at trial, they must produce affirmative evidence establishing the undisputed material facts sufficient to satisfy each element of the cause of action. When the party moving for summary judgment does not bear the ultimate burden of proof at trial, the moving party may demonstrate its entitlement to summary judgment either by showing an absence of evidentiary support in the nonmoving party's case or by showing that the undisputed facts disprove a necessary element of a claim against them or satisfy each element of an affirmative defense. *See generally*, *Celotex Corp.*, 477 U.S. 317. In bringing a "defensive" motion for summary judgment, a moving party may satisfy its initial burden by either submitting evidence (affidavits or otherwise) to demonstrate its entitlement or it may merely pinpoint the nonmoving party's lack of evidence. *Id.*

"When the moving party has carried its burden under Rule 56(c),12 its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A 'scintilla

3

of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact." *United Steelworkers of America v. Phelps Dodge*, 865 F.2d 1539, 1542 (9th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). The party opposing "a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. "The party opposing summary judgment does not have a duty to present evidence in opposition to a motion under Rule 56 in all circumstances, however. [T]hat obligation does not exist when . . . the matters presented fail to foreclose the possibility of a factual dispute . . . ." 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2727 (2d ed. 1998). When the party opposing the motion does not offer counter-affidavits or other evidentiary material showing that a genuine issue of material fact remains, or does not show a good reason, why he is unable to present facts in opposition to the motion, judgment must be entered against him. *Id*. In considering a motion for summary judgment, the Court must consider the evidence and "the inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion." *Matsushita*, 475 U.S. at 587–588.

## III. ARGUMENT

### A.  Historical Background

Any discussion of the law pertaining to Article XII would be incomplete without a discussion of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("Covenant"), the document that defines the political relationship between the Commonwealth and the United States. Before negotiating the Covenant, the people of the Northern Mariana Islands had endured well over 300 years of domination and subjugation by foreign powers. Only after the Second World War, and the

4

institution of the Trust Territory of the Pacific Islands ("Trust Territory") did the people of the Northern Mariana Islands begin to exercise some degree of control and autonomy over their own affairs. While the rest of the Trust Territory debated the steps towards ending U.S. administration over their islands, the people of the Northern Mariana Islands decided to seek a closer, continuing relationship with the United States. Thus the Marianas Political Status Commission ("MPSC") and representatives of the United States went to work over four years negotiating the Covenant.

The negotiation and ratification of the Covenant by both parties is of immense significance. As a community with, at the very least, quasi-sovereign status, the people of the Northern Mariana Islands negotiated with the United States to determine the terms that would govern any resulting relationship with the United States. This allowed the people of the Northern Mariana Islands to exact certain concessions from the United States, and vice versa. "The drafters of the Covenant noted that without these provisions, 'the accession of the Northern Mariana Islands to the United States would not have been possible.'" *Northern Mariana Islands v. Atalig*, 723 F.2d 682, 686 (9th Cir. 1984) (involving Covenant § 501 and the application of the right to trial by jury) (quoting Marianas Political Status Comm'n, Report of the Joint Drafting Comm. 3 (1975))[1]; *see also Fleming v. Dep't of Pub. Safety*, 837 F.2d 401 (1988) (finding that the 11th Amendment does not apply to the Commonwealth in suits in federal court arising under federal law, as it is absent in Covenant § 501.); *Rayphand v. Sablan*, 95 F. Supp. 2d 1133, 1140 (D.N. Mar. I. 1999) (finding that Covenant § 203(c), allowing Rota and Tinian equal representation in the Commonwealth Senate, does not violate the Fourteenth Amendment's "one person, one vote" principle). Indeed, as explained by the Marianas Political Status Commission:

---

[1]    For a comprehensive accumulation of the documents relating to the drafting and ratification of the Covenant, see Howard P. Willens & Deanne C. Siemer, *Northern Mariana Islands: Original Historical Documents on Development as a U.S. Commonwealth, 1960–1977* (N. Mar. Council for the Humanities, 2005).

"The establishment of the commonwealth involves compromises and concessions which reflect the different historical and geographic interests of the major islands in the Northern Mariana group, as well as population." Mar. Political Status Comm'n, Section–by–Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands 25 (1975) [hereinafter Analysis of the Covenant].

The Commonwealth is unique: the Commonwealth is not a territory, it is something more; the Commonwealth is not a State, though it enjoys some powers of self-governance comparable to the States. The Commonwealth is in political union with the United States of America, a situation that is unprecedented in our country's history. The people of the Northern Mariana Islands District, exercising their sovereignty through their duly elected representatives, negotiated the terms of their relationship to the United States. The terms of the Covenant, to which the United States and the people of the Northern Mariana Islands agreed, apply to this case, and largely control the outcome. Ultimately, this Court should uphold the Covenant and honor the agreement entered into by the United States and the people of the Northern Mariana Islands by granting summary judgment in Defendants' favor.

**B.  Summary Judgment in Favor of Defendant Governor Inos and CEC .**

Defendants Governor Inos and CEC are entitled to summary judgment in their favor on all Causes of Action. The first five causes of action are not specifically pled against any individual, but rather "are generalized assertions that various CNMI laws violate the Fourteenth and Fifteenth Amendments." Order Dismissing Commonwealth Election Commission as Def. at 2, *Davis v. Commonwealth Election Comm'n*, Apr. 20, 2012, (No. 1-12-CV-1), ECF No. 40; Compl. ¶¶ 42–64. Causes of Action Six and Seven are pled against Defendants Sablan and Guerrero only. Compl. ¶¶ 65–73. No cause of action is specifically pled against Governor Inos or CEC. *See generally* Compl. Only the Eighth Cause of Action can be construed as being pled

against Governor Inos and the Commission, because it mentions "defendants" without specifying which named Defendants. Compl. ¶ 79. For the reasons set forth below, all Defendants are entitled to summary judgment on the Eighth Cause of Action. As a result of the foregoing, Governor Inos and CEC are entitled to summary judgment in their favor.

### C. Davis' Claims for Relief One Through Four Fail Because Davis Bases Them Solely on the United States Constitution.

Defendants are entitled to summary judgment on Davis' first four claims for relief because they are based solely on the U.S. Constitution. Davis' First and Second Claims for Relief allege that Article XVIII(5)(c) violates the Fourteenth and Fifteenth Amendments, respectively. Davis' Third and Fourth Claims for Relief allege that PL 17-40 violates the Fourteenth and Fifteenth Amendments, respectively. Federal law is clear that plaintiffs cannot base suits on the Constitution itself. *See, e.g.*, *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986); *Healy v. Ratta*, 292 U.S. 263, 270 (1934); *Magana v. Northern Mariana Islands*, 107 F.3d 1436, 1438 (9th Cir. 1997); *Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992) ("Plaintiff has no cause of action directly under the United States Constitution. We have previously held that a litigant complaining of a violation of a constitutional right must utilize 42 U.S.C. § 1983.").

Davis cannot base claims directly on the Fourteenth and Fifteenth Amendments because federal courts only have the power granted to them by Article III of the U.S. Constitution and statutes promulgated by Congress. "Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender*, 475 U.S. at 541. Furthermore, the language of the amendments themselves illustrates that statutes are needed to give them effect. Each of the Post Civil War Amendments gives *Congress* the power to enforce their provisions. U.S. Const. amend. XIV, § 5 ("The Congress shall have the power to enforce, by appropriate legislation, the

provisions of this article."), amend. XV, § 2 ("The Congress shall have the power to enforce this article by appropriate legislation."). In 1879, the Supreme Court explained:

> All of the amendments derive much of their force from this latter provision. It is not said the *judicial power* of the general government shall extend to enforcing the prohibitions and to protecting the rights and immunities guaranteed. It is not said that branch of the government shall be authorized to declare void any action of a State in violation of the prohibitions. It is the power of Congress which has been enlarged Congress is authorized to *enforce* the prohibitions by appropriate legislation.

