OFFICE OF THE ATTORNEY GENERAL
Joey P. San Nicolas (F0342)
Attorney General
Charles E. Brasington (F0476)
Assistant Attorney General
Hon Juan A. Sablan Mem. Bldg., 2nd Floor
Saipan, MP  96950-8907
Tel:     (670) 664-2393
Fax:    (670) 664-2349
e-mail: charles.brasington.law@gmail.com

*Attorneys for Defendants*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| **JOHN H. DAVIS, JR.**<br><br>**Plaintiff,**<br>v.<br><br>**COMMONWEALTH ELECTION COMMISSION; FRANCIS M. SABLAN, Chairperson of the Commonwealth Election Commission; ROBERT A. GUERRERO, Executive Director of the Commonwealth Election Commission; ELOY INOS, Governor of the Commonwealth of the Northern Mariana Islands.**<br><br>**Defendants.** | CIVIL CASE No. 14-0002<br><br>**REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT**<br><br>**Judge:** Ramona V. Manglona<br><br>**Date:** April 24, 2014.<br><br>**Time:** 1:30 P.M. |

COMES NOW, Defendants, Commonwealth Election Commission ("CEC"), Francis M. Sablan, Chairperson of CEC, Robert A. Guerrero, Executive Director of CEC, and Eloy Inos, Governor of the Commonwealth of the Northern Mariana Islands (collectively "Defendants"), by and through counsel, Charles E. Brasington, and reply to Plaintiff John H. Davis, Jr.'s Opposition to Defendants' Cross-Motion for Summary Judgment. Summary judgment is appropriate because there are no genuine issues of material fact, and Defendants are entitled to judgment as a matter of law.

## I. DAVIS LACKS STANDING TO BRING A STATE TAXPAYER ACTION IN FEDERAL COURT.

Defendants are entitled to summary judgment on Davis' Eighth Claim for Relief because Davis lacks standing to bring a State taxpayer action in federal court, and even if he did, PL 17-40 has other legitimate public purposes. As an initial matter, Defendants concede that the Court can consider and apply supplemental jurisdiction *sua sponte*, and that under federal courts' liberal pleading standards, the Court could allow Davis to amend his complaint. Nevertheless, neither of these concessions saves Davis' Eighth Claim for Relief because taxpayer lawsuits simply do not satisfy Article III's case and controversy standing requirement. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006). As Defendants exhaustively demonstrated in the underlying Cross Motion, this is the clearly established law of the U.S. Supreme Court and the Ninth Circuit. *Id.*; *Arakaki v. Lingle*, 477 F.3d 1048, 1064 (9th Cir. 2007). Furthermore, Defendants have already explained that the Northern Marianas Descent Registry serves other public purposes. For these reasons and the reasons set forth in Defendants' Cross Motion, the Court should enter summary judgment in Defendants' favor on Davis' Eighth Claim for Relief.

## II. DEFENDANTS STAND BY MOST ARGUMENTS PRESENTED IN THEIR CROSS MOTION.

In light of page limitations, Defendants will stand by the arguments made in Sections III. A–D, and Section III.F. in order to focus on the issue at the heart of this case: race.

### III. ARTICLE XII, § 4'S DEFINITION OF NMD IS NOT RACIAL.

Defendants are entitled to summary judgment on Plaintiff's Fifteenth Amendment claims because the definition of "person of Northern Marianas Descent" ("NMD") in Article XII, § 4 is a political, *not racial*, classification identifing the community that negotiated the Covenant.[1] This argument is bolstered by the sources the Court identified in its Notice of Intent to Take Judicial Notice (collectively "Judicial Notice Documents") after the initial briefs were filed. Notice of Intent to Take Judicial Notice 1, Mar. 24, 2014, ECF No. 11. These sources—especially Alexander Spoehr, *Saipan: The Ethnology of a War-Devastated Island*, Feldiana: Anthropology 41 (1954) [hereinafter Spoehr, *Saipan*], and Office of the Chief of Naval Operations, *Handbook on the Trust Territory of the Pacific Islands* (Navy Dep't 1949) [hereinafter *Navy Handbook*]— provide documentary evidence that the definition of NMD is a political classification rather than a racial classification. To the extent that the Court has not officially taken judicial notice of the Judicial Notice Documents, Defendants hereby move for the Court to take such notice pursuant to Federal Rule of Evidence 201(c)(2).

