1

2

3

4

5

6

7

8

9

OFFICE OF THE ATTORNEY GENERAL
Joey P. San Nicolas
Attorney General
Charles E. Brasington
Assistant Attorney General
Hon Juan A. Sablan Mem. Bldg., 2nd Floor
Saipan, MP  96950-8907
Tel:    (670) 237-7500
Fax:    (670) 664-2349
e-mail: charles.brasington.law@gmail.com

*Attorneys for Defendants*

FILED
Clerk
District Court

JUN - 5 2014

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS**

10

11

12

13

14

15

16

17

18

| | |
|---|---|
| **JOHN H. DAVIS, JR.**<br><br>             **Plaintiff,**<br>     v.<br><br>**COMMONWEALTH ELECTION COMMISSION; FRANCIS M. SABLAN, Chairperson of the Commonwealth Election Commission; ROBERT A. GUERRERO, Executive Director of the Commonwealth Election Commission; ELOY INOS, Governor of the Commonwealth of the Northern Mariana Islands,**<br><br>             **Defendants.** | CIVIL CASE No. 14-0002<br><br><br>**NOTICE OF APPEAL & REPRESENTATION STATEMENT** |

19

20

21

22

23

24

25

26

27

28

NOTICE IS HEREBY GIVEN that the Commonwealth Election Commission ("CEC"),

Francis M. Sablan, Chairperson of CEC, Robert A. Guerrero, and Executive Director of CEC

(collectively "Defendants"), the Defendants in the above-named case, hereby appeal to the

United States Court of Appeals for the Ninth Circuit from the United States District Court for the

Northern Mariana Islands' Memorandum Decision and Order Granting in Part and Denying in

Part Plaintiff's Motion and Defendant's Cross Motion for Summary Judgment entered in this

action on the 20th day of May, 2014 (ECF No. 15), attached as **Exhibit A** to this Notice, and

corresponding Final Judgment entered in this action on the 4th day of June, 2014 (ECF No. 19),

ORIGINAL

1  attached as **Exhibit B** to this Notice.

2        Defendants' Representation Statement is attached to this Notice as required by Rule 3-

3  2(b).

4  RESPECTFULLY SUBMITTED.

5  DATED: June 5, 2014                         OFFICE OF THE ATTORNEY GENERAL

6

7

8                                           Charles E. Brasington

9                                           Attorney for Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# REPRESENTATION STATEMENT

The undersigned represents Defendants-Appellants Commonwealth Election Commission ("CEC"), Francis M. Sablan, Chairperson of CEC, Robert A. Guerrero, Executive Director of CEC, and no other party. Pursuant to Rule 12(b) of the Federal Rules of Appellate Procedure and Circuit Rule 3-2(b), Defendants-Appellants submit this Representation Statement.

The following list identifies all parties to the action, and it identifies their respective counsel by name, firm, address, telephone number, and e-mail, where appropriate.

| PARTIES | COUNSEL OF RECORD |
|---|---|
| Plaintiff-Appellee<br>John H. Davis, Jr. | Jeanne H. Rayphand<br>Box 502020<br>Saipan, MP 96950<br>Tel.:   (670) 287-9807<br>Email: jeanneesq@yahoo.com |
| Defendants-Appellants<br>Commonwealth Election Commission;<br>Francis M. Sablan, Chairperson of the<br>Commonwealth Election Commission;<br>Robert A. Guerrero, Executive Director of the<br>Commonwealth Election Commission | Joey P. San Nicolas<br>Attorney General<br>Charles E. Brasington<br>Assistant Attorney General<br>Hon Juan A. Sablan Mem. Bldg., 2nd Floor<br>Saipan, MP  96950-8907<br>Tel:    (670) 237-7500<br>Fax:   (670) 664-2349<br>e-mail: charles.brasington.law@gmail.com |

DATED: June 5, 2014

OFFICE OF THE ATTORNEY GENERAL

Charles E. Brasington
Attorney for Defendants

3

EXHIBIT A

FILED
Clerk
District Court

MAY 20 2014

for the Northern Mariana Islands
By_____
(Deputy Clerk)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

JOHN H. DAVIS, JR.,

        Plaintiff,

v.

COMMONWEALTH ELECTION
COMMISSION; FRANCES M. SABLAN,
Chairperson of Commonwealth Election
Commission; ROBERT A. GUERRERO,
Executive Director of Commonwealth
Election Commission; ELOY INOS,
Governor of the Commonwealth of the
Northern Mariana Islands,

        Defendants.

Case No.: 1-14-CV-00002

MEMORANDUM DECISION AND
ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFF'S
MOTION AND DEFENDANT'S CROSS
MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Plaintiff John H. Davis, Jr., is a registered voter in the Commonwealth of the Northern

Mariana Islands ("CNMI" or "Commonwealth") who wishes to vote on any initiative to amend

Article XII of the Commonwealth Constitution. Article XII restricts the acquisition of permanent

and long-term interests in real property to persons of Northern Marianas descent ("NMDs"). A

separate provision of the Commonwealth Constitution, Article XVIII, § 5(c), prohibits otherwise

qualified voters who are not of Northern Marianas descent ("non-NMDs") from voting on

Article XII initiatives.[1]

_____

[1] The acronyms "NMD" and "non-NMD" are commonly used both as adjectives and as nouns.
For example, "[T]he framers carefully considered what property ownership rights to extend . . . to non-
NMD relatives of NMDs." *In re Estate of Imamura*, 5 N.M.I. 60, 1997 MP 7 ¶ 13 (N. Mar. I. 1997).

EXHIBIT A

1     Two years ago, Plaintiff, who is not of Northern Marianas descent, asked this Court to

2 declare that Article XVIII, § 5(c) and its enabling laws deprive him of his right to vote as

3 guaranteed by the Fourteenth and Fifteenth Amendments of the United States Constitution. The

4 Court dismissed that action because it was not ripe – no Article XII initiative had qualified for

5
6 the ballot yet. *See* Memorandum Decision and Order ("Memo. Decision"), *Davis v. Commw.*

7 *Election Comm'n (Davis I),* Case No. 1:12-CV-01, 2012 WL 10133314, 2012 U.S. Dist. LEXIS

8 89323 (D. N. Mar. I. June 26, 2012). One such initiative has now cleared the Commonwealth

9 legislature and will be put before the voters no later than the general election in November 2014.

10
11 After careful consideration of arguments of counsel and the evidentiary record, the Court has

12 determined that Plaintiff and other qualified voters who are not NMDs must have the opportunity

13 to vote on this and any other initiative to amend Article XII.

14     **II.**     **BACKGROUND**

15     The legal issues in this case can be fully appreciated only against a background of the

16
17 history of the Northern Mariana Islands and the political relationship between the United States

18 and the Commonwealth.[2]

19     A. Formation of the CNMI

20     In 1947, the United States entered into an agreement ("Trusteeship Agreement") with the

21 United Nations to administer in trust the Northern Marianas and certain other Pacific island

22
23 groups formerly mandated to Japan. The Trust Territory of the Pacific Islands ("Trust Territory")

24

25     [2] The background has been described in prior decisions of this Court and others. *See, e.g., Davis*

26 *I; United States ex rel. Richards v. De Leon Guerrero,* 4 F.3d 749, 751–52 (9th Cir. 1993); *Sablan v.*
*Tenorio,* 4 N. Mar. I. 351, 367–368 (1996); *Borja v. Wesley Goodman & Younis Arts Studio, Inc.,* 1 N.

27 Mar. I. 225, 253–56 (1990). The brief history that follows draws on those sources, as well as Alexander
Spoehr, *Saipan: The Ethnology of a War-Devastated Island,* Fieldiana: Anthropology 41 (Chicago

28 Natural History Museum, 1954); and Don A. Farrell, *History of the Northern Mariana Islands* (1991).

EXHIBIT A

comprised the islands that later formed the Commonwealth, the republics of Palau and the

Marshall Islands, and the Federated States of Micronesia. One of the purposes of the trusteeship

was for the United States to promote independence and self-government among the peoples of

those islands.

In the Saipan District, which included all the Northern Mariana Islands, the primary

ethnic groups were Chamorros and Carolinians. Chamorros were the native people when Spain

took control of the islands in the seventeenth century. By 1720, the Spanish had depopulated the

Northern Marianas by removing the Chamorros to Guam. Chamorros began to return to Saipan

in numbers only in the late nineteenth century. Although by that time they had adopted

Christianity and intermixed to some degree with Spaniards and Filipinos, they had retained their

distinctive Chamorro language and culture. Carolinians first migrated to Saipan in 1815 after a

typhoon devastated their homes in the Caroline Islands. They brought with them to Saipan their

own unique language and way of life. In the nearly fifty years between the Spanish-American

War and the end of World War II, control of the Northern Marianas passed from Spain to

Germany, then Japan, and then the United States. At the time the Trust Territory was established,

the ratio of Chamorros to Carolinians was about four to one.

In 1972, the United States entered into formal talks with representatives of the people of

the Northern Marianas to determine the islands' future political status. On February 15, 1975, the

President's Personal Representative and the Marianas Political Status Commission signed the

Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with

the United States of America ("Covenant"). Proclamation No. 4534, 42 Fed. Reg. 56,593 (Oct.

24, 1977). The Covenant was approved by the Mariana Islands District Legislature and in a

plebiscite of Northern Marianas voters. On March 24, 1976, it was ratified by the United States

EXHIBIT A

Congress. Public Law 94-241; 90 Stat. 263, *codified at* 48 U.S.C. § 1801 note.

B. Land-Alienation Restrictions

Section 805 of the Covenant "provides that, notwithstanding federal law, the Commonwealth government shall regulate the alienation of local land to restrict the acquisition of long-term interests to persons of Northern Mariana Islands descent." *Wabol v. Villacrusis,* 958 F.2d 1450, 1452 (9th Cir. 1990). The text of Section 805 reads, in pertinent part:

> . . . notwithstanding the other provisions of this Covenant, or those provisions of the Constitution, treaties or laws of the United States applicable to the Northern Mariana Islands, the Government of the Northern Mariana Islands, in view of the importance of the ownership of land for the culture and traditions of the people of the Northern Mariana Islands, and in order to protect them against exploitation and to promote their economic advancement and self-sufficiency . . . will until twenty-five years after the termination of the Trusteeship Agreement, and may thereafter, regulate the alienation of permanent and long-term interests in real property so as to restrict the acquisition of such interests to persons of Northern Mariana Islands descent[.]

The framers of the Covenant understood that the land-alienation restrictions of Section 805 might conflict with federally guaranteed rights. The Fourteenth Amendment declares that it is unlawful for any state to "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Fifteenth Amendment specifically protects the right to vote: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." These amendments are made applicable in the CNMI by Covenant § 501(a). The framers wished "to make clear that under no circumstances can anything in Section 501 or, for that matter, any provision in the Covenant, have the effect of prohibiting the local government from imposing land alienation restrictions under Section 805[.]" Marianas Political Status Commission, *Section by Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands*

-4-

EXHIBIT A

1   ("Analysis of the Covenant") 47 (1975).[3] They therefore expressly stated in the Covenant that

2   the applicability of federal laws is "without prejudice to the validity of and the power of the

3   Congress of the United States to consent to . . . Section 805 . . ." Covenant § 501(b).

4           Article XII of the Commonwealth Constitution implements Covenant § 805. *See Wabol*,

5   958 F.2d at 1452. It restricts the "acquisition of permanent and long-term interests in real

6   property within the Commonwealth . . . to persons of Northern Marianas descent." N. Mar. I.

7   Const. art. XII, § 1. Section 4 of Article XII defines a person of Northern Marianas descent as

8

9           a person who is a citizen or national of the United States and who is of at least
            one-quarter Northern Marianas Chamorro or Northern Marianas Carolinian blood
10          or a combination thereof or an adopted child of a person of Northern Marianas
            descent if adopted while under the age of eighteen years. For purposes of
11          determining Northern Marianas descent, a person shall be considered to be a full-
            blooded Northern Marianas Chamorro or Northern Marianas Carolinian if that
12          person was born or domiciled in the Northern Mariana Islands by 1950 and was a
            citizen of the Trust Territory of the Pacific Islands before the termination of the
13          Trusteeship with respect to the Commonwealth.

14

15          Non-NMDs cannot own land in fee simple; the most they can acquire is a 55-year

16  leasehold interest. *See* N. Mar. I. Const. art. XII, § 3. The same restriction applies to non-NMD

17  corporations – corporations that are incorporated and have their principal place of business in the

18  Commonwealth, but of which at least one director is non-NMD or one voting share is owned by

19  a non-NMD. *See* N. Mar. I. Const. art. XII, § 5.