*Ex parte Virginia*, 100 U.S. 339, 345–46 (1879). Therefore, be it by intent or historical circumstance, litigants cannot invoke the power of the Judicial Branch alone to enforce the Post Civil War Amendments. Defendants are entitled to summary judgment on Davis' first four Claims for Relief, because Davis bases those claims solely on the Fourteenth and Fifteenth Amendments, rather than on an Act of Congress.

### D.  42 U.S.C. § 1971 Does Not Create a Private Cause of Action.

Defendants are entitled to summary judgment on Davis' Fifth and Sixth Claims for Relief because there is no private cause of action under 42 U.S.C. § 1971. The Ninth Circuit Court of Appeal and the majority of federal circuit courts of appeal have held that 42 U.S.C. § 1971 is only enforceable by the U.S. Attorney General. *Olagues v. Russoniello*, 770 F.2d 791, 805 (9th Cir. 1985); *see also McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000); *Mixon v. Ohio*, 193 F.3d 389, 406 n.12 (6th Cir. 1999); *see also Gilmore v. Amityville Union Free Sch. Dist.*, 305 F. Supp. 2d 271, 279 (E.D.N.Y. 2004); *Spivey v. State*, 999 F. Supp. 987, 996 (N.D. Ohio 1998); *Willing v. Lake Orion Community Sch. Bd. of Trustees*, 924 F. Supp. 815, 819 (E.D. Mich. 1996); *Good v. Roy*, 459 F. Supp. 403 (D. Kan. 1978).[2] This conclusion is based on the language in 42 U.S.C. § 1971(c), which provides:

> Whenever any person has engaged or there are reasonable grounds to believe that

---

[2]    Only the Eleventh Circuit has held that private plaintiffs can enforce the guarantees in 42 U.S.C. § 1971. *Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003).

any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section, the *Attorney General* may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order.

42 U.S.C. § 1971(c) (emphasis added). Under the majority approach, plaintiffs cannot enforce any of the provisions in 42 U.S.C. § 1971 because Congress made the U.S. Attorney General the sole means of enforcing the provisions of § 1971. This is equally true when plaintiffs attempt to enforce § 1971 through 42 U.S.C. § 1983. *Broyles v. Texas*, 618 F. Supp. 2d 661, 697 n.11 (S.D. Tex. 2009) (surveying the case law on the subject).  Defendants are entitled to judgment as a matter of law on the Fifth and Sixth Causes of Action because 42 U.S.C. § 1971 does not create a private right of action.

### E.  Commonwealth Constitution Article XVIII, § 5(C), PL 17-40, and the Acts of Defendants Sablan and Guerrero Do Not Violate the Fifteenth Amendment.

Defendants are entitled to summary judgment because Article XVIII, § 5(c) does not violate the Fifteenth Amendment. The Fifteenth Amendment reads: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. Defendants Sablan and Guerrero are entitled to summary judgment because Article XII, § 4's definition of NMD is a political classification rather than a racial classification.

#### 1.  *Rice v. Cayetano*

As Davis asserts that *Rice v. Cayetano*, 528 U.S. 495 (2000), controls the outcome of this case, it is important to understand the statutes at issue in that case. *Rice* involved elections for trustees of the Office of Hawaiian Affairs ("OHA"), which administered various programs for the descendants of the indigenous inhabitants of the Hawaiian Islands. Under Hawaii statute, "Hawaiian" was defined as "any descendant of the aboriginal peoples inhabiting the Hawaiian

9

Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii." *Rice*, 528 U.S. at 509. Hawaii statute defined "Native Hawaiian" as:

> [A]ny descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778, as defined by the Hawaiian Homes Commission Act, 1920, as amended; provided that the term identically refers to the descendants of such blood quantum of such aboriginal peoples which exercised sovereignty and subsisted in the Hawaiian Islands in 1778 and which peoples thereafter continued to reside in Hawaii.

*Id*. at 510. Voting for OHA trustees was limited to "Hawaiians" and "Native Hawaiians." *Id*. at 509. The plaintiff, who did not fit the requisite definition,  attempted to register to vote for the OHA trustees, and was denied. *Id*. at 510. The plaintiff sued the Governor of Hawaii, claiming violation of his rights under the Fifteenth Amendment. *Id*.

The U.S. Supreme Court held that the voting restriction violated the Fifteenth Amendment. The State argued that the definitions were not racial, but were based on ancestry, rather than race. *Id*. at 514 ("[T]he State argues the restriction in its operation excludes a person whose traceable ancestors were exclusively Polynesian if none of those ancestors resided in Hawaii in 1778"). Significantly, the Court explained: "Ancestry can be a proxy for race. It is that proxy here." *Id*. The Court reasoned that the Hawaiian islands were isolated until 1778 and had formed a distinct culture, which the State was attempting to protect through voting restrictions. *Id*. at 514–15. Furthermore, the legislative history of the definitions in under consideration originally used the term "race" instead of "peoples," and the drafters expressly recognized the racial purpose. *Id*. at 515–16. The Court found: "The very object of the statutory definition in question . . . is to treat the early Hawaiians as a distinct people, commanding their own recognition and respect." *Id*. at 515. The Court accordingly held that the voting scheme for the OHA violated the Fifteenth Amendment.

The case at bar is readily distinguishable from *Rice*. First and foremost, unlike the definition at issue in *Rice*, Article XII, § 4 is not a proxy for race, though the definition does have ancestral aspects. The definition of NMD is intended to identify the people of the Northern Mariana Islands District of the Trust Territory, who, exercising their right to self-determination through their duly elected representatives, negotiated the terms of Covenant. The date to which Article XII, § 4 refers, *i.e.*, 1950 is much closer in time than the date used by the Hawaii definition, *i.e.*, 1778. Furthermore, unlike the Hawaii laws at issue in *Rice*, nothing in the legislative history of Article XII, § 4 indicates that the definition of NMD was intended to be a racial definition. Second, unlike Hawaii, the Commonwealth is not a State, and therefore the U.S. Constitution does not apply *ex proprio vigore*; rather its applicability is governed by the Covenant. The Covenant allows the "Government of the Northern Mariana Islands" to regulate the alienation of lands  "notwithstanding the other provisions of this Covenant, or those provisions of the Constitution, treaties or laws of the United States applicable to the Northern Mariana Islands ." Covenant § 805. The voters of the Commonwealth, properly considered to be the "Government of the Northern Mariana Islands" in a democracy, legitimately exercised this power by amending the Commonwealth Constitution to restrict the right to vote on amendments to Article XII, the Fifteenth Amendment notwithstanding.

2.    *Article XII, § 4's definition is not a racial classification.*[3]

Defendants are entitled to summary judgment, and Davis is not entitled to summary judgment, because neither Article XVIII, § 5(c) nor PL 17-40 violate the Fifteenth Amendment of the U.S. Constitution. Neither Article XVIII, § 5(c) nor PL 17-40 violate the Fifteenth

---

[3]    To the extent the Court finds that 42 U.S.C. § 1971 provides for a private cause of action, the following argument defeats Davis' Fifth Cause of Action because the distinction made by Articles XII, § 4, and Article XVIII, § 5(c) are not racial. Davis' Sixth Cause of Action is likewise defeated if Article XII, § 4's definition is found not to be racial, because the Davis and an NMD voter would share different qualifications, and CEC is applying the same standard to all individuals seeking to register to vote as NMDs.