Article XII, § 4's definition of NMD is not racial because it relies primarily on race-neutral attributes such as birth place, domicile, and citizenship. Article XII, § 4 provides:

> A person of Northern Marianas descent is a person who is a citizen or national of the United States and who is of at least one-quarter Northern Marianas Chamorro or Northern Marianas Carolinian blood or a combination thereof or an adopted child of a person of Northern Marianas descent if adopted while under the age of eighteen years. For purposes of determining Northern Marianas descent, a person shall be considered to be a full-blooded Northern Marianas Chamorro or Northern Marianas Carolinian if that person was born or domiciled in the Northern Mariana Islands by 1950 and was a citizen of the Trust Territory of the Pacific Islands before the termination of the Trusteeship with respect to the Commonwealth.

NMI Const. art. XII, § 4. The documentary and statistical evidence contained in the Judicial Notice Documents underscores the heterogeneity of the population of the Northern Mariana

---

[1] Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, 48 U.S.C. § 1801 note.

Islands in 1950. Furthermore, the *Navy Handbook's* historical account of the plight of the Chamorro people under their various overlords demonstrates that the Chamorro population was quite heterogeneous from an ethnic perspective by 1950. *Navy Handbook* at 37–40. Ultimately, Article XVIII, § 5(c) does not violate the Fifteenth Amendment because the definition of NMD "excludes no descendant of a [1950] resident because he or she is also part European, Asian, or African as a matter of race." *Rice v. Cayetano*, 528 U.S. 495, 544 (2000) (Stevens, J., dissenting).[2]

### A. The population of the Northern Mariana Islands in 1950 was heterogeneous.

The Judicial Notice Documents establish that the population of the Northern Mariana Islands was surprisingly heterogeneous in 1950. It was this heterogeneity that prompted the framers of the Commonwealth Constitution to base the definition of NMD on "neutral principles of place of birth, domicile, incorporation and other essential attributes." Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands 164 (Dec. 6, 1976) [hereinafter "Analysis"].

All of the Judicial Notice Documents demonstrate that there were "non-native" inhabitants residing in the Trust Territory. The annual reports on the Administration of the Trust Territory categorize the permanent resident population of the Trust Territory into three groups: (1) "American" (excluding administrative or military personnel); (2) "Native"; and (3) "Other." Report on the Administration of the Trust Territory of the Pacific Islands for the Period July 1, 1948 to June 30, 1949, Statistical Supplement: Population at I (Navy Dep't 1949); Report on the Administration of the Trust Territory of the Pacific Islands for the Period July 1, 1949, to June 30, 1950, at 63 (Dep't of the Navy 1950); Report on the Administration of the Trust Territory of

---

[2] Defendants strongly urge the Court to seriously consider the arguments made in Part III of Justice Stevens dissent in *Rice*. 528 U.S. at 538–46. Defendants believe the arguments contained therein apply with great force to the case at bar.

the Pacific Islands for the Period July 1, 1951, to June 30, 1952, at 67 (Dep't of the Interior, 1952).[3] This tripartite categorization demonstrates that the peoples indigenous to the Northern Mariana Islands were not the only permanent residents in the 1950. The *Navy Handbook* similarly breaks down the population of the "Northern Marianas: Saipan District" into three groups: (1) "Islanders"; (2) "Whites"; and (3) "Asiatics." *Navy Handbook* at 35. Spoehr's work breaks the population of Saipan into two groups: Chamorro and Carolinian. Spoehr, *Saipan* at 372. However, the body of Spoehr's work indicates that the population of Saipan was more diverse than these categorization would otherwise imply.

Spoehr's work includes a more detailed accounting of Saipan's population, and should be considered in detail. Spoehr explains that "[t]he Chamorros have a long history of intermarriage with Spanish, other Europeans, Americans, Filipinos and . . . Japanese." Spoehr, *Saipan* at 28. Spoehr notes: "At the present time (1950) there are eleven Japanese adults living on Saipan who either are or have been married to Chamorros. In addition, there is a larger group which is the offspring of Japanese-Chamorro unions in the past." *Id*. Spoehr continues: "On Saipan today there are also five Filipinos, all married to Chamorros, *who intend to make Saipan their permanent home*. There is also one long-time resident who originally came from Santiago, Chile, *married a Chamorro and has reared a family to adulthood*." *Id*. (emphasis added). Finally, Spoehr explains that there are residents from other Micronesian islands: "There are two full-blood men from the Marshalls living on Saipan and married to Carolinians. There is also a resident of Saipan who is of mixed German, Portuguese, and Marshallese descent. He is married to a Chamorro." *Id*.