20          About 25 years ago, in *Wabol v. Villacrusis,* the Ninth Circuit was called upon to

21  determine "whether the constitutional guarantee of equal protection of the laws limits the ability

22  of the United States and the Commonwealth to impose race-based restrictions on the acquisition

23  of permanent and long-term interests in Commonwealth land." 958 F.2d at 1451. The court held

24

25

26

27  _____

    [3] The Analysis of the Covenant and other foundational documents of the Commonwealth have
28  been made available online by the Northern Mariana Islands Council for the Humanities, at
    http://www.nmihumanities.org/projdtl.asp?projID=24 (last visited May 16, 2014).

EXHIBIT A

1   that under the Territories Clause (U.S. Const. art. IV, § 3), Congress had the power to exclude

2   Covenant § 805 from the reach of the Fourteenth Amendment's Equal Protection Clause. *Id.* at

3   1462. The court observed that only fundamental constitutional rights necessarily apply in the

4   territories. *Id.* at 1459. It found that "the asserted constitutional guarantee against discrimination

5   in the acquisition of long-term interests in land" was not "fundamental in the international sense"

6

7   and therefore could be excluded from operation in the CNMI. *Id.* at 1460, 1462.[4]

8          C.   Amendment of Article XII and Voter Eligibility

9          Covenant § 805 requires the Commonwealth government to restrict the alienation of

10  permanent and long-term interests in land until at least 25 years after the termination of the

11  Trusteeship Agreement. On November 3, 1986, the Trusteeship Agreement was terminated by

12  presidential proclamation. Proclamation No. 5564, 51 Fed. Reg. 40,399 (Nov. 3, 1986). Thus, the

13

14  Commonwealth now has the power, in conformity with Section 805, to repeal the land-alienation

15  restrictions of Article XII.

16         The power to *modify* Article XII, however, is not new. In 1985, Commonwealth voters –

17  including both NMDs and non-NMDs – ratified two amendments to Article XII as proposed by

18  the second constitutional convention. One extended the long-term leasehold period from 40 years

19

20  to 55 years; the other raised the proportion of NMD directors and of voting shares held by

21  NMDs, needed for a corporation to be considered NMD, from 51 percent to 100 percent. See N.

22  Mar. I. Const. art. XII, §§ 3, 5 (source notes); 1 CMC [N. Mar. I. Code] p. cxxxiii (comment of

23

24  Commonwealth Law Revision Commission); *Milne v. Po Tin,* 2001 MP 16 ¶ 11 n.4 (N. Mar. I.

25

26

27  _____

28     [4] Plaintiff Davis's challenge to CNMI voting-rights restrictions does not require this Court to
    question the vitality of the *Wabol* decision or otherwise to re-examine the constitutionality of Article XII
    because it is not an issue in this case.

EXHIBIT A

1   2001) (leasehold term); *Dela Cruz v. Hotel Nikko Saipan,* 1997 MP 16 ¶ 10 n.2 (N. Mar. I. 1997)

2   (corporations).

3           Amendments to the Commonwealth Constitution "may be proposed by constitutional

4   convention, legislative initiative or popular initiative." N. Mar. I. Const. art. XVIII, § 1. Two of

5
    these three methods involve direct participation by qualified voters. By act of the legislature or
6

7   by initiative petition, the question of whether to hold a constitutional convention to propose

8   amendments to the Constitution may be submitted to the voters. *Id.* § 2(a),(b). Alternatively,

9   specific amendments may be proposed by initiative petition, "signed by at least fifty percent of

10  the persons qualified to vote in the Commonwealth and at least twenty-five percent of the
11
    persons qualified to vote in each senatorial district." *Id.* § 4(a). All proposed amendments are to
12

13  be "submitted to the voters for ratification at the next regular general election or at a special

14  election established by law." *Id.* § 5(a). Ratification of a proposed amendment requires approval

15  "by a majority of the votes cast." *Id.* § 5(b).[5]

16
            Article VII of the Commonwealth Constitution sets forth the qualifications of voters. Any
17

18  U.S. citizen or national who on the date of the election is at least 18 years of age, is a resident

19  and domiciliary of the Commonwealth for the statutorily provided period, and is not serving a

20  felony sentence or of unsound mind, is eligible to vote. N. Mar. I. Const. art. VII, § 1.

21          In 1999, voters approved Senate Legislative Initiative 11-1, which amended Section 5 of
22
    Article XVIII by adding this subsection:
23

24              (c) In the case of a proposed amendment to Article XII of this
                Constitution, the word "voters" as used in subsection 5(a) above shall be limited
25              to eligible voters under Article VII who are also persons of Northern Marianas
26

27  _____
        [5] For amendments proposed by constitutional convention or by popular initiative, ratification
28  additionally requires approval by "at least two-thirds of the votes cast in each of two senatorial districts."
    *Id.*

EXHIBIT A

descent as described in Article XII, Section 4, and the term "votes cast" as used in subsection 5(b) shall mean the votes cast by such voters.

On April 21, 2011, Governor Benigno R. Fitial signed into law House Bill 17-57. The new Public Law ("P.L.") 17-40 established a Northern Marianas Descent Registry ("NMDR") within the Commonwealth Election Commission ("CEC" or "Commission") and mandated the production of an Official Northern Marianas Descent Identification Card "that will be issued only to persons who are qualified pursuant to Article XII, § 4 of the Northern Mariana Islands Constitution." P.L. 17-40 § 2. The executive director of CEC is tasked with managing the "registry and activities of the NMDR." *Id.* § 2(b). The primary purpose of the NMDR is to serve as "the official registry of persons of Northern Marianas descent in any and all elections . . . that requires [*sic*] only persons of Northern Marianas descent to vote in such election pursuant to the said Article XVIII, § 5 of the Northern Marianas Islands Constitution . . ." *Id.* § 2(c)(1). No form of NMD identification issued by an agency other than CEC may be used for purposes of voting on proposed Article XII amendments. *Id.* § 2(c)(4).

The Commission has promulgated rules and regulations to effectuate the purposes of Public Law 17-40. *See* 33(9) N. Mar. I. Reg. 31918 *et seq.* (Sept. 26, 2011). To register for the NMDR, a person must complete a registration affidavit and execute an oath, under penalty of perjury, attesting that he or she is of Northern Marianas descent as defined in Article XII, § 4. *Id.* at 31918, 31930.[6]

Plaintiff Davis is a United States citizen and CNMI resident.  (Davis Declaration, ECF No. 4-1, ¶¶ 1, 2.)  He is registered to vote in the Commonwealth, is eligible to vote pursuant to Article VII, § 1 of the Commonwealth Constitution, and pays taxes in the Commonwealth.  (*Id.*

---

[6] The rules and regulations and the registration affidavit are available on the Commission's website, at http://www.votecnmi.gov.mp/downloads/NMDR_Regs.pdf (last visited May 16, 2014).

¶¶ 2, 4, 6.) He is not of Northern Marianas descent. (*Id.* ¶ 3.) (*See also* Def. Opp'n 1 ("Statement of Undisputed Facts").)

D. Legislative Initiative 18-1

On March 27, 2013, the CNMI House of Representatives passed Legislative Initiative 18-1 ("L.I. 18-1"). The initiative was sent on to the Senate, where it passed, with amendments, on August 29, 2013. On September 16, 2013, the House approved the Senate version.

The primary purpose of L.I. 18-1 is to amend Article XII, § 4 of the Commonwealth Constitution so that a United States citizen or national who has "at least some degree of Northern Marianas Chamorro or Northern Marianas Carolinian blood" will be "deemed a bona fide person of Northern Marianas descent for all purposes under Article XVIII . . ." L.I. 18-1 § 1 (Findings and Purpose). The full text of the proposed amendment is as follows (with additions to the current text of Article XVIII, § 4 shown by underlining and deletions shown by strikethrough):

> Section 4: Persons of Northern Marianas Descent: A person of Northern Marianas descent is a person who is a citizen or national of the United States and who is of has at least one quarter some degree of Northern Marianas Chamorro or Northern Marianas Carolinian blood or a combination thereof or an adopted child of a person of Northern Marianas descent if adopted while under the age of eighteen years. For purposes of determining Northern Marianas descent by adoption, a child without any degree of Northern Marianas descent when adopted shall not acquire any degree of Northern Marianas descent. For purposes of determining Northern Marianas descent, a person shall be considered to be a full-blooded Northern Marianas Chamorro or Northern Marianas Carolinian if that person was born or domiciled in the Northern Mariana Islands by 1950 and was a citizen of the Trust Territory of the Pacific Islands before the termination of the Trusteeship with respect to the Commonwealth.
> (a) Any person who has less than one quarter Northern Marianas Chamorro or Northern Marianas Carolinian blood or a combination thereof, claiming to be a person of Northern Marianas descent shall provide evidence to support that he/she possess [*sic*] some degree of Northern Marianas Chamorro or Northern Marianas Carolinian blood or a combination thereof to the Superior Court. Based on the evidentiary standard of "preponderance of the evidence", the

EXHIBIT A

> Superior Court may grant or deny such claim, and the decision of the Superior Court on such claim shall be subject to a "*de novo*" judicial review. However, if the Superior Court finds and agrees that the person in fact possesses at least some degree of Northern Marianas Chamorro or Northern Marianas Carolinian blood or a combination thereof, the Superior Court shall certify that the person is a person of Northern Marianas descent.

Under Article XVIII, § 5(a) of the Commonwealth Constitution, L.I. 18-1 must be submitted to the voters no later than the next general election, which is scheduled for November 4, 2014.[7]

## III.   PROCEDURAL POSTURE

Plaintiff Davis has brought eight claims against Defendants. The first four claims allege that Article XVIII, § 5(c) of the Commonwealth Constitution and Public Law 17-40 violate his right to vote as secured by the Fourteenth and Fifteenth Amendments. His fifth claim is that these same two Commonwealth laws violate his federal statutory voting right under 42 U.S.C. § 1971(a), which Congress enacted to enforce the Fifteenth Amendment. His sixth claim is that Robert A. Guerrero, Executive Director of CEC, and Frances C. Sablan, CEC's Chairperson, acting in their official capacities, are applying discriminatory standards in determining his qualification to vote, in violation of § 1971(a)(2)(A). His seventh claim is against all Defendants for deprivation of his civil rights, in violation of 42 U.S.C. § 1983. His eighth and final claim is a taxpayer action, brought under Article X, § 9 of the Commonwealth Constitution, to enjoin unlawful expenditure of public funds.  He seeks a declaration from this Court that Article XVIII, § 5(c) of the Commonwealth Constitution and Public Law 17-40 violate federal law applicable in the Commonwealth, and an injunction prohibiting Defendants from preventing him and other

---

[7] Other proposals to modify Article XII are at various stages of the amendment process. It is possible that one or more of these initiatives will make it onto the November ballot along with L.I. 18-1.

EXHIBIT A

non-NMD qualified voters from voting on Article XII initiatives.[8]  Plaintiff also requests an

award of fees and costs.

Before the Court are Plaintiff's motion and Defendants' cross motion for summary

judgment on all claims. The matter has been fully briefed.[9] A motions hearing was held on April

24, 2014, after which the Court took the matter under advisement.

## IV.    JUDICIAL NOTICE

During the briefing period, the Court gave the parties notice of its intention to take

judicial notice of census data and demographic information for the Northern Mariana Islands

compiled circa 1950, as contained in the following publications: (1) Report on the

Administration of the Trust Territory of the Pacific Islands for the Period July 1, 1948 to June

30, 1949, Transmitted by the United States to the Secretary-General of the United Nations

Pursuant to Article 88 of the United Nations Charter (Navy Department, July 1949) ("1949

Report"), Statistical Supplement: Population; (2) Report on the Administration of the Trust

Territory of the Pacific Islands for the Period July 1, 1949, to June 30, 1950, Transmitted by the

United States to the United Nations Pursuant to Article 88 of the Charter of the United Nations

(Department of the Navy, Office of the Chief of Naval Operations, 1950) ("1950 Report"),

Statistical Appendix: Population; (3) Report on the Administration of the Trust Territory of the

---

[8] Plaintiff has not moved to certify this suit as a class action. Class certification is unnecessary, however, when "the relief sought will, as a practical matter, produce the same result as formal class-wide relief." *James v. Bell,* 613 F.2d 180, 186 (9th Cir. 1979), *rev'd on other grounds sub nom. Ball v. James,* 451 U.S. 355 (1981).