Amendment of the U.S. Constitution because "person of Northern Marianas descent" ("NMD") is a political rather than racial classification. The Fifteenth Amendment only forbids restrictions on voting rights based on "race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. The U.S. Supreme Court has recognized that "[a]ncestry *can be* a proxy for race." *Rice*, 528 U.S. at 514 (emphasis added ) (citing *Guinn v. United States*, 238 U.S. 347 (1915)). However, ancestry is not *always* a proxy for race, and is not a proxy for race in this case.

The term "NMD" is a political classification that identifies as closely as possible the people of the Mariana Islands District of the Trust Territory, who, exercising their right to self-determination through their duly elected representatives, negotiated the Covenant. Article XII, § 4 states:

> A person of Northern Marianas descent is a person who is a citizen or national of the United States and who is of at least one-quarter Northern Marianas Chamorro or Northern Marianas Carolinian blood or a combination thereof or an adopted child of a person of Northern Marianas descent if adopted while under the age of eighteen years. For purposes of determining Northern Marianas descent, a person shall be considered to be a full-blooded Northern Marianas Chamorro or Northern Marianas Carolinian if that person was born or domiciled in the Northern Mariana Islands by 1950 and was a citizen of the Trust Territory of the Pacific Islands before the termination of the Trusteeship with respect to the Commonwealth.

NMI Const. art. XII, § 4. Although the foregoing definition has ancestral aspects, it is not a racial classification. Indeed, employing statutory analysis and an understanding of history places Article XII, § 4's definition in its proper historical and grammatical context.

The first reason that Article XII, § 4's definition is not racial is that it is not purely ancestral. Rather than relying wholly on ancestry like the scheme in *Rice*, Article XII, § 4's definition is also broadly based both on geography and relation back to an individual belonging to the community that negotiated the Covenant. Indeed, rather than being purely ancestral, an individual must meet two requirements before being considered a "full-blooded" NMD. First, the individual must have been "born or domiciled in the Northern Mariana Islands by 1950." NMI

Const. art. XII, § 4. Place of birth has nothing to do with race, and neither does the notion of "domicile," defined as "[t]he place at which a person has been [physically present and that the person regards as home; a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere." Black's Law Dictionary 558 (9th deluxe ed. 2009). Second, the individual must have been a citizen of the Trust Territory before its termination with respect to the Commonwealth. [4] The reason for this two-part requirement was to define as accurately as possible the community of individuals that exercised their self-determination through their duly elected representatives by negotiating the Covenant and joining the United States.

Indeed, the drafters of Article XII took pains to avoid using race to differentiate between individuals, for fear that it would be too exclusive. The purpose of the land restrictions was to implement the Covenant's goal "to preserve the character and strength of the communities that make up the Commonwealth," at least for the first 25 years after the termination of the Trusteeship. Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands 167 (Dec. 6, 1976) [hereinafter "Analysis of the Constitution"].[5] Article XII "reflects the importance of [land ownership] to the people of the Commonwealth and the judgment that only the people directly should be able to alter this provision." *Id*. at 164. When drafting Article XII:

> [T]he Convention sought to design restrictions that would include in the group eligible to own land *all those persons who are part of the community that has made the creation of the Commonwealth possible*, and to exclude as nearly as possible only those persons who are not part of that community.

*Id*. at 166 (emphasis added). "[T]he Convention avoided the use of any racial or ethnic classification to accomplish its purpose. Its classifications are based on neutral principles of

---

[4]    The Trusteeship terminated with respect to the Commonwealth on November 3, 1986. Proclamation No. 5564, 51 Fed. Reg. 40, 399 (Nov. 3, 1986).

[5]    The Analysis of the Constitution has been described by the Commonwealth Supreme Court as "extremely persuasive authority." *See, e.g.*, *Rayphand v. Tenorio*, 2003 MP 12 ¶ 71.

place of birth, domicile, incorporation and other essential attributes." *Id*. at 164. According to the Analysis of the Constitution: "The [Constitutional] Convention did not use a racial or ethnic classification for [defining a full blooded NMD]. *All persons* who were born in the Northern Mariana Islands by 1950 and who were citizens of the trust territory are defined as full-blooded [NMD]." *Id*. at 171. The Convention decided to exclude individuals that were not citizens of the trust territory at its termination because, "[b]y maintaining citizenship somewhere outside the Trust Territory, these persons indicated that their basic allegiance was elsewhere." *Id*. at 175. Article XII, § 4's definition of NMD is not racial because it is not based entirely on ancestry, but on racially neutral factors such as domicile, birth, and citizenship at a given point in time. Indeed, the language is inclusive, as it does not disqualify potential NMDs " because he or she is also part European, Asian, or African as a matter of race." *Rice*, 528 U.S. at 544 (Stevens, J. dissenting). Therefore, the purpose and intent behind Article XII, § 4's definition of NMD is to classify the community that negotiated the Covenant with the United States, not to classify or exclude a particular race.

Significantly, individuals who are not "racially" or ethnically Chamorro or Carolinian can qualify as NMDs under Article XII, § 4's definition. Individuals who are not born NMDs can become NMDs. Article XII, § 4's definition of NMD includes "an adopted child of a person of Northern Marianas descent if adopted while under the age of eighteen years." NMI Const. art. XII, § 4. Adoption is defined as "the relation of parent and child created by law between persons who are not in fact parent and child." Black's Law Dictionary 55 (9th deluxe ed. 2009). Adoption is a legal relationship, not a blood relationship based on ancestry. Furthermore, adoption does not alter an individual's race. If a "racially" Chamorro NMD adopts a Chinese or Filipino child, the child does not become "racially" Chamorro, but the child does qualify as an NMD. By contrast, a classification based on race cannot be changed; African Americans could

not circumvent Jim Crow laws by virtue of being adopted by white parents. This fact is vital for Fifteenth Amendment analysis, because, unlike race, the NMD designation is not necessarily established at birth. Not all NMDs are Chamorro or Carolinian, to the contrary, some NMDs do not have a drop of Chamorro or Carolinian "blood" in their veins. The inclusion of the adoption provision further conclusively demonstrates that ancestry is not a proxy for race in this case.

A consideration of groups excluded from the definition of NMD further demonstrates that Article XII, § 4's definition of NMD is not racial. Although the a majority of NMDs claim Chamorro or Carolinian ancestry, ethnicity is not at the heart of the Article XII, § 4's classification system. As explained above, the qualifications are based on geography, domicile and citizenship at a given point of recent history, rather than race. For example, Guamanian Chamorro or Yapese Carolinian would not qualify as an NMD, even though "racially" and "ethnically" affiliated with a Chamorro or Carolinian that "was born or domiciled in the Northern Mariana Islands by 1950 and was a citizen of the Trust Territory of the Pacific Islands before [November 3, 1986]." NMI Const. art. XII, § 4. Similarly, a Chamorro or Carolinian who "was born or domiciled in the Northern Mariana Islands by 1950" but who attained a citizenship other than that of the Trust Territory would not qualify as an NMD.