---

[3] Importantly, according to "American census arrangements" at the time, "persons of mixed [ancestry] [we]re required to be classified according to their 'accepted social position in the local community'; if this [was] not practical, then according to the 'race of the mother.'" *Navy Handbook* at 66.

4

The *Navy Handbook* is similarly useful in explaining the extent of voluntary migration of Trust Territory residents, and American policy regarding population movement within the Trust Territory. The *Navy Handbook* makes clear: "A major feature of postwar American policy has been to get the islanders *back to the places they count as home, or in which they want to live*." *Navy Handbook* at 49 (emphasis added). Therefore, "[m]inimum impediment [was] placed upon interterritorial travel of islanders in the postwar period." *Id*. The new-found, or more accurately newly restored, freedom of movement allowed migration of individuals to the places they identified as home. Indeed, several hundred individuals immigrated to the Marianas from Chamorro colonies in Yap and Palau. *Id*. at 50. While U.S. policy "disallow[ed] immigration of private persons to the territory," the American liberators discovered some non-indigenous residents, including a "white Russian in Saipan" and "a Cuban married to a Chamorro girl." *Id*. at 65. Several individuals of Asian descent were also allowed to remain in the Trust Territory. *Id*. The *Navy Handbook* notes that "nearly all of them are married to islanders, or are children adopted by island families." *Id*. Indeed, these non-indigenous residents were "generally living, *and fully accepted, as members of island communities*, and [were] vouched for by missionaries and other local leaders." *Id*. (emphasis added). Furthermore, some Chamorros and Carolinians from the Northern Mariana Islands voluntarily migrated to Guam, either permanently or temporarily for study or specialized training. *Id*. at 44, 49–50.

The framers of the Commonwealth Constitution considered the foregoing when defining "person of Northern Marianas Descent." It is certainly true that the Analysis states:

> Throughout the history of the Northern Mariana Islands, those who considered themselves as people of the Northern Mariana Islands have been the Chamorros and Carolinians who settled on the various islands, formed a cohesive social group, worked for the political and economic betterment of the Northern Mariana Islands, and considered these islands their home.

5

Analysis at 171. However, this does not mean that Article XII, § 4's definition automatically excluded individuals that were not ethnically Chamorro or Carolinian. Indeed, the Analysis continues: "The Convention did not want to use a racial or ethnic classification for this purpose. *All persons* who were born in the Northern Mariana Islands and who were citizens of the Trust Territory are defined as full-blooded Northern Marianas Chamorros or Northern Mariana Islands Carolinians."[4] *Id*. (emphasis added). The Analysis seems to assume that some individuals included in the definition would not be "racially" Chamorro or Carolinian. The Analysis provides:

> [T]he Convention sought to design restrictions that would include in the group eligible to own land *all those persons who are part of the community that has made the creation of the Commonwealth possible*, and to exclude as nearly as possible only those persons who are not a part of that community.

*Id*. at 167 (emphasis added). The Analysis continues: "The Convention has erred on the side of including a few of those persons who should be excluded *rather than excluding any of those persons who should be included*." *Id*. (emphasis added). Therefore, when drafting Article XII, § 4, the framers of the Commonwealth Constitution intentionally avoided creating a racial definition, opting instead for race-neutral attributes such as domicile and place of birth.

**B. The definitions at issue in *Rice v. Cayetano* are readily distinguishable.**

Although the definition has ancestral aspects, it is not a proxy for race in this case, and is readily distinguishable from the definitions at issue in *Rice v. Cayetano*, 528 U.S. 495 (2000). *Rice* involved two definitions: "Hawaiian" and "Native Hawaiian." Under Hawaii statute, "Hawaiian" was defined as "any descendant of the aboriginal peoples inhabiting the Hawaiian

---

[4] Plaintiff claims that *Wabol v. Villacrusis*, 958 F.2d 1450 (9th Cir. 1992), stands for the proposition that Article XII is racially based. This is simply not the case. The word "race" appears but once in the opinion. *Wabol*, 958 F.2d at 1451. The word "racially" also appears only once in the opinion. *Id*. at 1454. The *Wabol* court did not hold that Article XII's definition of NMD was racial. *Wabol* held that Congress had the authority to exempt acquisition and ownership of land from Fourteenth Amendment protections. *Id*. at 1462. The *Wabol* court merely assumed the NMD classification was racial for the purposes of argument.

Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii." *Rice*, 528 U.S. at 509. Similarly, Hawaii statute defined "Native Hawaiian" as:

> [A]ny descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778, as defined by the Hawaiian Homes Commission Act, 1920, as amended; provided that the term identically refers to the descendants of such blood quantum of such aboriginal peoples which exercised sovereignty and subsisted in the Hawaiian Islands in 1778 and which peoples thereafter continued to reside in Hawaii.

*Id*. at 510. The statute restricted voting for Office of Hawaiian Affairs trustees to "Hawaiians" and "Native Hawaiians." *Id*. at 509. The Supreme Court found: "Ancestry can be a proxy for race. It is that proxy here." *Id*. at 514. The Court reasoned that the Hawaiian islands were completely isolated until 1778, and that Hawaii's inhabitants formed a distinct culture, which the State was attempting to protect through voting restrictions. *Id*. at 514–16. The Supreme Court analogized the case to *Guinn v. United States*, 238 U.S. 347, 363 (1915), which involved a statute that excluded from literacy tests anyone descended from an individual that had the right to vote in 1866, before the Fifteenth Amendment was ratified and adopted. *Id*. at 514. Accordingly, the Court held that the use of ancestry in the Hawaiian statutes operated as a proxy for race, and therefore violated the Fifteenth Amendment. *Id*. at 515

The definitions in *Rice* and the case at bar are readily distinguishable. First, the dates included in Article XII, § 4, namely 1950 and 1986,[5] are far more recent. By 1950, the Northern Mariana Islands had been exposed to the outside world for centuries, during which the indigenous population was ruled by no less than three imperial overlords, and had recently been liberated and administered by the United States, acting as a trustee. By 1950, individuals of European, Latin American, and Asian descent were legally domiciled in the Northern Mariana

---

[5] The Trusteeship terminated with respect to the Commonwealth on November 3, 1986. Proclamation No. 5564, 51 Fed. Reg. 40, 399 (Nov. 3, 1986).

1  Islands, having married or been adopted by local families, and allowed to stay. Spoehr, *Saipan* at
2  28; *Navy Handbook*, 38, 64–66. Both Spoehr and the *Navy Handbook* indicate that these
3  "outsiders" were accepted and treated as part of the local community. Spoehr, *Saipan* at 28; *Navy
4  Handbook* at 64–65. By contrast, the definitions at issue in *Rice* referred to 1778, the year
5  Hawaii was "discovered" by Europeans. *Rice*, 528 U.S. at 514. Furthermore, "[f]or centuries
6  Hawaii was isolated from immigration." *Id*. In other words, the situation of Hawaii in 1778 and
7  the situation of the Northern Mariana Islands in 1950 were remarkably different. The population
8  of Hawaii in 1778 was homogeneous, whereas the population of the Northern Mariana Islands in
9  1950 was heterogeneous. As a result, the exclusive use of ancestry in the definitions at issue in
10 *Rice* was clearly a proxy for race; the same cannot be said for Article XII, § 4's definition of
11 NMD, especially in light of the race-neutral characteristics inherent in that definition.

The second significant difference between Article XII, § 4's definition of NMD and the definitions at issue in *Rice* is the fact that the drafters of Article XII, § 4 focused primarily on race-neutral factors such as domicile and birth rather than relying on ancestry alone. This point cannot be understated. In *Rice*, both the definitions of "Hawaiian" and "Native Hawaiian" relied exclusively on ancestry. *Rice*, 528 U.S. at 509–10. This, coupled with the fact that Hawaii was completely isolated from immigration until 1778 prompted the Supreme Court to find that the Hawaii statutes in question used ancestry as a proxy for race. *Id*. The same is true for the statutes at issue in *Guinn*. 238 U.S. at 363. Article XII, § 4's definition of NMD, by contrast, does not rely exclusively on ancestry, but also—and primarily—on "neutral principles of place of birth, domicile, incorporation and other essential attributes." Analysis at 164. In order to qualify as a "full-blooded" NMD, one must first have been "born or domiciled in the Northern Mariana Islands by 1950." NMI Const. art. XII, § 4. Spoehr, writing in 1950, identifies a significant number of non-indigenous individuals that are married to local Chamorros or Carolinians, some