[9] Plaintiff's Motion for Summary Judgment ("MSJ"), ECF No. 4; Declaration of Plaintiff ("Davis Decl."), ECF No. 4-1; Defendants' Cross Motion for Summary Judgment, ECF No. 10; Memorandum in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Cross Motion for Summary Judgment ("Def. Opp'n"), ECF No. 10-1; Plaintiff's brief in reply to the Commonwealth's opposition and in opposition to the cross motion ("Pl. Reply"), ECF No. 12; and Defendants' reply brief ("Def. Reply"), ECF No. 13.

EXHIBIT A

Pacific Islands for the Period July 1, 1951, to June 30, 1952, Transmitted by the United States to the United Nations Pursuant to Article 88 of the Charter of the United Nations (Office of Territories, United States Department of the Interior, 1952) ("1952 Report"), Statistical Appendix: Population; (4) Handbook on the Trust Territory of the Pacific Islands (Navy Department, Office of the Chief of Naval Operations, 1948) ("Navy Handbook"), Chapter IV: Population; and (5) Alexander Spoehr, *Saipan: The Ethnology of a War-Devastated Island,* Fieldiana: Anthropology 41 (Chicago Natural History Museum, 1954), Appendix: Population of Saipan (1950). *See* Notice of Intent to Take Judicial Notice, ECF No. 11. The Court made these materials available to the parties. Defendants subsequently requested that the Court take judicial notice of population information in these publications. (Def. Reply 2.) Plaintiff did not object. Therefore, pursuant to Rule 201 of the Federal Rules of Evidence, the Court takes judicial notice as indicated.

In addition, the Court on its own will take judicial notice of data on the Northern Marianas Islands from the 1970 Census of Population (U.S. Department of Commerce, Bureau of the Census, Jan. 1973). United States Census documents meet the accuracy requirements of Rule 201, and data from the Census are an appropriate subject of judicial notice. *See United States v. Esquivel,* 88 F.3d 722, 727 (9th Cir. 1996); *Hollinger v. Home State Mut. Ins. Co.,* 654 F.3d 564, 571–72 (5th Cir. 2011).

## V.     SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction over the federal claims for relief from an alleged deprivation of the right to vote. *See* 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1343(a)(3),(4) (civil rights and elective franchise); 42 U.S.C. § 1971(d); 42 U.S.C. § 1983. It may exercise supplemental jurisdiction over the taxpayer action brought under Commonwealth

EXHIBIT A

law. *See* 28 U.S.C. § 1367(a). Venue is proper in this district. *See* 28 U.S.C. § 1391(b)(1),(2).

A.  Article III Standing

A "necessary component" of subject matter jurisdiction, under Article III of the Constitution, is standing. *See Palmdale Hills Prop., LLC v. Lehman Commer. Paper, Inc. (In re Palmdale Hills Prop., LLC),* 654 F.3d 868, 873 (9th Cir. 2011). To have Article III standing, a plaintiff must have suffered an "injury in fact" that is fairly traceable to the defendant's conduct and can be remedied by a favorable court decision. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citations omitted).

In *Davis I,* the Court found that plaintiff lacked standing for the sole reason that his injury was not actual or imminent. *See* Memo. Decision 13. At the time, in 2012, the Commonwealth legislature had not passed an Article XII initiative or called a constitutional convention, and a popular initiative petition had not been presented to the Commission. Now that the legislature has passed such an initiative, at least one proposed amendment to Article XII is bound to be put to a vote of the people of the CNMI no later than this November. At this point, plaintiff's injury is "certainly impending," *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143 (1974), and that is enough for Article III standing.

B.  Ripeness

The matter is also ripe to be decided. To determine ripeness, a court must evaluate (1) the "fitness of the issues for judicial decision" and (2) the "hardship to the parties of withholding court consideration." *Texas v. United States,* 523 U.S. 296, 301 (1998) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149 (1967)). The issues were fit to decide at the time of

EXHIBIT A

*Davis I,* but withholding a decision did not then work a hardship on the parties. Now, with only a few months remaining before an Article XII initiative appears on the ballot, time is of the essence. Plaintiff needs to know whether he may vote, and supporters and opponents of the initiative need to know whether to expend resources to court his vote and the votes of other non-NMD citizens. Thus, Article III standing and ripeness are no longer an impediment to deciding this case.

    C.  <u>Challenges to the Parties</u>

        Plaintiff's first four claims for relief are brought under the Fourteenth and Fifteenth Amendments directly, without grounding them in a federal statute that enforces voting rights. In *Davis I,* the Court erroneously dismissed similar direct claims. (*See Davis I,* Decision and Order Granting in Part Defendants' Motion to Dismiss, Mar. 22, 2012, ECF No. 25.) The Court now has the opportunity to correct its error. Claims for injunctive or declaratory relief from an unconstitutional law may be brought directly. Although the inadequacy of direct actions prompted Congress to enact civil-rights and voting-rights legislation, those laws did not strip citizens of standing to bring direct challenges to prevent enforcement of an unconstitutional law. *See Civil Rights Cases,* 109 U.S. 3, 20 (1883) (Fourteenth Amendment "is undoubtedly self-executing without any ancillary legislation"); *Ex parte Young,* 209 U.S. 123 (1908) (approving issuance of injunctive relief claimed directly under Fourteenth Amendment); *Allen v. State Bd. of Elections,* 393 U.S. 544, 556 n.21 (1969) ("Of course the private litigant could always bring suit under the Fifteenth Amendment."); *cf. Magana v. Northern Mariana Islands,* 107 F.3d 1436, 1441 (9th Cir. 1997) (Fourteenth Amendment not self-executing "so as to provide a direct action for money damages"). Because Plaintiff is suing to invalidate Commonwealth laws so as to prevent imminent and impending harm, the action can be maintained directly.

EXHIBIT A

1    Defendants assert that under *Ex parte Virginia,* 100 U.S. 339 (1880), only an act of
2  Congress can be the basis for a suit to enforce rights created by the Fourteenth and Fifteenth
3  Amendments. (Def. Opp'n 8–9.) Referring to Section 5 of the Fourteenth Amendment ("The
4  Congress shall have the power to enforce, by appropriate legislation, the provisions of this
5
   article."), the Supreme Court declared: "It is not said the judicial power of the general
6
7  government shall extend to enforcing the prohibitions and to protecting the rights and immunities
8  guaranteed. It is not said that branch of the government shall be authorized to declare void any
9  action of a State in violation of the prohibitions. It is the power of Congress which has been
10 enlarged[.]" 100 U.S. at 345. *Ex parte Virginia* involved an early challenge to the breadth of
11
   Congress's authority to pass legislation to enforce the Fourteenth Amendment. The Supreme
12
13 Court was merely affirming, in the strongest possible language, the wide berth given to Congress
14 to act in this sphere so as "to make the amendments fully effective." *Id.* It was not saying that the
15 courts have no independent role to play in enforcing the Fourteenth and Fifteenth Amendments.
16
   Rather, "*in addition to the courts,* Congress has full remedial powers to effectuate the
17
18 constitutional prohibition against racial discrimination in voting." *South Carolina v. Katzenbach,*
19 383 U.S. 301, 326 (1966) (citing *Ex parte Virginia*) (emphasis added). *See also Cale v.*
20 *Covington,* 586 F.2d 311, 316 (4th Cir. 1978) (resolving any inconsistency between the *Civil*
21 *Rights Cases* and *Ex parte Virginia* "by reference to the protection the Fourteenth Amendment
22
   provided of its own force as a shield under the doctrine of judicial review"). The Court now
23
24 addresses the propriety of the parties in this case.

25    1. *Governor Inos*

26    The Commonwealth asserts that Governor Inos and CEC should be granted summary
27
   judgment on all but the eighth cause of action (the Commonwealth taxpayer action) because they
28

EXHIBIT A

1   are not proper defendants on the federal claims. (Opp'n 6–7.) Plaintiff asserts that a § 1983

2   action may be maintained against Governor Inos for acts undertaken in his official capacity. (Pl.

3   Reply 3.)

4          For state officials to be proper defendants in their official capacities, there must be a

5   "causal connection between their responsibilities and any injury that the plaintiff might suffer,

6   such that relief against the defendants would provide redress," and jurisdiction must be proper

7   
8   under the *Ex parte Young* doctrine. *Planned Parenthood of Idaho, Inc. v. Wasden,* 376 F.3d 908,

9   919 (9th Cir. 2004). "Under the principle of *Ex Parte Young,* private individuals may sue state

10  officials for prospective relief against ongoing violations of federal law." *Nat'l Audubon Soc'y v.*

11  
12  *Davis.* 307 F.3d 835, 847 (9th Cir. 2002). The causal connection must be "fairly direct; a

13  generalized duty to enforce state law or general supervisory power over the persons responsible

14  for enforcing the challenged provision will not subject an official to suit." *Los Angeles County*

15  *Bar Ass'n v. Eu,* 979 F.2d 697, 704 (9th Cir. 1992). A governor's general duty to enforce state

16  
17  law does not provide the requisite causal connection. *See Women's Emergency Network v. Bush,*

18  323 F.3d 937, 949–50 (11th Cir. 2003) ("Where the enforcement power is the responsibility of

19  parties other than the governor . . . , the governor's general executive power is insufficient to

20  confer jurisdiction."); *see also Bishop v. Oklahoma ex rel. Edmondson,* 333 Fed. Appx. 361, 365

21  (10th Cir. 2009) (unpublished) (surveying published decisions of several circuits).  Although

22  
23  Plaintiff asserts that Governor Inos (together with Defendants Guerrero and Sablan) has "taken

24  specific actions to administer and enforce Article XVIII(5)(c) and Public Law 17-40" (Pl. Reply

25  3), those actions are not identified in the complaint. It has not been shown that Governor Inos has

26  any specific or special power to enforce the challenged Commonwealth laws. Therefore, he is

27  not a proper defendant in this lawsuit and must be dismissed from it.

28

EXHIBIT A

2.   *Commonwealth Election Commission*

*Ex parte Young* also affects whether the Commonwealth Election Commission can be sued under 42 U.S.C. § 1983. The *Ex parte Young* doctrine "provid[es] a pathway to relief from continuing violations of federal law by a state or its officers." *Eu,* 979 F.2d at 704 (*citing Green v. Mansour,* 474 U.S. 64 (1985)). The reason a pathway is necessary is that the Eleventh Amendment prevents an individual from suing a state directly, unless the state waives sovereign immunity. *See, e.g., Alabama v. Pugh,* 438 U.S. 781 (1978) (per curiam). However, the Eleventh Amendment does not apply to the CNMI. *Fleming v. Dep't of Public Safety,* 837 F.2d 401, 406 (9th Cir. 1988), *questioned but not overruled by Norita v. Commw. of the N. Mar. I.,* 331 F.3d 690 (9th Cir. 2003). In addition, the Eleventh Amendment does not bar actions seeking only prospective declaratory or injunctive relief against state officers in their official capacities. *Eu,* 979 F.2d at 704, citing *Ex Parte Young,* 209 U.S. 123 (1908); *Edelman v. Jordan,* 415 U.S. 651, 667-68 (1974). Therefore, there is no constitutional barrier to Plaintiff's bringing actions against CEC directly, in addition to suing its commissioners in their official capacities.

D.   Standing to Maintain Taxpayer Action

The Commonwealth Constitution provides for taxpayer actions. "A taxpayer may bring an action against the government or one of its instrumentalities in order to enjoin the expenditure of public funds for other than public purposes or for breach of fiduciary duty." N. Mar. I. Const. Art. X, § 9. The Commonwealth asserts, however, that Plaintiff lacks standing to bring a taxpayer lawsuit in federal court. (Def. Opp'n 30–34.)

A plaintiff always has the burden to establish standing. *See DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 342 (2006). To meet that burden, a plaintiff must show an injury in fact that is concrete and particularized, not conjectural or hypothetical. *Lujan,*

EXHIBIT A

1    504 U.S. at 560. An alleged injury "based on the asserted effect of the allegedly illegal

2    activity on public revenues, to which the taxpayer contributes[,]" is not concrete and

3    particularized and therefore cannot support standing. *DaimlerChrysler*, 547 U.S. at 344.

4    An injury is conjectural or hypothetical if it requires speculation as to how any savings

5    from ending government expenditure on the alleged unlawful activity will directly benefit

6

7    the taxpayer, in the form of a tax credit or other such relief. *Id.* When a district court is

8    asked to exercise supplemental jurisdiction over a state claim, the state claim must

9    independently satisfy Article III's case-or-controversy requirement. *Id.* at 351–353.