Article XII, § 4's definition of NMD is distinguishable from ancestral definitions that have been found to be a proxy for race. As explained above, the statutory definition of Hawaiian at issue in *Rice*, namely "any descendant of the indigenous people inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands prior to 1778," was entirely ancestral. *Rice*, 528 U.S. at 517. Furthermore, the date employed by the Hawaiian definition was highly dubious, since Hawaii was first "discovered" by European explorers in 1778, and was almost completely isolated from the rest of the world before that time. *Id*. Similarly, the Supreme Court invalidated an ancestral proxy in *Guinn v. United States*, 238 U.S.

347 (1915). In *Guinn*, Oklahoma required voters to read and write, unless the individual was descended from a "person who was, on January 1st, 1866, or any time prior thereto, entitled to vote under any form of government, or who at that time resided in some foreign nation." *Id*. at 357. The Supreme Court invalidated the requirement "because on its face and inherently considering the substance of things, that standard is a mere denial of the restrictions imposed by the prohibitions of the 15th Amendment, and by necessary result re-creates and perpetuates the very conditions which the Amendment was intended to destroy." *Id*. at 360. Furthermore, it is important to note that the scheme in *Guinn* was "part of a series of blatant efforts to exclude blacks from voting." *Rice*, 528 U.S. at 540 (Stevens, J. dissenting).

As the foregoing conclusively illustrates, Article XII, § 4's definition of NMD is substantially broader and less ancestral than either of the schemes in *Guinn* or *Rice*. The NMD classification is clearly different from that in *Guinn*. *Guinn* involved language whose sole purpose was to exclude formerly disenfranchised African Americans from voting, being anchored to a date before the Fourteenth and Fifteenth Amendments were passed by Congress or ratified by the States. The definition of "Hawaiian" in *Rice* was likewise exclusively ancestral, and based on relation back to a time period where the Hawaiian Islands were isolated from the rest of the world. *Rice*, 528 U.S. at 516. Article XII, § 4's definition is not entirely ancestral, and its ancestral aspects are outweighed by race-neutral factors such as birth, domicile, and citizenship, which serve to identify the community that exercised its right to self-determination through its duly elected representatives by negotiating the Covenant. Furthermore, the legislative history behind the definition of "Hawaiian" in *Rice* explicitly stated that ancestry was a proxy for race. *Rice*, 528 U.S. at 516. The drafters of the Commonwealth Constitution, by contrast, painstakingly avoided using racial classifications so as to include all of the permanent members of the island community existing at the time the Covenant was negotiated and the

Commonwealth Constitution drafted. Therefore, unlike *Rice* and *Guinn*, the NMD definition does not "single[] out 'identifiable classes of persons . . . solely because of their ancestry or ethnic characteristics.'" *Rice*, 528 U.S. at 515 (quoting *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987)).  Furthermore, neither of the limitations in *Guinn* or *Rice* could be defeated by adoption, and both related back to periods of time that made race an essential, indivisible component of the ancestral definition. Ultimately, the use of race-neutral criteria, allowing adoption, and the framers of the Commonwealth Constitution's efforts to keep the definition of NMD race-neutral distinguish Article XII, § 4's definition from the definitions in *Rice* and *Guinn*.

Defendants are entitled to summary judgment on Davis' Fifteenth Amendment claims because the term NMD is a political classification, not a racial classification. The definition of NMD uses race-neutral criteria, as its "classifications are based on neutral principles of place of birth, domicile, incorporation and other essential attributes." Analysis of the Constitution at 164. The definition of NMD in Article XII, § 4 identifies the community that exercised its right to self-determination by negotiating the Covenant and joining the United States, it does not, and was never intended to, elevate one race of people over another. The fact that Davis is excluded from the definition does not automatically render Article XVIII, § 5(c) and PL 17-40 violations of the Fifteenth Amendment. As the foregoing conclusively demonstrates, the NMD classification is not based on "race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. Thus, Article XVIII, § 5(c)'s limitation does not violate the Fifteenth Amendment. Defendants Sablan and Guerrero are accordingly entitled to summary judgment on Davis' claim that their actions violated the Fifteenth amendment. While the fact that NMD is not a racial classification is relevant to Davis' Fourteenth Amendment claims, resolving these claims requires further discussion.

17

**F. Commonwealth Constitution Article XVIII, § 5(C), PL 17-40, and the Acts of Defendants Sablan and Guerrero do not violate the Fourteenth Amendment.**

Defendants are entitled to summary judgment because restricting the right to vote on proposed amendments to Article XII to NMDs is valid under the Fourteenth Amendment. Although voting is normally considered a "fundamental right," the voting scheme created by Article XVIII, § 5(c) is constitutionally permissible as a "special interest" election, and constitutionally permissible in the Commonwealth under the *Insular Cases*. Finally, the Article XVIII, § 5(c) and PL 17-40 are narrowly tailored and necessary to accomplish the compelling state interest in allowing NMDs to decide the fate of one of the Covenant's most integral provisions.

*1.  Any vote on amending Article XII is a special limited purpose election that disproportionally impacts NMDs*

Article XVIII, § 5(c)'s limitations are acceptable because any vote to amend Article XII would be a special election that disproportionately affects NMDs, the community that exercised its fundamental right to self-determination by negotiating the Covenant. The constitutional rule of thumb for electoral schemes is "one person, one vote." *Reynolds v. Sims*, 377 U.S. 533 (1964). This rule is not without exception, however. In *Ball v. James*, 451 U.S. 355 (1981), and *Salyer Land Co. v. Tulane Lake Basin Water Storage Dist.*, 410 U.S. 719 (1973), the U.S. Supreme Court held that the "one person, one vote" rule did not apply to "special purpose elections." *Ball* and *Salyer* both involved elections to the governing bodies of water storage and reclamation districts, in which the ability to vote was restricted to land owners, and voting power was apportioned according to the amount of land each voter owned. In each case, the Supreme Court found that the voting scheme was permissible because the election was for a limited purpose, and restricted vote to persons that were disproportionally affected by the result. Article XVIII, § 5(c) is valid under the Fourteenth Amendment, because the election would be for a special, limited

18

purpose, and restricts the vote to NMDs, the group that will be disproportionately affected by any decision to amend Article XII.

Salyer and Ball both stand for the proposition that the "one person, one vote" rule does not apply to "special limited purpose" elections that restrict the right to vote to a group that is "disproportionately affected." Salyer involved the election of directors to the governing body of a water storage district. Salyer, 410 U.S. at 724. The California Water Code provided that "[o]nly holders of title to land are entitled to vote at a general election," and that "[e]ach voter . . . may cast one vote for each one hundred dollars . . . worth of his land." Id. at 724 n.5, n.6. The plaintiffs, landowners, lessees, and residents within the district, sued under 42 U.S.C. § 1983. Id. at 724. The Court noted that the defendant water district had "relatively limited [governmental] authority," limited to "provid[ing] for the acquisition, storage, and distribution of water for farming in the Tulare Lake Basin." Id. at 728. Most importantly, the water district's actions "disproportionately affect land owners," since the "costs of the district projects are assessed against land . . . in proportion to the benefits received," and delinquency results in "charges becom[ing] a lien on the land." Id. at 730. The Court conceded that other residents would be affected by the district's activities. Id. However, the Court pointed out that the "[s]ince assessments imposed by the district become a cost of doing business . . . , and that cost must ultimately be passed along to the consumers . . . , food shoppers in far away metropolitan areas are to some extent likewise 'affected' by the activities of the district." Id. at 730–31. The Court ultimately upheld the restriction. Id. at 732.