8

of which have "reared a family to adulthood" and "who intend to make Saipan their permanent home." Spoehr, *Saipan* at 28; *see also Navy Handbook*, at 64–65. Such individuals clearly qualify as being "domiciled in the Northern Mariana Islands by 1950."

The second qualification is that one must be a citizen of the Trust Territory before 1986. NMI Const. art. XII, § 4. While the grant of citizenship by birth was rather restrictive, the High Commissioner of the Trust Territory had the authority to naturalize, *i.e.*, grant Trust Territory citizenship to, eligible individuals. 53 TTC § 2 (1970). Furthermore, it is up to each country to determine whether a child gains the citizenship of its parents (mother, father, or both) or the citizenship of the place of birth.[6] Finally, one must again stress the adoption provision: individuals that are not NMD by birth acquire the same NMD status as their adoptive parents by virtue of adoption. Adoption is a legal process that has absolutely nothing to do with the race of the adoptive parents or the adoptee. Therefore, while Davis is correct that both the definitions at issue in *Rice* and Article XII, § 4's definition of NMD are based on residence as of a certain date, relying on that superficial similarity alone ignores the many, significant differences between the competing definitions. Simply stated, the definitions in *Rice* were based exclusively on ancestral descent from a time Hawaii was completely isolated. Article XII, § 4's definition is based not only on ancestry, but primarily on neutral principles of birth, domicile, and citizenship that are race-neutral. Therefore, while the exclusive use of ancestry may have been a proxy for race in *Guinn* and *Rice*, Article XII, § 4's definition of NMD is not based exclusively on race, and is dominated by the neutral factors enumerated above.

The final difference between the definitions at issue in *Rice* and Article XII, § 4 is the intent of the respective framers. As explained in *Rice*, the term "Hawaiian" was originally

---

[6] There is not ample space to expound further on this rather complicated issue of international law. For further information on this topic, see Charles E. Brasington, Note, *After Alyosha: Baltic Citizenship Requirements Twenty Years After the Fall of Soviet Communism*, 20 Transnat'l Law & Contemp. Probs. 197, 203–10 (2011), and the sources cited therein.

defined as "any descendant of the races inhabiting the Hawaiian Islands, previous to 1778." *Rice*, 528 U.S. at 515. While this language was ultimately changed, "the drafters of the revised definition 'stress[ed] that this change is non-substantive, and that "peoples" does mean "races."'" *Id*. at 516. Furthermore, the definition of "Native Hawaiian" retained the explicit reference to race. *Id*. This is simply not the case here. Here, had the framers of the Commonwealth Constitution wished to only include "racially pure" Chamorros and Carolinians, they could have done so by utilizing much simpler language. Instead, the Constitutional Convention intentionally avoided using "racial or ethnic classification." Analysis at 171. The framers sought to "include in the group eligible to own land all those persons who are part of the community that made the creation of the Commonwealth possible," and "erred on the side of including a few of those persons who should be excluded rather than excluding any of those persons who should be included." *Id*. at 167. This explicit intent practically compels the conclusion that the framers of Article XII recognized that several members of the local community that helped build the Commonwealth would not fit within strict definitions based on race and ethnicity. They accordingly eschewed such definitions in favor of one primarily based on birth, domicile, and citizenship, albeit with some ancestral aspects.

## IV. CONCLUSION

For the foregoing reasons, there are no issues of material fact and the Defendants entitled to judgment as a matter of law. Accordingly, Defendants respectfully request this Court to enter summary judgment in their favor.

RESPECTFULLY SUBMITTED this 17th of April, 2014.

OFFICE OF THE ATTORNEY GENERAL

/s/_____
Charles E. Brasington
Attorney for Defendants

10

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been electronically filed this 17th day of April 2014, with service requested to all parties of record.

OFFICE OF THE ATTORNEY GENERAL


/s/_____
Charles E. Brasington
Assistant Attorney General