10          Plaintiff Davis has made no showing of an injury in fact to himself as a taxpayer.

11   In his complaint (¶¶ 74–79), he alleges only the generalized grievance of all taxpayers

12

13   when tax money is spent for an allegedly improper purpose. He therefore lacks standing

14   to bring a taxpayer lawsuit in federal court. Summary judgment will be granted to all

15   Defendants on Davis' taxpayer cause of action.

16          E.   42 U.S.C. § 1971 Private Right of Action Exists for Injunctive Relief

17

18          The Commonwealth asserts that the fifth and sixth causes of action fail because §

19   1971 does not confer a private right of action. (Def. Opp'n 8-9)  Section 1971(a)(2)

20   Section 1971 expressly grants the Attorney General of the United States the right to

21   enforce its provisions: "[T]he Attorney General may institute for the United States, or in

22

23   the name of the United States, a civil action or other proper proceeding for preventive

24   relief, including an application for a permanent or temporary injunction, restraining order,

25   or other order." 42 U.S.C. § 1971(c). But it is silent in regards to the right of individuals

26   to sue.

27

28

1    The Ninth Circuit has not determined whether § 1971 cases may be brought by

2  private citizens. The holding against a private right of action in *Olagues v. Russoniello,*

3  770 F.2d 791, 805 (9th Cir. 1985), cited by the Commonwealth (Def. Opp'n 8), is limited

4  to actions for damages under the Voting Rights Act. It does not pertain to § 1971(a)

5
   actions for injunctive relief. Courts in several circuits have found no private right of
6
7  action, but they have engaged in little or no analysis beyond pointing to the language in §

8  1971(c). *See, e.g., McKay v. Thompson,* 226 F.3d 752, 756 (6th Cir. 2000) (citing *Mixon*

9  *v. Ohio,* 193 F.3d 389, 406 n.12 (6th Cir. 1999)); *Willing v. Lake Orion Community*

10
   *Schools Bd. Of Trustees,* 924 F. Supp. 815, 820 (E.D. Mich. 1996); *Spivey v. State of*
11
12 *Ohio,* 999 F. Supp. 987, 997 (N.D. Ohio 1998) (citing *Willing*); *Gilmore v. Amityville*

13 *Union Free School Dist.,* 305 F. Supp. 2d 271, 279 (E.D.N.Y. 2004) (citing all cases

14 *supra*); *Good v. Roy,* 459 F. Supp. 403, 405–6 (D. Kans. 1978). *See also* Daniel P.

15
   Tokaji, *Public Rights and Private Rights of Action: The Enforcement of Federal Election*
16
   *Laws,* 44 Ind. L. Rev. 113, 138 (2010) (surveying case law).
17
18    The Eleventh Circuit, however, found an implied right of action for private

19 persons to bring § 1971 actions. *See Schwier v. Cox,* 340 F.3d 1284, 1294–97 (11th Cir.

20 2003). In *Schwier,* several unsuccessful voter registrants filed suit against the Secretary

21
   of the State of Georgia seeking relief based on claims that Georgia's voter registration
22
23 procedure and form violated the Voting Rights Act. The Eleventh Circuit observed that

24 the Supreme Court has found that Congress intended to authorize a private right of action

25 under other voting-rights statutes that expressly provide for enforcement by the Attorney

26 General. *Id.* at 1294–95 (citing *Allen v. State Board of Elections,* 393 U.S. 544 (1969),

27
   and *Morse v. Republican Party of Virginia,* 517 U.S. 186 (1996) (plurality opinion)). It
28

EXHIBIT "A"

1    noted that from 1871 to 1957, when the provision for Attorney General enforcement was

2    added, "plaintiffs could and did enforce the provisions of § 1971 under § 1983." *Id.* at

3    1295. It pointed to language in a 1957 House report that "demonstrates an intense focus

4    on protecting the right to vote and does not support the conclusion that Congress meant

5    merely to substitute one form of protection for another." *Id.*

6

7         The Eleventh Circuit's well-reasoned analysis in *Schwier* is highly persuasive.

8    The core provisions of § 1971 were first enacted in 1870, in order "to insure a faithful

9    observance of the fifteenth amendment to the Constitution of the United States[.]" Act of

10   May 31, 1870, ch. 114 § 10, 16 Stat. 140, 142. In 1957, § 1971 was amended to prohibit

11   interference with a person's voting rights through intimidation or coercion and to give the

12   Attorney General the right to enforce its provisions. Civil Rights Act of 1957, P.L. 85-

13   315, 71 Stat. 634. The purpose of the 1957 act, as proclaimed in the title of Part IV, was

14   "to provide means of *further* securing and protecting the right to vote[.]" *Id.* (emphasis

15   added). It could hardly have been intended to shut down existing means of enforcement.

16   Other courts have read this Eleventh Circuit decision as permitting "a private right of

17   action under § 1971 . . . ." *Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326,

18   1371 (N.D. Ga. 2005). Now this Court does as well.

19

20   **VI.    SUMMARY JUDGMENT STANDARD**

21

22        A court must grant summary judgment if there is no genuine issue of material fact for

23   trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An

24   issue is genuine if a reasonable jury could return a verdict in favor of the non-moving party on

25   the evidence presented; a mere "scintilla of evidence" is not sufficient. *Rivera v. Philip Morris,*

26   *Inc.,* 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

27

28

EXHIBIT A

252 (1986)). A fact is material if it could affect the outcome of the case. *Id.*

The court views the evidence in the light most favorable to the non-moving party and draws "all justifiable inferences" in that party's favor. *Miller v. Glenn Miller Prods., Inc.,* 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999)). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989) (quoting *Angel v. Seattle-First Nat'l Bank,* 653 F.2d 1293, 1299 (9th Cir. 1981)).  In this case, the parties have filed cross-motions for summary judgment on all the issues.  There is no dispute of any material fact and the matter, therefore, is proper for a decision without a trial.

## VII.    DISCUSSION OF THE MERITS

### A.   Article XVIII, § 5(c) Violates the Fifteenth Amendment's Prohibition of Racial Discrimination in Voting

Plaintiff asserts that Article XII, § 4 of the Commonwealth Constitution creates a race-based definition of persons of Northern Marianas descent. He argues that because Article XVIII, § 5, together with its implementing legislation (P.L. 17-40) and regulations, relies on that definition to deprive non-NMDs of the right to vote on Article XII initiatives, it violates the Fifteenth Amendment's prohibition of race-based restrictions on voting rights. (MSJ at 12–16, 20–21.) In support of this argument, Plaintiff relies heavily on *Rice v. Cayetano,* 528 U.S. 495 (2000), in which the Supreme Court found that a Hawaii law that granted the right to vote for trustee of a state board only to ancestral "Hawaiians" and "native Hawaiians" who benefited

EXHIBIT A

from the trust created unconstitutional raced-based voter qualifications.

Defendants deny that Article XVIII, § 5(c) violates the Fifteenth Amendment. They assert that Northern Marianas descent is not a racial classification, but a political one. (Def. Opp'n 9.) They acknowledge that the definition of NMD has "ancestral aspects," but maintain that at core it identifies the political class of Trust Territory citizens of the Northern Marianas who negotiated the Covenant. (*Id.* at 11.) They distinguish the Commonwealth laws from the Hawaii laws at issue in *Rice* in that (1) adopted children are included in the NMD class; (2) the date at which qualifying status is determined is relatively recent, after the Chamorro and Carolinian peoples had already intermixed with other races; and (3) the legislative history of Article XII does not show an intent to discriminate by race. (*Id.*)

    1.   *The Fifteenth Amendment Prohibits the Use of Ancestry as a Proxy for Race*

The "fundamental principle" of the Fifteenth Amendment is that the national government and the individual states may not "deny or abridge the right to vote on account of race." *Rice,* 528 U.S. at 512. Although the "immediate concern" of the amendment, when it was enacted in the wake of the American Civil War, was to guarantee voting rights for emancipated slaves, the Fifteenth Amendment "grants protection to all persons, not just members of a particular race." *Id.* The amendment mandates that eligibility to vote be race-neutral: "If citizens of one race having certain qualifications are permitted by law to vote, those of another having the same qualifications must be. Previous to this amendment, there was no constitutional guaranty against this discrimination; now there is." *United States v. Reese,* 92 U.S. 214, 218 (1876), *quoted in Rice,* 528 U.S. at 512. Race, as used in the Reconstruction-era civil-rights laws, meant something other than or in addition to skin color or shared physical features. It also referred to classes of persons singled out "solely because of their ancestry or ethnic characteristics." *Saint Francis*

EXHIBIT A

*College v. Al-Khazraji,* 481 U.S. 604, 613 (1987). When a voting-rights law "use[s] ancestry as a racial definition and for a racial purpose" – when it uses ancestry as "a proxy for race" – it runs afoul of the Fifteenth Amendment. *Rice,* 528 U.S. at 514–15.

A law that establishes a set of voter qualifications designed to deny voting rights to persons of a particular race may be invalid even if it contains not a single racially tinged word. For example, Oklahoma law exempted from a literacy test the lineal descendants of persons who on or before January 1, 1866, had been entitled to vote. *See Guinn v. United States,* 238 U.S. 347 (1915). This so-called "grandfather clause" did not mention race, color, or previous condition of servitude. The Supreme Court held Oklahoma's grandfather clause to be unconstitutional, finding that "mere forms of expression . . . resting upon no discernible reason other than the purpose to disregard the prohibition of the [Fifteenth] Amendment" cannot save a race-based voting-rights law. *Id.* at 363–64. In the nearly one hundred years since *Guinn,* the Supreme Court has consistently invalidated laws employing a variety of such "techniques" to skirt the Fifteenth Amendment. *See Rice,* 528 U.S. at 513 (surveying cases).

The Commonwealth laws that Plaintiff is challenging explicitly limit voting on Article XII initiatives to persons of Northern Marianas descent. If NMD is a racial classification, or if it is a "proxy" or stand-in for race, those laws violate the Fifteenth Amendment.

In *Wabol v. Villacrusis,* the Ninth Circuit Court of Appeals assumed without questioning that Article XII's land-alienation restrictions are "racially based." 958 F.2d at 1455. Because the court's decision did not turn on whether the restrictions were indeed race-based, the issue was not analyzed. Therefore, this characterization in *Wabol* is dictum and does not settle the matter.

*Rice v. Cayetano,* though, comes close to settling it. In *Rice,* the State of Hawaii limited

EXHIBIT A

1   voting in a statewide election for trustees of the Office of Hawaiian Affairs ("OHA") to two

2   classes of descendants of people who inhabited the Hawaiian Islands in 1778, the year Captain

3   James Cook became the first European to discover the islands. *Rice,* 528 U.S. at 498–99. These

4   classes, called "Hawaiian" and "native Hawaiian," included only people who benefited from

5
    programs the OHA administered. *Id.* Petitioner Rice was a citizen of Hawaii who did not belong
6
7   to one of these classes but wanted to vote in the trustee election. *Id.* at 499.

8          Hawaii maintained that the classifications were not racial but merely ancestral. *Id.* at 514.

9   It pointed out that by 1778 some of the islands' inhabitants were not aboriginal Hawaiians but

10
    persons who had migrated there more recently from other places; and that aboriginal Hawaiians
11
12  whose ancestors had left Hawaii before 1778 were excluded from the classes. *Id.* The Supreme

13  Court squarely rejected this argument. The Court stated: "Simply because a class defined by

14  ancestry does not include all members of the race does not suffice to make the classification race

15  neutral." *Id.* at 516–17. Where the classification is animated by a "racial purpose" and the "actual

16
    effects" are to segregate the population along racial lines, ancestry stands in for race. *Id.* at 517.
17
18  In support of this conclusion with respect to the Hawaii law, the Court pointed to explicit

19  references to "race" in early drafts of and senate committee comments on the class definitions.

20  *Id.* at 516. And yet the Court made it quite clear that even without this legislative history, the

21  Hawaii law offended the Fifteenth Amendment:
22
            The ancestral inquiry mandated by the State implicates the same grave
23      concerns as a classification specifying a particular race by name. One of the
        principal reasons race is treated as a forbidden classification is that it demeans the
24      dignity and worth of a person to be judged by ancestry instead of by his or her
        own merit and essential qualities. An inquiry into ancestral lines is not consistent
25
        with respect based on the unique personality each of us possesses, a respect the
26      Constitution itself secures in its concern for persons and citizens.
            The ancestral inquiry mandated by the State is forbidden by the Fifteenth
27      Amendment for the further reason that the use of racial classifications is
28

-24-

EXHIBIT A

corruptive of the whole legal order democratic elections seek to preserve. The law itself may not become the instrument for generating the prejudice and hostility all too often directed against persons whose particular ancestry is disclosed by their ethnic characteristics and cultural traditions. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). Ancestral tracing of this sort achieves its purpose by creating a legal category which employs the same mechanisms, and causes the same injuries, as laws or statutes that use race by name. The State's electoral restriction enacts a race-based voting qualification.