The Court reaffirmed its commitment to the "special limited purpose" election doctrine in Ball. Ball involved a water reclamation district that exercised far more power than in Salyer. Like the district in Salyer, the power to vote in Ball was limited to landowners and proportionate to the amount of land owned. Ball, 451 U.S. at 359. Unlike the district in Salyer, the district in

*Ball* exercised governmental powers such as "the power to condemn land, to sell tax-exempt bonds, and to levy taxes on real property." *Id*. at 360. Furthermore, the Court noted that "the District sells electricity to virtually half the population of Arizona, and . . . can exercise significant influence on flood control and environmental management within its boundaries." *Id*. The Supreme Court identified the issue as "whether the purpose of the District is sufficiently specialized and narrow and whether its activities bear on land owners so disproportionately as to distinguish the district from those public entities whose more general governmental functions demand application of the *Reynolds* principle." *Id*. at 363.

The Court held that the *Reynolds* rule did not apply. *Id*. First, although the *Ball* district exercised more functions and powers than the district in *Salyer*, it "simply [did] not exercise the sort of governmental powers that invoke the strict demands of *Reynolds*." *Id*. at 366. The district could not "enact any laws governing the conduct of citizens, nor does it administer . . . normal functions of government." *Id*. The Court did not consider the fact that the district provided power and water to urban areas constitutionally relevant. "A key part of the *Salyer* decision was that the voting scheme for a public entity like a water district may constitutionally reflect the narrow primary purpose for which the district is created." *Id*. at 369. The Court further found that the voting landowners were disproportionately affected by the district's decisions, since only landowners' land was subject to liens, only voting landowners were subject to the district's taxing power, and the voting landowners were "the only residents who have ever committed capital to the District through stock assessments charged by the Association." *Id*. at 370. The Court concluded:

> The *Salyer* opinion did not say that the selected class of voters for a special public entity must be the only parties at all affected by the operations of the entity, or that their entire economic well-being must depend on that entity. Rather, the question was whether the effect of the entity's operations on them was disproportionately greater than the effect on those seeking the vote.

*Id*. at 371. The purpose of Article XII and its relationship to the Covenant indicate that the "special limited purpose" election doctrine of *Ball* and *Salyer* applies with equal strength to proposed amendments to Article XII.

Defendants are entitled to summary judgment because an election pursuant to Article XVIII, § 5(c) qualifies as a "special limited purpose" election. Article XVIII, § 5(c) is strictly limited to proposed amendments of Article XII. An Article XVIII, § 5(c) election does not affect a governing body of any sort. An Article XVIII, § 5(c) election is one of "relatively limited authority" because "[Article XII's] primary purpose, indeed the reason for its existence" is "to protect [the people of the Northern Mariana Islands] against exploitation and to promote their economic advancement and self-sufficiency." *Salyer*, 410 U.S. at 728; Covenant § 805(a); *see also Wabol v. Villacrusis*, 958 F.2d 1450, 1461 (9th Cir. 1990). The Covenant permits restrictions on the alienation of land "in view of the importance of the ownership of land for the culture and traditions of the people of the Northern Mariana Islands, and in order to protect them against exploitation and to promote their economic advancement and self-sufficiency." Covenant § 805(a). Significantly, NMDs are disproportionally affected by any amendment to Article XII, because voting on amendments to Article XII affects protections that the people of the Northern Mariana Islands secured when negotiating the Covenant. This is not to say that NMDs would be the only ones "affected." *See Ball*, 451 U.S. at 371. Rather, the issue is whether the effect of amending Article XII would be "disproportionately greater than the effect on those seeking the vote." *Id*. Any amendment of Article XII would directly impact the rights that NMDs, through the MPSC, bargained for when entering the Covenant. This is significant because, as explained earlier, the people of the Northern Mariana Islands gave up their right to sovereignty by entering the Covenant.

Any amendment to Article XII directly affects the Covenant's protection of NMDs, as

well as the promotion of the people of the Northern Mariana Islands' economic advancement and self-sufficiency. The drafters of the Covenant and Commonwealth Constitution realized "[t]he people of the Northern Mariana Islands have had little opportunity to gain experience in land transactions of the kind that would be necessary to compete effectively against investors from other countries with well-developed economies." Analysis of the Constitution at 166. Indeed, "substantial economic and cultural dislocation would follow should this land be lost by transactions with outsiders." *Id.* at 165. This fact serves to justify the Commonwealth voters' decision to enact Article XVIII, § 5(c) and limit the right to vote on Article XII to NMDs.[6] *Cf. Salyer*, 410 U.S. at 732. Although the peoples of the Northern Mariana Islands have had more than 25 years to gain experience with business and land transactions, they would still be relinquishing significant rights and protections they bargained for when negotiating the Covenant by amending or repealing Article XII. This is significant, as NMD voters can decide to what extent Article XII is a benefit or a burden, whereas non-NMDs are likely to view Article XII as a burden without benefits. Article XVIII, § 5(c) places the decision to amend or repeal Article XII in the hands of the community that negotiated the Covenant, and the people Article XII and Covenant § 805 are designed to protect. Article XVIII, § 5(c) is therefore constitutionally valid because it involves the "special limited purpose" of amending Article XII, and restricts the vote to a class of individuals who would unquestionably be disproportionately affected by a decision to amend Article XII. Defendants are accordingly entitled to summary judgment in their favor.

> 2. Arti*cle XVIII, § 5(c) and PL 17-40 are narrowly tailored to serve a compelling state interest.*

Defendants are entitled to summary judgment because Article XVIII, § 5(c) and PL 17-40 are narrowly tailored to serve the Commonwealth's compelling interest in preserving protections

---

[6]        Importantly, it was the entire electorate, not merely NMDs that approved Article XVIII, § 5(c).

22

afforded to NMDs under integral provisions of the Covenant. The U.S. Supreme Court has stated that "in an election of general interest, restrictions on the franchise other than residence, age, and citizenship must promote a compelling state interest in order to survive constitutional attack." *Hill v. Stone*, 421 U.S. 289, 295 (1972).[7] Importantly, fundamental rights are not absolute or inviolable. *See, e.g.*, *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 (1961) (freedoms of speech and association are not absolute). When a State places a limitation on a fundamental right, the limitation is valid if the State proves that it is narrowly tailored and necessary to achieve a compelling governmental interest. *E.g.*, *Roe v. Wade*, 410 U.S. 113, 155 (1973); *Kramer v. Union Free Sch. Dist.*, 395 U.S. 621, 627 (1969); *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965). The Commonwealth has a compelling interest in ensuring that any change to integral provisions of the Covenant is decided by the individuals the Covenant seeks to protect. Article XVIII, § 5(c) and PL 17-40 are necessary to achieve this objective and are narrowly tailored because they rely on the definition of NMD that identifies the community that negotiated the Covenant, and which has been found valid in previous case law. *Wabol*, 928 F.2d at 1463. Without Article XVIII, § 5(c), individuals that have settled in the Commonwealth after the Covenant was entered into would be voting on the future of one of the most fundamental rights and protections that the peoples of the Northern Marianas bargained for and secured when entering the Covenant. PL 17-40 is necessary to ensure that only qualified individuals vote, and that eligible voters are not denied their right to cast a ballot.