*Id.* at 517. Whereas the Court started with the somewhat timid proposition that "[a]ncestry can be a proxy for race," it ended by all but obliterating the distinction between ancestry and race.

   2.   *Northern Marianas Descent Is a Race-Based Classification*

Article XVIII of the Commonwealth Constitution creates voter qualifications strikingly similar to those that *Rice* found were race-based. It explicitly limits the right to vote on initiatives to amend Article XII to otherwise eligible voters "who are also persons of Northern Marianas descent . . ." N. Mar. I. Const., art. XVIII, § 5(c). Blood, in the first instance, defines who is and isn't an NMD. A person is of Northern Marianas descent if he or she "is of at least one-quarter Northern Marianas Chamorro or Carolinian blood or a combination thereof" or was adopted by an NMD before the age of eighteen. *Id.,* art. XII, § 4. A person will "be considered to be a full-blooded Northern Marianas Chamorro or Northern Marianas Carolinian" if two conditions are satisfied: (1) birth or domicile in the Northern Mariana Islands by 1950 and (2) Trust Territory citizenship before termination of the Trusteeship with respect to the Commonwealth. Membership in this group became fixed at the moment the Trusteeship terminated on November 3, 1986. People who met the two conditions were grandfathered in as full-blooded, without having to prove they descended from Northern Marianas Chamorros and Carolinians. Indeed, they became the ancestors from whom all other persons must prove descent in order to qualify as

EXHIBIT "A"

NMDs. Although the clause employs factors (birthplace, domicile, and citizenship) which on the surface are not racial, its purpose is to define who fully belongs to a group identified by ethnicity: Northern Marianas Chamorro or Carolinian.

Article XII's ancestry test is an effective substitute or proxy for race because it excludes nearly all persons whose ancestors were not Chamorro or Carolinian. Census data indicate that in 1950 the vast majority of people who made their home in the Northern Mariana Islands were natives. The total population in the Saipan District was 6,286. (1950 Report 64 (table B).)[10] Although the 1950 census does not break down the district's population by ethnicity, it does give such a breakdown for the overall population of the Trust Territory. Out of a total of 54,843 persons residing in the Trust Territory in 1950, 54,299 were "Native"; only 544 were "American" or "Other." (*Id.* at 63 (table A).) Thus, the number of non-Micronesians who made the Trust Territory their home was minuscule – well under 1 percent. Moreover, the 1950 census suggests that of those 544 non-natives, at least 300 were Japanese laborers on Angaur, an island that is now part of the Republic of Palau. The number of non-natives living in the Northern Marianas would not have been more than 200.

The number of non-natives who qualify as full-blooded Northern Marianas Chamorro or Carolinian is further restricted by the second condition: Trust Territory citizenship before termination of the Trusteeship with respect to the Commonwealth. Under the Trust Territory Code, persons born in the Trust Territory were deemed to be Trust Territory citizens, "except persons, born in the Trust Territory, who at birth or otherwise have acquired another nationality." 53 TTC § 1(1) (1970). Thus, a person born by 1950 in the Northern Marianas would not be designated as a Northern Marianas Chamorro or Carolinian if her father or mother was a citizen

---

[10] The municipality of Saipan accounted for about 86 percent of the population of the Saipan District. 1952 Report 15.

EXHIBIT A

of a country like the United States that passes citizenship from parents to children.

Defendants read the historical evidence differently. They characterize the population of the Northern Mariana Islands in 1950 as "surprisingly heterogeneous." (Def. Reply 3.) They point to data compiled by the Navy Department showing that not only "Islanders" but also "Whites" and "Asiatics" lived in the Saipan District. (*Id.* at 4, citing Navy Handbook 35.) They call attention to the anthropologist Alexander Spoehr's observation that "Chamorros have a long history of intermarriage with Spanish, other Europeans, Americans, Filipinos and . . . Japanese," and that perhaps as many as two dozen such outsiders had married Chamorros and Carolinians and become long-time residents of Saipan. Spoehr, *Saipan* 28. The Navy Handbook (at 49–50) likewise notes this tendency, as well as the postwar migration of persons of various ethnicities into and out of Saipan. (Def. Reply 5.)

Defendants' interpretation of this material is not persuasive. The mere fact that some number of persons who were not Chamorro or Carolinian made their home in Saipan in the late 1940s pales against the reality of how few such persons there were, both in absolute terms and as a percentage of the general population. According to the Navy Department, the estimated resident population of the Saipan District as of January 1, 1948, was 5,600 "Islanders," 9 "Whites," and 27 "Asiatics." (Navy Handbook 35 (table)). By this count, non-"Islanders" made up less than 1 percent of the population. Trust Territory census data, as noted earlier, tell a similar story. Moreover, almost all of these few non-natives had married into Chamorro or Carolinian families. The acceptance of these spouses as "full-blooded" natives served the practical purpose of keeping family property within the family for generations. Thus, in practice Article XII let into the group privileged to own property almost no one who did not have close familial ties to Northern Marianas Chamorros or Carolinians.

EXHIBIT "A"

The Commonwealth seeks to distinguish the NMD classification from the racial classifications that the State of Hawaii created. It notes that the class of persons defined by Article XII excludes some Chamorros and Carolinians (for example, Guamanian Chamorros) and includes some persons who have no Chamorro or Carolinian ancestors. Hawaii's definitions, however, were not all-inclusive or all-exclusive either. In *Rice,* Hawaii pointed out that persons whose Polynesian ancestors had left the Hawaiian Islands before 1778 would be outside the class, and that there was evidence some of the pre-1778 inhabitants had come to Hawaii from as far away as the Pacific Northwest. *Rice,* 528 U.S. at 514. The Supreme Court took a dim view of this argument: "Even if the residents of Hawaii in 1778 had been of more diverse ethnic backgrounds and cultures, it is far from clear that a voting test favoring their descendants would not be a race-based qualification." *Id.* The Court noted that Hawaii's historic isolation from migration routes had resulted in a native population that shared common physical characteristics and a common culture. *Id.* at 514–15. Similarly, preservation of the unique cultural identities of Northern Marianas Chamorros and Carolinians was the impetus behind Covenant § 805. "This Section expressly recognizes the importance of the ownership of land for the culture and traditions of the people of the Northern Mariana Islands . . ." Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands (Dec. 6, 1976), 116. The census data from around 1950 shows that almost all the people who made the islands their home at that time were native Chamorros and Carolinians.

Defendants find it significant that some "individuals who are not 'racially' or ethnically Chamorro or Carolinian can qualify as NMDs" by means of adoption. (Def. Opp'n 14.) Article XII gives persons adopted by NMDs before the age of eighteen NMD status, even if they acquired no Chamorro or Carolinian blood from their birth parents. To Defendants' thinking,

EXHIBIT A

race is established solely at birth; it is genetically acquired and immutable. Defendants posit, for example, that before the civil-rights era, a person born of African American parents "could not circumvent Jim Crow laws by virtue of being adopted by white parents." (*Id.* at 14–15.) In their view, the inclusion of some adoptees as NMDs "conclusively demonstrates" that the NMD classification is not racial. (*Id.* at 14.)

The problem with this argument is that there is nothing "conclusive" about the NMD classification itself other than the intent that Northern Marianas Chamorros and Carolinians comprise the majority of the class. Indeed, if L.I. 18-1 is approved by voters in November, adoptees who possess no blood quantum at the time of adoption will be written out of the class. The essential class characteristics are those of the ancestors, the persons deemed to be full-blooded Northern Marianas Chamorros and Carolinians. That generation, as previously shown, is made up almost entirely of ethnic Chamorros and Carolinians. Whether an exception is made for adoptees has no effect on the composition of the core class.

Other differences that Defendants point out between Article XII and the Hawaii laws examined in *Rice* do not lead to a different result. The definition of "native Hawaiian" under scrutiny in *Rice* referred explicitly to "the *races* inhabiting the Hawaiian Islands previous to 1778[.]" *Id.* at 516 (quoting Haw. Rev. Stat. § 10-2 (1993)) (emphasis added). Although "Hawaiian" was defined as "any descendant of the aboriginal *peoples* inhabiting the Hawaiian Islands . . ." (emphasis added), a conference committee report shows that the substitution of "peoples" for "races" was, as the drafters put it, "merely technical." *Id.* (quoting Haw. Rev. Stat. § 10-2 (1993) and Hawaii Senate Journal, Conf. Comm. Rep. No. 77 at 999). In contrast, the word "race" does not appear in section 4 of Article XII. Moreover, the drafters of the Constitution declared that one of the basic principles followed by the constitutional convention

**EXHIBIT A**

in implementing Covenant § 805 was to "avoid[] the use of any racial or ethnic classification to accomplish its purpose." Analysis of the Constitution 164.

Yet in spite of the drafters' avowed intentions, Article XII's test for eligibility to own land in fee simple depends on racial terminology. Article XII defines the group that can own land in terms of who is and isn't of "Northern Marianas Chamorro or Northern Marianas Carolinian blood" or adopted into a family with the right blood quantum. The Covenant, however, only required that interests in land acquisition be restricted to "persons of Northern Marianas descent[.]" Covenant § 805(a). It was the drafters of the Commonwealth Constitution who chose to tie NMD status to a blood relationship to the two ethnicities.[11]

In fairness, the drafters should not stand accused of injecting a racist ideology into a racially neutral concept of the Northern Marianas community. The historical record shows that the community was not "surprisingly heterogeneous" but unsurprisingly homogeneous. It was made up almost entirely of Chamorros and Carolinians, who had been ruled in the Northern Marianas by a succession of world powers – Spain, Germany, Japan, and the United States – for over four hundred years. *See* Analysis of the Constitution 170–71. The purpose of the land-alienation restrictions of the Commonwealth Constitution as well as the Covenant was, as Covenant § 805 declared, to "protect them against exploitation and to promote their economic advancement and self-sufficiency[.]" Those whom the negotiators of the Covenant and the framers of the Commonwealth Constitution saw as in need of protection were not the remnants

---

[11] The fiction that NMD is not racial has proved hard to maintain over time. Public Law 17-40, enacted in 2011, allows that CEC, in order to determine whether a voter is an NMD, may require the local hospital and local courts "to provide a copy of the original birth record showing the natural parents or ancestors of the person registering. Such birth record shall identify the *nationality and race* of the parents, i.e. NMD Chamorro or Carolinian or part NMD, etc." P.L. 17-40 § 2(c)(5) (emphasis added).

EXHIBIT A

of the Spanish, German, or Japanese colonizers but the native colonized peoples. The Analysis of the Constitution's declaration of race neutrality can be understood, on one hand, as an expression of the framers' aspiration to create a society that respects all persons regardless of race and, on the other, as an attempt to preempt the argument that was sure to come in the courts over whether the land-alienation restrictions violated the Equal Protection Clause. As it turned out, the Ninth Circuit upheld Article XII on other grounds – that the right to equal protection of the laws with respect to land ownership was not fundamental in the international sense – even if NMD was a racial classification. *See Wabol,* 958 F.2d at 1462.

The drafters of the Commonwealth Constitution recognized that they needed to devise a practical means to ascertain who was of Northern Marianas descent and who, therefore, could own land in fee simple. A combination of birthplace, domicile, and citizenship served as a workable proxy. The drafters admitted as much in their commentary on Article XII:

> [T]he Convention sought to design restrictions that would include in the group eligible to own land all those persons who are part of the community that has made the creation of the Commonwealth possible, and to exclude as nearly as possible only those persons who are not part of that community. In so doing, the Convention recognized that no classification system based on neutral principles can be completely effective or error-free, including only those who should be included or excluding only those who should be excluded. The Convention erred on the side of including a few of those persons who should be excluded rather than excluding any of those persons who should be included.

Analysis of the Constitution 167. This passage makes it clear that the "community" does not include everyone who was born or domiciled in the Northern Marianas by 1950 and a Trust Territory citizen by the termination date. The intent was to minimize, to the greatest degree possible, the number of persons not of Northern Marianas Chamorro or Carolinian blood who would gain fee-ownership rights:

> Over the years there has been some migration to and from these islands by people from each of [the] ruling nations and from the other islands in the pacific. People

EXHIBIT "A"

occasionally have come to the Northern Mariana Islands from other places. Most of these people came as administrators or entrepreneurs. They maintained their citizenships elsewhere and clung to their national identities. They did not adopt the culture or integrate with the people of the Northern Mariana Islands. Throughout the history of the Northern Mariana Islands, those who considered themselves as the people of the Northern Mariana Islands have been the Chamorros and the Carolinians who settled on various islands, formed a cohesive social group, worked for the political and economic betterment of the Northern Mariana Islands, and considered these islands as their home.