Considering that the right to vote is fundamental, the voter qualifications in Article XVIII, § 5(c) and PL 17-40 are narrowly tailored and necessary to achieve a compelling governmental interest. Although the Supreme Court has not dictated a standard for determining

---

[7]     As explained earlier, the Supreme Court has found the right to vote is not fundamental in some instances, such as special limited purpose elections; in those cases, limitations on voter eligibility appear to have been analyzed using rational basis. *See Ball*, 451 U.S. at 371; *Salyer*, 410 U.S. at 731.

whether a given government interest is "compelling," federal courts have identified a number of governmental interests as "compelling." *Ashcroft v. ACLU*, 542 U.S. 656, 675 (2004) (protecting minors from sexually explicit materials is a compelling interest); *Howlett v. Salish & Kootenai Tribes*, 529 F.2d 233, 244 (9th Cir. 1976) (ensuring voters make educated choices is a compelling interest). The Commonwealth has a compelling interest in ensuring that the community that negotiated the Covenant decides the fate of one of the Covenant's core provisions, namely restrictions on land alienation, that are explicitly designed to protect the members of that community from exploitation. Covenant § 805. This interest is compelling because the Covenant was an agreement negotiated between two equal sovereigns, by which one of the sovereigns sacrificed its absolute right to self-governance in exchange for certain concessions. One of the most important terms of the Covenant was that the "Government of the Northern Mariana Islands" would regulate the alienation and acquisition of interests in real property. Covenant § 805. Covenant § 805 and Article XII were enacted "to prevent the inhabitants from selling their cultural anchor for short term gain, thereby protecting local culture and values and preventing exploitation of the inexperienced islanders at the hands of resourceful and comparatively wealthy businessmen." *Wabol*, 958 F.2d at 1461; Analysis of the Covenant at 116. Allowing all registered Commonwealth voters to decide the fate of Article XII has the potential to allow many "resourceful and comparatively wealthy businessmen" to vote to abolish the very protections that currently prevent them from exploiting the NMD population. Article XVIII, § 5(c)'s qualifications ensure that the voters deciding the fate of Article XII are individuals who belong to the community that negotiated the Covenant and who Article XII is designed to protect.

The voter qualifications in Article XVIII, § 5(c) and PL 17-40 are narrowly tailored. According to the U.S. Supreme Court, "a statute is narrowly tailored only if it targets and

eliminates no more than the exact source of the 'evil' it seeks to remedy." *Ward v. Rock Against Racism*, 491 U.S. 781, 804 (1989). The "evil" that Article XVIII, § 5(c)'s voter qualifications seek to prevent is individuals with little or no connection to Covenant § 805 from deciding the future of Article XII. Article XVIII, § 5(c) accomplishes this task by basing the voter qualifications entirely on Article XII's definition of "person of Northern Marianas descent." NMI Const. art. XVIII, § 5(c). Only those individuals that are protected by Covenant § 805 and Article XII are entitled to vote on a fundamental issue that affects their rights as negotiated under the Covenant.

> 3. *The right to vote on proposed amendments to Article XII is not "fundamental in an international sense."*

Article XVIII, § 5(c) and PL 17-40 are also permissible under the *Insular Cases*, because the U.S. Constitution does not have the same effect in unincorporated territories as it does in the several States. Although Covenant § 501(a) makes many provisions of the United States Constitution "applicable to the Northern Mariana Islands as if the Northern Mariana Islands were one of the several States," Covenant 501(b) exempts a number of Covenant provisions from the U.S. Constitution.[8] The *Insular Cases* apply to the Commonwealth in the areas where the § 501(b) exceptions apply. *Wabol*, 958 F.2d 1450; *Atalig*, 723 F.2d 682. "It is well established that the entire Constitution applies to a United States territory *ex proprio vigore*—of its own force— only if that territory is 'incorporated.'" *Wabol*, 958 F.2d at 1459. Only "fundamental" constitutional rights apply in unincorporated territories. *Id*. Whereas a right is "fundamental" under the Fourteenth Amendment when it "is necessary to an Anglo–American regime of

---

[8]     Covenant 501(b) states:

> (b) The applicability of certain provisions of the Constitution of the United States to the Northern Mariana Islands will be without prejudice to the validity of and the power of the Congress of the United States to consent to Sections 203, 506 and 805 and the proviso in Subsection (a) of this Section.

Covenant § 501(b).

ordered liberty," a right is "fundamental" in the territorial context only if it is one of "'those . . . limitations in favor of personal rights' which are 'the basis of all free government.'" *Id.* at 1460. In other words, a right under the U.S. Constitution is "fundamental" under the *Insular Cases* only where it is "fundamental in this *international* sense." *Id.* The question in this case is whether the right to vote on proposed amendments to Article XII, a constitutional provision that enacts one of the Covenant's core provisions, is "fundamental in an international sense."[9] *Id.* at 1460.

The *Insular Cases* apply to this case, because the power over the regulation of the alienation and acquisition of real property was given to the Commonwealth by Covenant § 805, which is exempt from otherwise applicable provisions of the Constitution. Covenant § 501(b). Article XVIII, § 5(c) and PL 17-40 are acceptable applications of Covenant § 805 because they provide for the manner in which the fate of land regulation will be decided. Section 805 states:

> [T]he *Government of the Northern Mariana Islands* . . . will until twenty-five years after the termination of the Trusteeship Agreement, *and may thereafter*, regulate the alienation of permanent and long-term interests in real property so as to restrict the acquisition of such interests to persons of Northern Mariana Islands descent.

Covenant § 805 (emphasis added).  In 1999, the voters of the Commonwealth, both NMD and non-NMD, voted to amend the Commonwealth Constitution pursuant to Legislative Initiative 11-1. The Commonwealth voters, acting as a whole pursuant to the procedures for amending the Commonwealth Constitution, can be properly understood as "the Government of the Northern Mariana Islands" in the most fundamental sense. *Compare Rice*, 528 U.S. at 528, n.1 (Stevens, J., dissenting). The 17th Commonwealth Legislature and Governor, which enacted and approved PL 17-40, are likewise properly understood as "the Government of the Northern Mariana Islands." A majority of Commonwealth voters decided to regulate the alienation of long-term

---

[9]    The rights inquiry is properly limited to the right to vote on proposed amendments to Article XII. Characterizing the right in question as the right to vote generally obscures the issue by stating it in overbroad terms.

interest in land by amending the Commonwealth Constitution to limit the right to vote on future amendments to Article XII.

The right to vote on proposed amendments to Article XII is not "fundamental in an international sense." In *Atalig*, the Ninth Circuit considered whether Commonwealth law's restriction of the right to jury trial violated the Sixth and Fourteenth Amendments of the U.S. Constitution. The court looked to the *Insular Cases* when analyzing whether the right to jury trial was "one of 'those fundamental limitations in favor of personal rights' which are 'the basis of all free government.'" *Id*. at 690 (quoting *Dorr v. United States*, 195 U.S. 138, 146 (1904)). The court noted that the U.S. Supreme Court had stated that "[a] criminal process which was fair and equitable but used no juries is easy to imagine." *Id*. at 689 (quoting *Duncan v. Louisiana*, 391 U.S. 145, 150 n.14 (1968)). Finally, the court observed that "the NMI does not dispense entirely with trial by jury in criminal cases and that both the Covenant and NMI constitution provide criminal defendants with the other procedural safeguards guaranteed by the Bill of Rights." *Id*. at 690. The court therefore concluded that the right to jury trial in all criminal cases was not a "fundamental right" under the *Insular Cases*. *Id*.