*Id.* at 171. Here, as in the text of Article XII itself, the drafters are forthright about the identity of the group they are defining: Northern Marianas Chamorros and Carolinians. In *Rice v. Cayetano,* the Supreme Court found that Hawaii laws impermissibly made ancestry a proxy for race where "the drafters of the statutory definition in question emphasized the 'unique culture of the ancient Hawaiians' in explaining their work. . . . The provisions before us reflect the State's effort to preserve that commonality of people to the present day." *Rice,* 528 U.S. at 515. The same can be said for Article XII. But it does not make the Article XII definitions any less racial.

Defendants ascribe significance to the choice of 1950 as a cutoff date. (Def. Opp'n 15–16.) In their view, the cutoff dates of 1778 in the Hawaii legislation (*Rice*) and 1866 in the Oklahoma amendment (*Guinn*) are "highly dubious" (Def. Opp'n 15), but 1950 is not. Defendants' seems to be saying that 1778 (the date of the first recorded European contact with the Hawaiian Islands) and January 1, 1866 (less than one month after ratification of the Thirteenth Amendment, which abolished slavery), are fraught with racial baggage that does not weigh down the Article XII date. They point to the "long history" of Chamorro intermarriage with European and Asian peoples predating 1950. (Def. Reply 4.)

Certainly, 1950 does not resonate in the history of the Northern Marianas the way 1778 and 1866 do in their respective contexts. Still, Defendants' implicit argument about the impurity of the Chamorro and Carolinian races by the mid-twentieth century is unconvincing. In spite of

EXHIBIT A

1   centuries of intermingling with other peoples, the Chamorros and Carolinians of the Northern

2   Marianas had maintained their distinctive languages, cultures, and identities. At oral argument,

3   the Commonwealth conceded that if Article XII read simply, "Only Northern Marianas

4   Chamorros and Carolinians can own land in fee simple," it would discriminate on account of

5   race. That would be so even if hardly any Chamorro or Carolinian family could show a "pure"

6

7   bloodline.

8       It is hard to evaluate Defendants' argument on this point fully without knowing why 1950

9   was chosen. The historical record at the Court's disposal does not give a clear answer. However,

10  a comparison of demographic data from 1950 and 1970 is instructive. According to the U.S.

11  Census, the total population of the Northern Mariana Islands (which comprised the Trust

12  Territory's Marianas District)[12] in 1970 as 9,640. 1970 Census, vol. 1, part 58, table 7. Of these,

13

14  372 were born in the United States and 155 were foreign born. *Id.* The remaining 9,113 were

15  born in U.S. territories, including the Trust Territory. *Id.* Thus, by 1970 the proportion of the

16  population who were not Chamorro or Carolinian by birth appears to have grown from under 1

17  percent in 1950 to more than 5 percent. It seems notable that the drafters, working in 1976,

18  looked back one generation (about 25 years) to set the birth and domicile term. That left out

19

20  relative newcomers to the islands. Still, without more to go on, the Court cannot draw any

21  conclusion, favorable or unfavorable to Defendants' position, from the choice of date.

22      A further issue raised by Defendants is whether the exclusion of Chamorros and

23

24  Carolinians residing outside the Northern Marianas makes the classification "Northern Marianas

25  descent" non-racial. The answer to that question is a firm no. Imagine a law that restricted fee-

26  simple ownership to white farmers. The fact that a white rancher could not own land in fee

27

28  ─────────────────────
[12] The district's name changed in 1962 from Saipan District to Marianas District.

1 would not save the law from scrutiny as a racial classification when a black farmer challenged it.

2 If logic itself weren't enough, the Supreme Court, as noted earlier, has disavowed the argument

3 that the failure of an ancestry test to include all members of the ethnic group "suffice[s] to make

4 the classification race neutral." *Rice,* 528 U.S. at 517.

5
6    3. *"Northern Marianas Descent" Is Not a Political Classification*

7       Defendants' insistence that Article XII creates a "political classification" (Def. Opp'n 9,

8 12) and not a racial one alludes to an argument that Hawaii raised in its defense in *Rice.* In

9 certain limited circumstances, the Supreme Court has upheld federal statutes that give a

10 preference to members of Native American tribes. The leading case, discussed extensively in

11
12 *Rice,* is *Morton v. Mancari,* 417 U.S. 535 (1974). *Mancari* validated federal employment

13 preferences for Native Americans in the Bureau of Indian Affairs ("BIA"). The Court found that

14 the preferences applied to "tribal Indians . . . not as a discrete racial group, but, rather, as

15 members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in

16 a unique fashion." *Mancari,* 417 U.S. at 554. The Court characterized the preference as "*political*

17 rather than racial in nature*" (emphasis added) because it "applies only to members of 'federally

18 recognized' tribes" and "operates to exclude many individuals who are racially to be classified as

19
20 'Indians.'" *Id.* at n.24.

21       Hawaii argued that the status of "Hawaiians" and "native Hawaiians" was similar enough

22 to that of tribal Indians to merit similar treatment of them as political classifications. *Rice,* 528

23
24 U.S. at 518. The Court held that even if Hawaii were right – big "if," according to the Court –

25 and Congress may "treat the native Hawaiians as it does the Indian tribes[,]" Hawaii's argument

26 fails because "Congress may not authorize a State to create a voting scheme of this sort." *Id.* at

27 518–19. And what sort was that? All that the State wanted to do was restrict voting rights for
28

-34-

EXHIBIT "A"

trustee to the voters who were the sole beneficiaries of the trust – "Hawaiians" and "native

Hawaiians." And yet because the trust (the Office of Hawaiian Affairs) "remains an arm of the

State . . . the elections for OHA trustee are elections of the State, not of a separate quasi

sovereign, and they are elections to which the Fifteenth Amendment applies." *Id.* at 521–22.

Article XVIII, § 5(c) and Public Law 17-40 can fair no better. There is no meaningful

categorical difference between them and the Hawaii laws. The vote on Article XII initiatives will

accept or reject amendments to the Commonwealth Constitution, to which all citizens of the

Commonwealth, NMD and non-NMD alike, are subject. Moreover, non-NMDs have a more

direct stake in the fate of the initiatives than non-"Hawaiians" had in the governance of the

OHA. The initiatives concern ownership rights not just to a small percentage of land reserved for

NMDs, but to all real property privately held in the twelve islands of the Commonwealth.

Whether Article XII is repealed, or amended to modify the blood quantum or extend the

allowable period of long-term leases, will impact the lives of all Commonwealth citizens. That

impact will be felt not only by those who are looking to buy or sell land. Lifting or modifying

restrictions on land ownership will likely have a lasting effect, for better or worse, on the overall

economy of these islands.

The Supreme Court has made it clear that the Fifteenth Amendment "establishes a

national policy . . . not to be discriminated against as voters in elections to determine public

governmental policies . . ." *Terry v. Adams,* 345 U.S. 461, 467 (1953), *quoted in Rice,* 528 U.S.

at 514. Article XII initiatives are elections that "determine public governmental policies." Every

Commonwealth citizen otherwise qualified to vote can claim a profound interest in the outcome

of the ballot initiatives. If the Hawaii laws at issue in *Rice* did not come under the *Mancari*

exception, neither do the Commonwealth laws at issue here.

EXHIBIT A

1    Having found that the NMD classification is racial, the Court declares that Article XVIII,

2  § 5(c) of the Commonwealth Constitution impermissibly imposes race-based restrictions on the

3  voting rights of non-NMDs, in violation of the Fifteenth Amendment, and will enjoin the

4  Commonwealth and its officials from enforcing Article XVIII, § 5(c) and any Commonwealth

5  laws and regulations designed to effectuate it.

6

7    B.    Article XVIII, § 5(c) Violates the Right to Equal Protection of the Laws, as
         Guaranteed by the Fourteenth Amendment

8
     The Fourteenth Amendment provides that no State shall "deny to any person within its
9
10 jurisdiction the equal protection of the laws." Even if Article XVIII, § 5(c) did not impose a

11 racial test for qualification to vote on Article XII initiatives, it would be invalid if it violates the

12 Fourteenth Amendment guarantee of equal protection of the laws with respect to voting. Plaintiff

13 asserts that by limiting the right to vote on Article XII initiatives to NMDs, Article XVIII, § 5(c)

14
15 impermissibly violates the Fourteenth Amendment because the Commonwealth has no

16 compelling interest in restricting voting on land-alienation initiatives to NMDs. (MSJ 17.)

17    Defendants respond that the voting-rights restriction is permissible on two grounds: (1)

18 Article XII ballot initiatives are special limited-purpose elections for which the government may

19
   restrict voting without offending the principle of "one person, one vote"; and (2) in the
20
21 alternative, Article XVIII, § 5(b) is narrowly tailored to accomplish a compelling state interest.

22 (Def. Opp'n 18.) Additionally, Defendants maintain that equal protection of the voting-rights

23 laws does not apply in elections to modify land-alienation restrictions, nor is it "fundamental in

24 the international sense," and that it may, therefore, be waived by Congress with respect to the

25
   territories. (Id. at 25.)
26
27    1.   Article XII Initiatives Are Not Special Limited-Purpose Elections

28    Elections to a district board that has a special limited purpose, and whose decisions

-36-

EXHIBIT A

disproportionately affect one class of citizens, may be exempted from the constitutional

guarantee of "one person, one vote." *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.,*

410 U.S. 719, 728 (1973); *also Ball v. James,* 451 U.S. 355 (1981). Relying on *Salyer* and *Ball,*

Defendants assert that the voting restrictions of Article XVIII, § 5(c) are "acceptable because any

vote to amend Article XII would be a special election that disproportionately affects NMDs . . ."

(Def. Opp'n 18–19.)[13]

Defendants' reliance is misplaced. *Salyer* and *Ball* concern "the limits imposed by the

Equal Protection Clause of the Fourteenth Amendment on legislation apportioning representation

in state and local governing bodies and establishing qualifications for voters in the election of

such representatives." *Salyer,* 410 U.S. at 720. It is not the election that is for a special limited

purpose, but the district or unit of government. *See Kirk v. Carpenter,* 623 F.3d 889, 897 (9th

Cir. 2010) ("states and localities can restrict voting in certain elections involving so-called

'limited purpose entities'"). In *Salyer,* the government unit was a water storage district, *id.* at

721; in *Ball,* it was a water reclamation district, 451 U.S. at 357. The Commonwealth restrictions

on voting on Article XII ballot initiatives are not elections for a special limited-purpose district.

The unit of government is the entire Commonwealth.

A more pertinent set of "special limited-purpose" cases involves state laws giving only

property taxpayers the right to vote on certain bond initiatives. In *Cipriano v. City of Houma,*

395 U.S. 701 (1969), and *City of Phoenix v. Kolodziejski,* 399 U.S. 204 (1970), the Supreme

Court struck down such laws as invidiously discriminating against non-landowners. *Cipriano*

---

[13] A similar argument was made in *Rice.* But because that case was decided on Fifteenth Amendment grounds, the Supreme Court declined to settle whether *Salyer* and *Ball* would provide Hawaii relief from a Fourteenth Amendment challenge. The Court did opine, however, that "it is far from clear that the *Salyer* line of cases would be at all applicable to statewide elections for an agency with the powers and responsibilities of [the Office of Hawaiian Affairs]." *Rice,* 528 U.S. at 522.

EXHIBIT "A"

involved a statute that prevented persons who did not pay property taxes from voting to approve the issuance of revenue bonds by a municipal utility. 395 U.S. at 702–03. The Court required the city to show it was necessary to exclude non-property taxpayers to promote a compelling government interest, and that "all those excluded are in fact substantially less interested or affected than those the statute includes." *Id.* at 704 (quoting *Kramer v. Union Free School District No. 15,* 395 U.S. 621, 632 (1969)). It determined that non-property taxpayers' interest in the bond issues' effect on utility rates was not substantially less than property taxpayers' interest in the effect on land values. "The challenged statute contains a classification which excludes otherwise qualified voters who are as substantially affected and directly interested in the matter voted upon as are those who are permitted to vote." *Id.* at 706. In *City of Phoenix,* the asserted interest of landowners was stronger than in *Cipriano*: debt on general obligation bonds would be serviced, in large part, by the levying of property taxes. *City of Phoenix,* 399 U.S. at 208. Even so, the Court held that the interest of renters in the public facilities and services supported by bonds was strong enough that they could not be excluded from voting. *Id.* at 209.