*Wabol* also supports a finding that the right to vote on proposed amendments to Article XII is not "fundamental in an international sense." In *Wabol*, the Ninth Circuit found that the restriction on the alienation of land in the Covenant and Article XII did not violate the Fourteenth Amendment. 958 F.2d at 1462. The court explained that "land is principally important in the Commonwealth not for its economic value but for its stabilizing effect on the natives' social system," and that Article XII was designed "to prevent the inhabitants from selling their cultural anchor for short term gain, thereby protecting local culture and values and preventing exploitation of the inexperienced islanders at the hands of resourceful and comparatively wealthy businessmen." *Id*. at 1461. The court also observed that "[t]he legislative

history of the Covenant and Constitution indicate that the political union of the Commonwealth and the United States could not have been accomplished without the restrictions." *Id.* The court eloquently explained: "The Bill of Rights was not intended to interfere with the performance of our international obligations. Nor was it intended to operate as a genocide pact for diverse cultures. Its bold purpose was to protect minority rights, not enforce homogeneity." *Id.* at 1462. The court stated that the restriction "was understandable" "[w]here land is so scarce, so precious, and so vulnerable to economic predation." *Id.* at 1462.

Federal courts also considered the "one person, one vote" principle in *Rayphand v. Sablan*, 95 F. Supp. 2d 1133 (D.N. Mar. I. 1999). The plaintiffs in *Rayphand* challenged the constitutionality of the Commonwealth's "malapportioned Senate," which grants three senators each to Saipan, Tinian, and Rota, rather than apportioning the number of senators on the basis of population. 95 F. Supp. 2d at 1136. The court characterized the issue as "whether the 'one man, one vote' requirement applicable to the states by *Reynolds* is [a] right that is 'the basis of all free government.'" *Id.* at 1140. As in *Wabol*, the court noted that "without the express condition of equal representation in the Senate, the islands of Rota and Tinian would not have agreed to join the union with Saipan." *Id.* at 1136. The court held that the "one person, one vote" doctrine was not a right that is "the basis of all free government" because "[s]everal countries that are considered to have 'free government' have a bicameral legislative [sic.] in which one house is malapportioned." *Id.* at 1140. The U.S. Senate is a prime example of this phenomenon.

Defendants are entitled to summary judgment because neither PL 17-40 nor Article XVIII, § 5(c) violate the Fourteenth Amendment since the right to vote on proposed amendments to Article XII is not "fundamental in an international sense." First, neither the right to own real property nor the "one person, one vote rule" are "fundamental in an international sense," nor are they "rights that are the basis of free government." *Wabol*, 958 F.2d at 1462; *Rayphand*, 95 F.

Supp. 2d at 1140. Article XVIII, § 5(c) is a reasonable application of those principles. If neither the right to own land, nor the right to "one person, one vote" are rights that are the "basis of free government," then it stands to reason that equal voting rights are not "fundamental" as to proposed amendments to Article XII. Furthermore, the right to vote is not unqualified, as even the paragons of western democracy require voter eligibility criteria such as citizenship, residency, age, competency, and criminal status. Many criteria, such as residency and citizenship, ensure that the individual has an actual stake in the election. Article XVIII, § 5(c) merely adds an additional voting criteria to a single, extremely limited class of elections, proposed amendments to Article XII, that disproportionately affect NMDs. Article XVIII, § 5(c) is not based on race, nor does it create an arbitrary classification. Article XVIII, § 5(c) merely places the decision on amending or repealing Article XII in the hands of the individuals that it was designed to protect. Indeed, Article XVIII, § 5(c) is logical and compelling extension of Article XII and Covenant § 805 that prevents "resourceful and comparatively wealthy" outsiders to repeal Article XII as an end run around the protections secured by the community that negotiated the Covenant.

### 4. Article XVIII, § 5(c) and PL 17-40 do not violate the Fourteenth Amendment

Defendants are entitled to summary judgment because neither Article XVIII, § 5(c) nor PL 17-40 violate the Fourteenth Amendment. Article XVIII, § 5(c) and PL 17-40 do not violate the Fourteenth Amendment because plebiscites on proposed amendments to Article XII are special limited purpose elections, and the right to vote on proposed amendments to Article XII is not "fundamental in an international sense." Article XVIII, § 5(c) is strictly limited to proposed amendments to Article XII, a limited issue that disproportionately affects NMDs. Although non-NMD voters certainly have an interest in voting on issues of public concern, the constitutional inquiry is "whether the effect of [amending Article XII] on [NMDs] is disproportionately greater

than the effect on those seeking the vote." *Ball*, 451 U.S. at 371. NMDs would clearly be disproportionately affected by any decision to amend or repeal Article XII, as they would be giving up the cultural and economic protections they bargained for when entering the Covenant. The "special limited purpose" election doctrine is even more compelling in this case in light of the *Insular Cases*. The right to vote for proposed amendments to Article XII is not "fundamental in an international sense." Federal case law establishes that neither the right to own land nor the right to an equal vote in Commonwealth Senate elections are "fundamental in an international sense." *Wabol*, 958 F.2d at 1462; *Rayphand*, 95 F. Supp. 2d at 1140.  Article XVIII, § 5(c) is a narrow limitation that the voters of the Commonwealth felt was necessary in light of the Covenant and the Commonwealth's history and culture. In sum, Article XVIII, § 5(c) is a narrow restriction of a non-fundamental right for the "special limited purpose" of voting on proposed amendments to Article XII, a decision that "disproportionately affects" NMDs as it pertains to protections in an integral section of the Covenant.

### G.  Davis' Taxpayer Standing Action Fails as a Matter of Federal Law.

The Commonwealth is entitled to summary judgment on Davis' taxpayer claim for two important reasons. First, well-established U.S. Supreme Court precedent makes clear that state taxpayer actions do not meet Article III's "case or controversy" requirement. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006);  *Doremus v. Brd. of Ed. of Borough of Hawthorne*, 342 U.S. 429 (1952). Second, the Northern Marianas Descent Registry ("NMDR") is used for other important governmental purposes unrelated to voter registration.

### 1.  *Davis lacks standing to bring a state taxpayer suit in federal court.*

The Commonwealth is entitled to summary judgment on Davis' taxpayer cause of action because Davis lacks standing to bring a state taxpayer action in federal courts. Federal courts' jurisdiction are subject to Article III's "case-or-controversy" requirement. *DaimlerChrysler*

*Corp*, 547 U.S. at 342. "The 'core component' of the requirement that a litigant have standing to invoke the authority of a federal court 'is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The elements of standing are well established: "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). The U.S. Supreme Court has made unambiguously clear that there is no federal taxpayer standing. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982); *United States v. Richardson*, 418 U.S. 166 (1974); *Frothingham v. Mellon*, decided with *Massachusetts v. Mellon*, 262 U.S. 447 (1923). The U.S. Supreme Court has likewise made equally clear that "[t]he . . . rationale for rejecting federal taxpayer standing applies with undiminished force to state taxpayers." *DaimlerChrysler Corp.*, 547 U.S. at 345; *Doremus*, 342 U.S. at 433–434. "Standing has been rejected in such cases because the alleged injury is not 'concrete and particularized,' but instead a grievance the taxpayer 'suffers in some indefinite way in common with people generally.'" *Id.*, at 344 (internal citations omitted). Furthermore, the injury alleged in a taxpayer action is also "conjectural or hypothetical" where "it depends on how legislators respond" to a change in revenue. *Id.*; *see also Arakaki v. Lingle*, 477 F.3d 1048, 1064 (9th Cir. 2007). Finally, claims based on taxpayer status fail the standing doctrine's redressability requirement, because "establishing redressability requires speculating that abolishing the challenged credit will redound to the benefit of the taxpayer because legislators will pass along the supposed increased revenue in the form of tax reductions." *DaimlerChrysler Corp.*, 547 U.S. at 344. As a practical matter, the *DaimlerChrysler Corp.* Court noted:

> [B]ecause state budgets frequently contain an array of tax and spending provisions, any number of which may be challenged on a variety of bases,

31

1
2
3
4

affording state taxpayers standing to press such challenges simply because their tax burden gives them an interest in the state treasury would interpose the federal courts as "'virtually continuing monitors of the wisdom and soundness'" of state fiscal administration, contrary to the more modest role Article III envisions for federal courts.