"Presumptively, when all citizens are affected in important ways by a governmental decision subject to a referendum, the Constitution does not permit . . . the exclusion of otherwise qualified citizens from the franchise. . . . Placing such power in property owners alone can be justified only by some overriding interest of those owners that the State is entitled to recognize." *Id.*

The Commonwealth has not shown an overriding interest that justifies the challenged voter restrictions. The effect of changes to Article XII will not fall disproportionately on NMDs. All citizens have an equal interest in whether they are entitled to buy real property, and on what terms. The interest of the non-privileged class in whether the privilege will be extended to them is as substantial as the interest of the privileged class in whether it will remain exclusive. This is

Case 1:14-cv-00002 Document 20 Filed 06/05/14 Page 42 of 55
Case 1:14-cv-00002 Document 15 Filed 05/20/14 Page 39 of 51
EXHIBIT "A"

not to discount the interest of Northern Marianas Chamorros and Carolinians, recognized in the Covenant and validated in *Wabol,* to preserve their ancestral lands. But that interest does not override the stake the Commonwealth's non-NMD citizens have in whether they will ever be able to own outright the land on which they make their homes. Article XII ballot initiatives, therefore, are not special limited-purpose elections, but general-interest elections in which all otherwise qualified voters have the right to participate.

2. *Article XVIII, § 5(c) Is Not Narrowly Tailored to Achieve a Compelling State Purpose*

Equal protection of the laws includes equal protection of the voting laws. "It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote." *Reynolds v. Sims,* 377 U.S. 533, 554 (1964). Voting-rights restrictions "strike at the heart of representative government." *Id.* at 555.

In a general-interest election, "any classification restricting the franchise on grounds other than residence, age, and citizenship cannot stand unless the district or State can demonstrate that the classification serves a compelling state interest." *Hill v. Stone,* 421 U.S. 289, 297 (1975). Absent such a showing, "the Equal Protection Clause prohibits states from imposing voter qualifications that result in the wholesale exclusion of a particular constituency from an election[.]" *Kirk,* 623 F.3d at 896. Even if the state's interest is compelling, the classification must be narrowly tailored so that the exclusion of the plaintiff's class of voters "is necessary to achieve the articulated state goal." *Kramer,* 395 U.S. at 632. A law is narrowly tailored "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz,* 487 U.S. 474, 485 (1988).

The Commonwealth asserts it has a compelling interest "in ensuring that the community that negotiated the Covenant decides the fate of one of the Covenant's core provisions, namely

EXHIBIT A

1   restrictions on land alienation, that are explicitly designed to protect the members of that

2   community from exploitation." (Def. Opp'n 24.) It likens this interest to others that courts have

3   found compelling, such as protecting minors from exposure to sexually explicit materials and, in

4   Defendants' words, "ensuring voters make educated choices." (*Id.*) The commonality the

5   Commonwealth seems to see in these interests is the state's paternal obligation to protect the

6   weak and vulnerable from those who would deceive or corrupt them.

7

8       On close examination, the proffered analogy does not hold up. To start with, the

9   Commonwealth has misconstrued the voter-education example. In the case the Commonwealth

10  cites in support, *Howlett v. Salish and Kootenai Tribes,* the state's compelling interest was in

11  "attempting to see that the voters have the *opportunity* that their choice be an informed one." 529

12  F.2d 233, 243–44 (9th Cir. 1976) (emphasis added). The court upheld a stringent one-year

13  residency requirement for candidates to a tribal council which was designed to provide the

14  electorate, spread over three rural and sparsely populated counties, "with the opportunity to

15  observe and acquire first-hand knowledge of prospective candidates." *Id.* at 244. The compelling

16  purpose that the court recognized was not to help a class of naïve aboriginals, unschooled in the

17

18  ways of democracy, become educated voters. The court disavowed any notion that the state

19  should, as Defendants put it, ensure voters make educated choices. "Less than all voters will

20  observe, learn and rationally choose," said the Ninth Circuit, "but this is not to deny to the state

21  its interest in extending the opportunity." *Id.* As to the second example, laws protecting minors

22

23  from exposure to sexually explicit materials rest on the state's unique purpose in promoting

24  "[t]he well-being of its children . . ." *Ginsberg v. New York,* 390 U.S. 629, 639 (1968). The

25  state's power "to control the conduct of children reaches beyond the scope of its authority over

26

27  adults." *Id.* at 638 (quoting *Prince v. Massachusetts,* 321 U.S. 158, 170 (1944)).

28

The Commonwealth has not demonstrated that the descendants of the founding generation of Chamorros and Carolinians have a need to be protected. Historically, that sort of paternalism did animate the adoption of Covenant § 805. "This Section expressly recognizes the importance of the ownership of land for the culture and traditions of the people of the Northern Mariana Islands and the desirability of protecting them against exploitation and promoting their economic advancement and self-sufficiency." Analysis of the Covenant 116. And it supported the *Wabol* court's conclusion, in 1990, that Article XII is shielded from the Fourteenth Amendment: "The land alienation restrictions are properly viewed as an attempt, albeit a paternalistic one, to prevent the inhabitants from selling their cultural anchor for short-term economic gain, thereby protecting local culture and values and preventing exploitation of the inexperienced islanders at the hands of resourceful and comparatively wealthy outside investors." *Wabol,* 958 F.2d at 1461. Current burdens that a law imposes on voting rights, however, "must be justified by current needs." *Northwest Austin Mun. Utility Dist. No. One v. Holder,* 557 U.S. 193, 203 (2009). The Commonwealth has made no showing that today's NMD voters need protection.

Cutting against the Commonwealth's position is the fact that prior to the passage of Section 5(c) in 1999, non-NMDs were permitted to vote on two proposed changes to Article XII: the enlargement of the maximum leasehold term to 55 years, and the restriction of corporate NMD status by requiring a corporation's directors and voting shares to be 100 percent NMD. Defendants have not suggested that the social contract between the government and the people was damaged by the participation of non-NMDs in the ratification vote, or that the political legitimacy of those amendments has been seriously questioned. The Commonwealth has intimated that its compelling interest is limited to proposals for repeal – that is, limited to

EXHIBIT A

insuring that the beneficiaries of Article XII themselves consent to relinquishing its protections. But if that is so, then the voting restrictions on Article XII amendments are overbroad and not narrowly tailored to cure the alleged evil.

Narrow tailoring is problematic for other reasons, too. The Commonwealth asserts that the voting restrictions seek to eliminate "the potential to allow many 'resourceful and comparatively wealthy *businessmen'* to vote to abolish the very protections that currently prevent them from exploiting the NMD population." (Def. Opp'n 24.) (emphasis added.) The Commonwealth's quotation from *Wabol* makes the silent substitution of "businessmen" for "outside investors." By doing so, this effectively expands the scope of Article XII's aim beyond what the Covenant allows. The Covenant enabled "the people of the Northern Marianas . . . to prevent the alienation of their land to outsiders . . ." Analysis of the Covenant 116. Nowhere does it indicate a concern over the malign influence of *insiders* – non-NMD citizens who make the Commonwealth their home and are entitled to vote in all other general elections in the CNMI.

The Commonwealth presents no evidence that the disenfranchisement of non-NMDs in Article XII ballot initiatives will prevent comparatively wealthy businesspeople from exploiting NMDs. Nor does it appear categorically to be true. It is equally possible that many non-NMD voters are not wealthy; and that while they may be able to afford a long-term lease in a depressed housing market, they would be priced out of a reinvigorated market for land in fee simple if restrictions were lifted. Likewise, there may be wealthy NMDs who have amassed cheap land over the past forty years and would favor repealing Article XII in anticipation of windfall profits. If that alternative set of speculative assumptions were to prove accurate, Section 5(c) of Article XVIII could be a formula for disaster – assuming, as the Commonwealth seems to have done,

EXHIBIT A

1   that the best interest of most Northern Marianas Chamorros and Carolinians is to leave Article

2   XII alone or only trim it at the edges.

3       The United States Supreme Court has repeatedly emphasized that

4           discrimination itself, by perpetuating "archaic and stereotypic notions" or by
5           stigmatizing members of the disfavored group as "innately inferior" and
            therefore as less worthy participants in the political community, can cause
6           serious non-economic injuries to those persons who are personally denied
            equal treatment solely because of their membership in a disfavored group.
7

8   *Heckler v. Mathews,* 465 U.S. 728, 739–40 (1984) (internal citations omitted). The danger of this

9   type of injury is acute when the favored group cannot show a compelling reason to extend the

10  exclusion of others beyond the narrow confines of absolute necessity. Here, the exclusion of non-

11
12  NMDs from voting on Article XII risks perpetuating the sort of outdated and overbroad

13  stereotypes about NMDs and non-NMDs that the Equal Protection Clause is designed to combat.

14  Section 5(c) of Article XVIII of the Commonwealth Constitution violates the Fourteenth

15  Amendment.

16      3.  *Equal Protection of the Laws Applies in the Commonwealth With Respect to Voting*
17
18          *on Article XII Initiatives*

19
20      Defendants assert that in spite of any conflict with the Fourteenth Amendment, Article

21  XVIII, § 5(c) is a legitimate exercise of the Commonwealth government's power to regulate land

22  alienation under Covenant § 805 and is exempted from application of the Fourteenth

23  Amendment. Covenant § 501(b) states that "[t]he applicability of certain provisions of the

24  Constitution of the United States to the Northern Mariana Islands will be without prejudice to the

25  validity of and the power of the Congress of the United States to consent to . . . [Section] 805 . .
26
27  ." It has been held that Congress did not exceed its powers under the Territories Clause by

28  insulating the land-alienation restrictions of Covenant § 805 from equal-protection attack. *See*

EXHIBIT A

*Wabol,* 958 F.2d at 1462. Defendants assert that the same is true with respect to the right to vote on changes to existing land-alienation restrictions.

The starting place for this inquiry is the text of Covenant § 805:

> [T]he Government of the Northern Mariana Islands . . . will until twenty-
> five years after the termination of the Trusteeship Agreement, and may thereafter,
> regulate the alienation of permanent and long-term interests in real property so as
> to restrict the acquisition of such interests to persons of Northern Mariana Islands
> descent[.]

The 25-year period has run, and the Commonwealth government may now repeal all land-alienation restrictions or continue to regulate long-term interests in land. If allowing non-NMDs to vote on Article XII would not prejudice the validity of land-alienation restrictions, then Article XVIII, § 5(c) and the Commonwealth laws and regulations that implement it must comport with the Fourteenth Amendment.

Defendants maintain that the voting-rights restrictions are permissible because non-NMDs had a vote in the 1999 ballot initiative to approve Section 5(c) of Article XVIII. "The voters of the Commonwealth, properly considered to be the 'Government of the Northern Mariana Islands' in a democracy, legitimately exercised this power [to regulate alienation of land] by amending the Commonwealth Constitution to restrict the right to vote on amendments to Article XII . . ." (Def. Opp'n 11.) "The Commonwealth voters, acting as a whole pursuant to the procedures for amending the Commonwealth Constitution, can be properly understood as 'the Government of the Northern Mariana Islands' in the most fundamental sense." (*Id.* at 26.)

This is an argument that only the most ardent lover of majoritarian excesses could embrace. It is a sure-fire formula for majority groups to strip minorities of valuable political rights and consolidate power for themselves. And it misconstrues the nature of voting rights. "The right to vote is personal . . ." *United States v. Bathgate,* 246 U.S. 220, 227 (1918). Voting

1  rights subject to equal protection are "individual and personal in nature." *Reynolds,* 377 U.S. at

2  561 (1964). *See also Burdick v. Takushi,* 504 U.S. 428, 433 (1992) (noting "individual's right to

3  vote"). "An individual's constitutionally protected right to cast an equally weighted vote cannot

4  be denied even by a vote of a majority of a State's electorate[.]" *Lucas v. Forty-Fourth General*

5
  *Assembly of the State of Colorado,* 377 U.S. 713, 736 (1964) (rejecting constitutionally defective
6

7  apportionment plan approved in popular referendum). Plaintiff Davis's right to vote belongs to

8  Plaintiff Davis personally. It was beyond the power of the voters in 1999 to relinquish it on his

9  behalf.