*Id.* at 346.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

The U.S. Supreme Court has recognized but a single exception to the rejection of taxpayer standing in federal courts: "a taxpayer will have standing consistent with Article III to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of" the Establishment Clause of the First Amendment. *Flast v. Cohen*, 392 U.S. 83, 105–106 (1968). The reason for this sole exception is that "[t]he Establishment Clause . . . of the First Amendment operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power conferred by Art. I, s 8." *Id.* at 104. The Court noted that "[w]hether the Constitution contains other specific limitations can be determined only in the context of future cases." *Id.* at 105. Despite this observation, however, the Court has subsequently declined to extend this exception beyond the Establishment Clause. *DaimlerChrysler Corp.*, 547 U.S. at 347–48 (declining to extend the *Flast* exception to the Commerce Clause); *Bowen v. Kendrick*, 487 U.S. 589, 618 (1988) ("Although we have considered the problem of standing and Article III limitations on federal jurisdiction many times since [*Flast*], we have consistently adhered to *Flast* and the narrow exception it created to the general rule against taxpayer standing."); *Arakaki*, 477 F.3d at 1064–65 (declining to extend the *Flast* exception to the Equal Protection Clause.).[10]

24
25
26

Davis' taxpayer standing claim cannot be saved by federal subject matter jurisdiction. First and foremost, Davis has not invoked 28 U.S.C. § 1367 to allow this Court to consider his

27
28

---

[10]    Importantly, although the Court of Appeals for the Ninth Circuit formerly recognized state taxpayer standing, *see Hoohuli v. Ariyoshi*, 741 F.2d 1169 (9th Cir. 1984), it has explicitly overruled that precedent in light of *DaimlerChrysler. Arakaki v. Lingle*, 477 F.3d 1048, 1062 (9th Cir. 2007).

state law cause of action. Compl. ¶ 2, ECF No. 1. The failure to invoke this Court's supplemental jurisdiction alone is fatal to the Eighth Cause of Action. However, the *DaimlerChrysler* Court considered supplemental jurisdiction in the context of state taxpayer actions. The procedural posture of *DaimlerChrysler* was distinguishable from the posture of this case, albeit in an immaterial respect, as the *DaimlerChrysler* case was initially filed in state court and removed to federal court. *DaimlerChrysler*, 547 U.S. at 339. Accordingly, the *DaimlerChrysler* plaintiffs were forced to rely on the supplemental jurisdiction propounded by *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966), which held that "federal-question jurisdiction over a claim may authorize a federal court to exercise jurisdiction over state-law claims that may be viewed as part of the same case because they 'derive from a common nucleus of operative fact' as the federal claim." *DaimlerChrysler*, 547 U.S. at 351. The Court rejected the plaintiffs' reliance on *Gibbs*. *Id*. at 352. The Court explained that *Gibbs* could not be applied so as "to permit a federal court to exercise supplemental jurisdiction over a claim that does not itself satisfy those elements of the Article III inquiry, such as constitutional standing, that 'serv[e] to identify those disputes which are appropriately resolved through the judicial process.'" *Id*. at 351–52 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The Court reaffirmed the principle that "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler*, 547 U.S. at 352. Even though Commonwealth Constitution Article X, § 9 confers taxpayer standing in Commonwealth courts, litigants seeking to avail themselves of Article X, § 9 in federal courts must still independently satisfy Article III's standing requirement. In light of the U.S. Supreme Court's near-wholesale rejection of taxpayer standing in federal courts, absent a claim based on the Establishment Clause it is well-nigh impossible for any litigant to enforce Commonwealth Constitution Article X, § 9 in federal court.

The Commonwealth is entitled to summary judgment on Davis' Eighth Claim for Relief because Davis lacks standing to bring a state taxpayer action in federal courts. Davis lacks standing as a taxpayer because the injury alleged by Davis is not "concrete and particularized," as the grievance he alleges is one that he "suffers in some indefinite way in common with people generally." *DaimlerChrysler Corp.*, 547 U.S. at 344. Second, the injury alleged by Davis is "hypothetical and conjectural" because it requires the Court to speculate as to "how legislators respond" to changes in revenue. *Id.* Third, establishing redressability requires the Court to speculate that enjoining the expenditure of public funds for the NMDR will "redound to the benefit of [Davis] because legislators will pass along the supposed increased revenue in the form of tax reductions." *Id.* Importantly, as Davis' taxpayer claim is not based on the Establishment Clause, *Flast*—the only recognized exception to the rejection of taxpayer standing—does not apply. Finally, supplemental jurisdiction does not save the Eighth Cause of Action because: (1) Davis has not invoked 28 U.S.C. § 1367; and (2) Davis must still satisfy Article III's standing requirement, which, for the foregoing reasons, he cannot. The Commonwealth is entitled to summary judgment because Davis' lack of standing precludes this Court from exercising jurisdiction over Eighth Cause of Action.

> ### 2. *The Northern Marianas Descent Registry has as other public purposes unrelated to voter registration.*

As to the merits, the Commonwealth is entitled to summary judgment because the NMDR serves other important public purposes unrelated to voter registration. Public Law 17-40 provides that "the NMDR is the only one authorized to be established in the Commonwealth," and forbids other Commonwealth entities from "establishing within their respective offices registry of persons of Northern Marianas descent." PL 17-40, § 2(a). Furthermore, PL 17-40 explicitly abolished the Marianas Public Land Authority's pre-existing registry of persons of Northern Marianas descent. PL 17-40, § 2(c)(2). The NMDR serves as the central registry of

individuals of Northern Marianas Descent, and the NMDR's Official Northern Marianas Descent Identification Card ("ONMDIC") serves to establish NMD status to Commonwealth and Federal government agencies. PL 17-40, § 3(c). Public Law 17-40 explicitly provides that the Department of Public Lands may require the ONMDIC "to ensure that the individual applying for village or agricultural homestead in the Commonwealth is of Northern Marianas descent." PL 17-40, § 3(b). Importantly, Article XII exists independently of Article XVIII, § 5(c), and has been held constitutional by the Ninth Circuit. *Wabol*, 958 F.2d at 1461. Furthermore, PL 17-40 contains a severability clause that would save the non-voting purposes of the NMDR in the event that this Court finds the provisions related to voting to be unconstitutional. The NMDR therefore serves important public purposes within the meaning of Commonwealth Constitution Article X, § 9, and the Commonwealth is therefore entitled to summary judgments on the merits of Davis' Eighth Claim for Relief.

## IV. CONCLUSION

For the foregoing reasons, there are no issues of material fact and the Defendants entitled to judgment as a matter of law. Defendants respectfully request this Court to enter summary judgment in their favor.

RESPECTFULLY SUBMITTED.

DATED: March 20, 2014

OFFICE OF THE ATTORNEY GENERAL


/s/_____
Charles E. Brasington
Attorney for Defendants

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been electronically filed this 20th day of

March 2014, with service requested to all parties of record.

OFFICE OF THE ATTORNEY GENERAL


/s/_____
Charles E. Brasington
Assistant Attorney General