10     A more substantial argument is that Congress implicitly consented to restrict voting on

11
   land-alienation restrictions. If in Section 805 "the Government of the Northern Mariana Islands"
12

13  means only Northern Marianas Chamorros and Carolinians, then it may prejudice the validity of

14  Section 805 to let non-NMDs vote on Article XII initiatives. Although not well developed in

15  Defendants' papers, this is the position that the Commonwealth legislature took when it passed

16  Public Law 17-40:
17

18          The Legislature . . . finds . . . that Covenant § 805 in part stated that, "the
        Government of the Northern Mariana Islands, in view of the importance of the
19      ownership of land for the culture and tradition of the people of the Northern
        Mariana Islands, and in order to protect them against exploitation and to promote
20      their economic advancement and self-sufficiency," by this direct mentioned [*sic*]
        of "the people of the Northern Mariana Islands", is clearly referring to persons of
21      Northern Marianas Chamorro and Carolinian descent who negotiated and voted
        for the Covenant.
22

23  P.L. 17-40 § 1 (2011). The Marianas Political Status Commission seems to have had a similar

24  view:
25

26          Thus, it will be entirely up to the Government of the Northern Marianas and the
        people of the Northern Marianas to determine the precautions which they will
27      take to prevent their land from being alienated. Section 805 and the underlying
        authority of the local government which it recognizes will permit land alienation
28      restraints regardless of any other provision of the Covenant . . .

EXHIBIT "A"

1   Analysis of the Covenant 117–18.

2       The problem with this argument is that the government of the Northern Mariana Islands
3
    in 2014 is not restricted to blood descendants of the people who negotiated the Covenant in the
4
5   mid-1970s, any more than the government of the United States in 2014 is limited to those who
6   can trace their bloodline back to the founders of the Republic. In their opposition brief,
7   Defendants recognized that in a democracy, the voters are properly considered to be the
8
9   government. (*See* Def. Opp'n 11.) Allowing all qualified Commonwealth voters, NMD and non-
10  NMD alike, to participate in Article XII ballot initiatives does not frustrate the purpose of
11  Section 805 to permit the Government of the Northern Mariana Islands to reconsider land-
12  alienation restrictions, but positively promotes it.

13      Because Congress did not consent to insulate Article XII from application of the United
14
15  States Constitution's voting-rights guarantees, the carve-out provisions of Covenant §§ 501(b)
16  and 805 do not afford safe harbor to Article XVIII, § 5(c) and its implementing legislation and
17  regulations.[14] To the extent those laws would prevent Plaintiff Davis from voting on Article XII
18  ballot initiatives, they violate the Fourteenth and Fifteenth Amendments and are unenforceable.
19
20  The Court therefore grants summary judgment to the Plaintiff on his first and second claims for
21  relief.

22

23      [14] Having determined that Congress did not waive application of equal protection of the laws with
    respect to voter initiatives on land-alienation restrictions, it is unnecessary to decide whether Congress
24  has the *power* to waive it – whether equal protection of the voting laws is "fundamental in the
    international sense." It is worth noting, however, that the Supreme Court has called voting a "fundamental
25  political right, because preservative of all our rights." *Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886).
    "Voting is one of the most fundamental and cherished liberties in our democratic system of government."
26  *Burson v. Freeman,* 504 U.S. 191, 214 (1992) (Kennedy, J., concurring). Not only *our* democratic
    system: the right to vote is guaranteed in the Universal Declaration of Human Rights: "The will of the
27  people shall be the basis of the authority of government; this will shall be expressed in periodic and
28  genuine elections which shall be by universal and equal suffrage . . ." G.A. Res. 217 A (III), U.N. Doc.
    A/810 (1948), art. 21 § 3.

EXHIBIT "A"

C. Public Law 17-40 Is Invalid Insofar as It Violates Federal Voting-Rights Guarantees

In his third, fourth, and fifth claims for relief, Plaintiff asserts that Public Law 17-40 violates the Fourteenth and Fifteenth Amendments and 42 U.S.C. § 1971(a), which entitles all United States citizens who are otherwise qualified to vote in a state or territory "to vote at all such elections, without distinction of race, color, or previous condition of servitude[.]"

The primary purpose of Public Law 17-40 is to effectuate Article XVIII, § 5(c) and ensure "that 'only' persons of Northern Marianas descent can vote on Constitutional amendments affecting the protection against alienation of lands." P.L. 17-40 § 1 (Findings and Purposes). But this is not the act's only purpose. Prior to the act's passage, the Department of Public Lands had, for a time, registered NMDs to determine whether persons applying for homesteads qualified to acquire land in fee simple. *Id.* § 1, § 3(b). Also, CEC had begun to keep a separate registry, but without express authorization from the legislature. *Id.* § 1. A secondary purpose of P.L. 17-40 was to centralize NMD registration. *Id.* (finding it "necessary to mandate the establishment and control of the registry of persons of Northern Marianas descent within the Office of the Commonwealth Election Commission").

In defending against the merits of Plaintiff's taxpayer claim, Defendants asserted that even if discrimination against non-NMDs in voting on Article XII initiatives is unconstitutional, the sections of P.L. 17-40 that create the NMDR are lawful because the registry serves "other important public purposes unrelated to voter registration." (Def. Opp'n 34.) They pointed out that these purposes are still legitimate because race-based discrimination in the application of land-alienation laws was upheld in *Wabol*. (*Id.* at 35.)

It may well be that the Commonwealth has a compelling interest in accurately determining which applicants for homesteads qualify, and that the creation of an NMD registry

EXHIBIT A

and the issuance of NMD identity cards are narrowly tailored to effectuate this purpose. It is also possible that once its election provisions are severed, P.L. 17-40, like Article XII, is shielded from equal-protection attack by Covenant § 501(b). Plaintiff's claim for relief, however, does not require the Court to decide those questions. Plaintiff only seeks to vindicate his voting rights. He does not claim that P.L. 17-40 injures him in other ways. The issuance of official identification cards to members of a privileged class could, for example, run the risk of stigmatizing those who do not qualify for a card and inciting hostility against them. *See Shaw v. Reno,* 509 U.S. 630, 643 (1993). Without the need to sort NMD from non-NMD voters efficiently at the polls, the need for NMD identity cards at all is not obvious. But the identity card itself does not cause the impending injury of which Plaintiff complains. Therefore, the Court will not disturb those provisions of P.L. 17-40 and its implementing regulations that create an NMD registry and identity cards. The Commonwealth does not have to discontinue those practices, however it cannot use the registry or identity cards to determine voter eligibility. With that sole limitation, the Court grants summary judgment to Plaintiff on the third, fourth, and fifth causes of action.

D. <u>Section 1983</u>

Section 1983 of Title 42 of the United States Code "provides a cause of action against any person who, under the color of state law, abridges rights 'unambiguously' created by the Constitution or laws of the United States." *Crowley v. Nevada,* 678 F.3d 730, 734 (9th Cir. 2012). Plaintiff is asking for an injunction to prevent CEC Executive Director Guerrero and CEC Chairperson Sablan from interfering with his right to vote on Article XII ballot initiatives. State officers sued in their official capacities are "persons" within the meaning of § 1983 so long as the plaintiff seeks only prospective injunctive relief. *Doe v. Lawrence Livermore Nat. Laboratory,* 131 F.3d 836, 839 (9th Cir. 1997).

EXHIBIT A

1        The constitutional rights to equal protection of the voting laws and to freedom from racial

2    restrictions in voting are clearly established. The Court has already determined that Article

3    XVIII, § 5(c) and Public Law 17-40 violate those rights. Any action that Defendants Guerrero

4    and Sablan take, consistent with those Commonwealth laws, to prevent Plaintiff from casting a

5    ballot on Article XII initiatives likewise violates those rights. Therefore, summary judgment is

6    
7    granted to Plaintiff on his seventh claim for relief.

8        E.   Section 1971(a)(2)(A)

9        Section 1971(a)(2) of Title 42 of the United States Code provides as follows:

10   
11           No person acting under color of law shall – (A) in determining whether an
     individual is qualified under State law or laws to vote in any election, apply any
12   standard, practice, or procedure different from the standard, practices, or
     procedures applied under such law or laws to other individuals within the same
13   county, parish, or similar political subdivision who have been found by State
     officials to be qualified to vote[.]
14   

15   For example, an election official who requires students to fill out a residency questionnaire but

16   does not require non-students to do so may be violating § 1971(a)(2)(A). *See Shivelhood v.*

17   *Davis,* 336 F. Supp. 1111 (D. Verm. 1971) (officials must not require students to fill out

18   supplemental questionnaire unless all applicants are required to fill one out); *Ballas v. Symm,* 494

19   
20   F.2d 1167, 1171–72 (5th Cir. 1974) (no violation where county registrar required questionnaire

21   only when he lacked personal knowledge of whether student applicant met residency

22   requirements).

23       The CEC requires all otherwise qualified Commonwealth voters who wish to vote on

24   Article XII initiatives to swear out the same standardized affidavit to prove they are NMDs.

25   
26   Election officials do not apply one set of standards and procedures to NMDs and another to non-

27   NMDs. Under P.L. 17-40, all Commonwealth voters have to jump through the same hoop.

28   Therefore, § 1971(a)(2)(A) does not provide Plaintiff relief. Summary judgment on the sixth

EXHIBIT "A"

claim for relief is granted to Defendants.

## VIII.  CONCLUSION AND ORDER

Northern Marianas descent, as defined in Section 4 of Article XII of the Commonwealth Constitution, is a racial classification, and under federal law it may not serve as the basis for preventing otherwise qualified voters from voting on proposed amendments to Article XII. Even if Northern Marianas descent were not a racial classification, it would be unconstitutional to deny non-NMDs the right to vote on Article XII initiatives because the restriction is not narrowly tailored to achieve a compelling state purpose. The constitutional protections of the Fourteenth and Fifteenth Amendments with respect to the right to vote on initiatives to modify or repeal land-alienation restrictions are applicable in the Commonwealth.

For the foregoing reasons, the Court orders as follows:

(1) Plaintiff's Motion for Summary Judgment (ECF No. 4) and Defendants' Cross Motion for Summary Judgment (ECF No. 10) are GRANTED IN PART and DENIED IN PART, as indicated below.

(2) Summary judgment is granted in favor of Plaintiff Davis on his first five claims for relief, namely, a finding and declaration that Section 5(c) of Article XVIII of the Commonwealth Constitution and Public Law 17-40 violate the voting-rights guarantees of the Fourteenth and Fifteenth Amendments of the United States Constitution and 42 U.S.C. § 1971(a)(1).

(3) Summary judgment is granted in favor of Plaintiff Davis on his § 1983 action against Defendants Guerrero and Sablan (seventh claim for relief).

(4) Summary judgment is granted in favor of Defendants on Plaintiff's § 1971(a)(2)(A) action (sixth claim for relief) and Commonwealth taxpayer action (eighth claim for

**EXHIBIT A**

relief).

(5) Governor Inos is not a proper party and therefore is dismissed from this lawsuit as a named defendant.

(6) The Commonwealth is permanently enjoined from enforcing Article XVIII, § 5(c), and from enforcing Public Law 17-40 and any CEC rules and regulations implementing that law, insofar as such enforcement would prevent or hinder Plaintiff and other qualified voters who are not NMDs from voting on Article XII ballot initiatives.

(7) The Commonwealth may continue to maintain the Northern Marianas Descent Registry and issue Official Northern Marianas Descent Identification Cards for purposes not associated with voting, but is permanently enjoined from using the Registry and Identification Cards to qualify voters or to identify qualified voters at the polls.

(8) Plaintiff's claim for attorney fees and costs is to be submitted to the Court within 10 days of the date of this order. Defendants' response is due 14 days after Plaintiff submits his claim.

The Clerk is directed to enter judgment for Plaintiff on the first, second, third, fourth, fifth, and seventh claims for relief, and for Defendants on the sixth and eighth claims for relief. The case remains open, pending disposition of Plaintiff's request for fees and costs.

SO ORDERED this 20th day of May, 2014.

Ramona V. Manglona
Chief Judge

EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| JOHN H. DAVIS, JR., | Case No.: 1-14-CV-00002 |
| Plaintiff, | |
| v. | **ENTRY OF JUDGMENT** |
| COMMONWEALTH ELECTION COMMISSION; FRANCES M. SABLAN, Chairperson of Commonwealth Election Commission; ROBERT A. GUERRERO, Executive Director of Commonwealth Election Commission; ELOY INOS, Governor of the Commonwealth of the Northern Mariana Islands, | |
| Defendants. | |

In accordance with the court's Memorandum Decision and Order Granting in Part and Denying in Part Plaintiff's Motion and Defendant's Cross Motion for Summary Judgment issued on May 20, 2014 (ECF No.15), the clerk hereby enters judgment as follows:

For Plaintiff on the first, second, third, fourth, fifth, and seventh claims for relief.

For Defendants on the sixth and eighth claims for relief.

The court awarded reasonable attorney's fees and costs to Plaintiff in its *Order Awarding Fees and Taxing Costs* on June 2, 2014. (*See* ECF No. 18).

SO ENTERED this 2nd day of June, 2014.

HEATHER L. KENNEDY
Clerk of Court

-1-