OFFICE OF THE ATTORNEY GENERAL
Gilbert J. Birnbrich
Attorney General
Charles E. Brasington
Assistant Attorney General
Hon Juan A. Sablan Mem. Bldg., 2nd Floor
Saipan, MP  96950-8907
Tel:     (670) 237-7500
Fax:    (670) 664-2349
e-mail: charles.brasington.law@gmail.com

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS**

**JOHN H. DAVIS, JR.**

     **Plaintiff,**

  v.

**COMMONWEALTH ELECTION COMMISSION; FRANCES M. SABLAN, Chairperson of the Commonwealth Election Commission; ROBERT A. GUERRERO, Executive Director of the Commonwealth Election Commission; ELOY INOS, Governor of the Commonwealth of the Northern Mariana Islands.**

     **Defendants.**

CIVIL CASE No. 14-0002

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SEQUESTRATION OF BALLOTS PENDING APPEAL**

**Judge:**  Ramona V. Manglona

**Date:**  October 29, 2014

**Time:**  2:00 p.m.

## I. **INTRODUCTION**

Defendants Commonwealth Election Commission, Frances M. Sablan, Chairperson of the Commonwealth Election Commission, Robert A. Guerrero, Executive Director of the Commonwealth Election Commission, Eloy S. Inos, Governor of the Northern Mariana Islands (collectively, "the Commonwealth") hereby move for an order enjoining the Commonwealth Election Commission ("CEC") from tabulating the votes on House Legislative Initiative 18-1 and sequestering the ballots until resolution on appeal.

As this Court is well aware, Article XII of the Commonwealth Constitution restricts ownership of permanent interests in real property to persons of Northern Marianas descent ("NMD").[1] Article XVIII, § 5(c), in turn provides that to qualify as a "voter" for purposes of proposed amendments to Article XII a person must be of NMD. House Legislative Initiative 18-1 is a proposed amendment to Article XII.

Plaintiff-Appellee John H. Davis, Jr. challenged the constitutionality of Article XVIII § 5(c). The this Court held that Article XVIII § 5(c) (and related legislation) violated the Fourteenth and Fifteenth Amendments, and 53 U.S.C. § 10101. This Court further held the all qualified and registered voters in the Commonwealth of the Northern Mariana Islands must have the opportunity to cast a vote on ballot initiatives seeking to amend Article XII.

Tabulating and certifying the votes prior to the disposition of this appeal will set into motion actions that will be difficult and burdensome to undo if the Ninth Circuit reverses the this Court on appeal. The Commonwealth will suffer irreparable harm if the relief is not obtained before the close of business on **November 3, 2014**, the day before the general election, as CEC is

---

[1] As this Court noted in its order: "The acronyms 'NMD' and 'non-NMD' are commonly used both as adjectives and as nouns. For example, 'the framers carefully considered what property ownership rights to extend . . . to non-NMD relatives of NMDs.'" (Memorandum Decision and Order Granting in Part and Denying in Part Plaintiff's Motion and Defendant's Cross Motion for Summary Judgment [hereinafter Order], (quoting *In re Estate of Imamura*, 5 NMI 60, 1997 MP 7 ¶ 13.)

1

mandated by law to begin tabulating all votes when the polls close.

The Commonwealth does ***not seek to enjoin or otherwise stay the Order***; rather, the Commonwealth seeks to enjoin the tabulation of the votes, and the necessary sequestration of ballots pending the disposition of this appeal. The Commonwealth believes that it is fairest to all citizens to allow all registered voters to cast a ballot on HLI 18-1, but then postpone the tabulation of the votes as to HLI 18-1 until the appeal is resolved. During this time, the ballots will be sequestered as set forth by the Declaration of Robert A. Guerrero, filed contemporaneously herewith.

Counsel for the Commonwealth, after consulting with his colleagues, concluded that as the Commonwealth is not seeking to stay the Order that the Ninth Circuit Court of Appeals was the proper tribunal to grant the relief sought. Accordingly, the Commonwealth filed a version of this motion in the Ninth Circuit on October 10, 2014. The Ninth Circuit rejected the motion on October 14, 2014. This Motion before this Court follows.

## II. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This Court is already aware of the relevant facts and procedural posture of this case. However, it seems wise to reiterate that information.

In 1947, the United States was charged with administering the Trust Territory of the Pacific Islands, which included the Commonwealth of the Northern Mariana Islands ("CNMI"). *See Commonwealth of the N. Mariana Islands v. Atalig*, 723 F.2d 682, 684 (9th Cir. 1984) (citing *Gale v. Andrus*, 643 F.2d 826, 828–30 (D.C. Cir. 1980)). As part of this charge, the United States was responsible for promoting the development of the Trust Territory toward self-government or independence. *Id.* at 684–85 (citing Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, art. 6(1), 61 Stat. 3301, T.I.A.S. No. 1665, 8 U.N.T.S. 189). Importantly, the United States did not have sovereign authority over the Trust Territory. *Id.*

1   The United States entered into lengthy negotiations with the Trust Territory, and
2   eventually began conducting independent negotiations with the CNMI. *Id.* at 685. From these
3   negotiations came the Covenant to Establish a Commonwealth in Political Union with the United
4   States of America ("Covenant"). *Id.* "The Covenant defines the relationship between the
5   Commonwealth and the United States, sets up a framework and set of mandates for the
6   Commonwealth Constitution, and provides for the eventual termination of the trusteeship."
7   *Wabol v. Villacrusis*, 958 F.2d 1450, 1459 (9th Cir. 1990).

Section 501 of the Covenant governs the applicability of the U.S. Constitution to the Commonwealth. Section 501(a) provides that the 15th and Fourteenth Amendments apply to the Commonwealth. Covenant § 501(a). However, Covenant § 501(b) exempts the applicable provisions of the U.S. Constitution from the U.S. Constitution, including Covenant § 805.

Section 805 of the Covenant authorized the CNMI to regulation the alienation of permanent and long-term interests in land to restrict the acquisition of such interests to persons of Northern Mariana Islands descent. Covenant, § 805(a), 48 U.S.C. § 1801 note. Embodying this authorization, Article XII of the CNMI Constitution provides that "[t]he acquisition of permanent and long-term interests in real property within the Commonwealth shall be restricted to persons of Northern Marianas descent." NMI Const. art. XII § 1. "Northern Marianas descent" is defined as follows:

> A person of Northern Marianas descent is a person who is a citizen or national of the United States and who is of at least one-quarter Northern Marianas Chamorro or Northern Marianas Carolinian blood or a combination thereof or an adopted child of a person of Northern Marianas descent if adopted while under the age of eighteen years. For purposes of determining Northern Marianas descent, a person shall be considered to be a full-blooded Northern Marianas Chamorro or Northern Marianas Carolinian if that person was born or domiciled in the Northern Mariana Islands by 1950 and was a citizen of the Trust Territory of the Pacific Islands before the termination of the Trusteeship with respect to the Commonwealth.

NMI Const. art. XII § 4.

In 1999, with the approval of the voters, the Commonwealth Constitution was amended

3

to limit voting on proposed amendments to Article XII to qualified voters who were of NMD. *See* NMI Const. art. XVIII § 5(c). To implement section 5(c) of Article XVIII, the Seventeenth Commonwealth Legislature enacted a law to establish a voter registry for persons of NMD. *See* CNMI Pub. L. No. 17-40 ("PL 17-40").

On September 16, 2014, the 18th Commonwealth Legislature passed House Legislative Initiative 18-1 ("H.L.I. 18-1"), which proposes an amendment to Article XII. The proposed amendment would modify the definition of "Northern Marianas descent" to include all persons with "some degree of Northern Marianas Chamorro or Northern Marianas Carolinian blood or a combination thereof" and to exclude adopted children who do not have "any degree of Northern Marianas descent." (*See* H.L.I. 18-1, Exh. B.)

Plaintiff-Appellee John H. Davis, Jr.—a registered voter in the CNMI, but not an NMD—brought suit against the Commonwealth Election Commission ("CEC") and various Commonwealth officials (collectively "the Commonwealth") in the U.S. District Court for the Northern Mariana Islands, alleging that section 5(c) of Article XVIII of the Commonwealth Constitution and PL 17-40 violated his rights under the Fourteenth and Fifteenth Amendments of the U.S. Constitution, 42 U.S.C. § 1983, 52 U.S.C. § 10101,[2] and Commonwealth Constitution Article X, § 9 ("Taxpayer's Right of Action").

This Court ultimately held that section 5(c) and PL 17-40 violated the Fourteenth and Fifteenth Amendments, and 53 U.S.C. § 10101. This Court accordingly enjoined the Commonwealth from enforcing section 5(c) and PL 17-40 insofar as doing so would prevent Davis and other similarly individuals from voting on Article XII ballot initiatives.

H.L.I. 18-1 will be put before the voters at the upcoming general election on November

---

[2] Davis's complaint plead claims under 42 U.S.C. § 1971. However, during the pendency of the appeal, 42 U.S.C. § 1971 was transferred to 52 U.S.C. § 10101.

4

4, 2014,[3] and pursuant to this Court's order, all qualified CNMI voters will be allowed to cast a vote on the matter. The Commonwealth Election Commission must begin tabulating all election votes after all election polls are closed and continue tabulating until all votes are counted. *See* 1 CMC § 6524(a)(1). When all votes are tabulated, CEC must make an official public announcement of the election results. 1 CMC § 6524(a)(2). CEC must certify the results of the election within twenty days after the date of the election. 1 CMC § 6509(a).

### III. APPLICABLE LEGAL STANDARD

To obtain a preliminary injunction, the movant "must show that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *See Friends of the Wild Swan v. Weber*, __ F.3d __, ___, 2014 WL 4723559, at *3 (9th Cir. 2014) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)); *see also Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006) (analyzing an injunction pending appeal). A sliding scale is incorporated into this approach: "[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Friends of Wild Swan*, 2014 WL 4723559, at *3 (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.,* 709 F.3d 1281, 1291 (9th Cir. 2013)) (alteration in the original).

If the court grants injunctive relief, it "must be tailored to remedy the specific harm alleged." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (quoting *Lamb–Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir.1991) (internal quotation marks omitted).

### IV. ARGUMENT

---

[3] Election Day is on November 4, 2014, but voters may cast votes prior to that day by absentee ballot or during the early-voting period. *See* 1 CMC §§ 6211, 6222.

5

An injunction pending appeal is appropriate here because—(1) the Commonwealth is likely to succeed on the merits (or at least raises serious questions going to the merits); (2) the Commonwealth will suffer irreparable harm if an injunction does not issue; (3) the balance of hardships tips sharply in favor of the Commonwealth; and (4) the public interest will be furthered by the issuance of an injunction. The requested injunction is narrowly tailored to address the harm the Commonwealth seeks to prevent.

### A. *Likelihood of Success on the Merits*

The Commonwealth is likely to succeed on the merits of its appeal because the district erred in finding the following: (1) Article XVIII, § 5(c) and PL 17-40 violated the Fifteenth Amendment; (2) that Article XVIII, § 5(c) and PL 17-40 violated the Fourteenth Amendment; (3) that Article XVIII, § 5(c) and PL 17-40 violated 52 U.S.C. § 10101. At the very least, the importance of the Covenant's core provisions and the Commonwealth's unique position within the United States raises serious questions.

####    1.    Article XVIII. § 5(c) and PL 17-40 do not violate the Fifteenth Amendment or 52 U.S.C. § 10101

This Court erred in finding that Article XVIII, § 5(c) and PL 17-40 violate the Fifteenth Amendment and 52 U.S.C. § 10101 because the definition of NMD relied on by those provisions, Article XII, § 4, is not racial. The Fifteenth Amendment reads: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. 52 U.S.C. 10101(a) reads: "All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory . . . shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding." 52 U.S.C. § 10101. As such, the analysis under the

Fifteenth Amendment and 52 U.S.C. § 10101 are the same. Article XII, § 4's definition of NMD relies on race-neutral factors such as birth, domicile, and citizenship to determine whether a person is NMD. Although a disproportionately large number of NMDs are Chamorro or Carolinian, Article XII, § 4's definition is race-neutral.

Article XII, § 4's definition does not violate the Fifteenth Amendment because it relies on race-neutral criteria. To qualify as a "full blooded" NMD, one must: (1) have been "born or domiciled in the Northern Mariana Islands by 1950"; and (2) "was a citizen of the Trust Territory of the Pacific Islands before the termination of the Trusteeship with respect to the Commonwealth."[4] NMI Const. art. XII, § 4. On their face, these factors have nothing to do with race.

This Court found the text of Article XII, § 4's definition to be racial for two reasons: (1) the fact that "[b]lood, in the first instance defines who is and isn't and NMD"; and (2) the fact that the definition groups all NMDs into ethnic categories, namely "Northern Marianas Chamorro" or "Northern Marianas Carolinian." Order at 25–26. The Commonwealth concedes that the use of the term "blood" and the use of ethnic labels make the definition appear racial at first blush. However, reading this unfortunate word choice in isolation ignores the core, race-neutral criteria that determine NMD status. The method for determining whether an individual is a "full blooded" NMD relies exclusively on the race-neutral criteria noted above: citizenship and birth/domicile in 1950. Indeed, this Court found: "Membership in this group became fixed at the moment the Trusteeship terminated on November 3, 1986. People who met the two conditions were grandfathered in as full-blooded without having to prove they descended from Northern Marianas Chamorros and Carolinians." (Order at 25.) Article XII, § 4's definition of NMD is therefore race-neutral on its face.

---

[4] The Trusteeship terminated with respect to the Commonwealth on November 3, 1986. Proclamation No. 5564, 51 Fed. Reg. 40, 399 (Nov. 3, 1986).

      Article XII, § 4's definition is also race-neutral because the adoption provision allows individuals of any race to acquire NMD status. Adoption is defined as "[t]he creation by judicial order of a parent-child relationship between two parties who usu. are unrelated; the relationship of parent and child created by law between persons who are not in fact parent and child." Black's Law Dictionary 58 (10th Deluxe ed. 2014). It is clear that adoption is a legal relationship, not one based on ancestry, biology, or genetics. It is likewise clear that an individual's race does not change by virtue of adoption. Therefore, the adoption provision shows a clear intent on the part of the framers of the Commonwealth Constitution to include individuals that are not racially Chamorro or Carolinian into the NMD class. What is vitally important here is that the definition allows individuals of any race to acquire the same NMD status as their adoptive parents.

      Article XII, § 4's definition of "NMD," which is used by Article XVIII, 5(c) and PL 17-40, is readily distinguishable from *Rice v. Cayetano*, 528 U.S. 495 (2000). *Rice* involved elections for trustees of the Office of Hawaiian Affairs ("OHA"), which administered various programs for the descendants of the indigenous inhabitants of the Hawaiian Islands. Voting for the OHA trustees was limited to "Hawaiians." *Rice*, 528 U.S. at 509. Under Hawaii statute, "Hawaiian" was defined as "any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii." *Id.*

      The U.S. Supreme Court held that the voting restriction violated the Fifteenth Amendment. The State argued that the definitions were not racial, but were based on ancestry, rather than race. *Id.* at 514. Significantly, the Court explained: "Ancestry can be a proxy for race. It is that proxy here." *Id.* The Court reasoned that the Hawaiian islands were isolated until 1778 and had formed a distinct culture, which the State was attempting to protect through voting restrictions. *Id.* at 514–15. Furthermore, the legislative history of the definitions in under

consideration originally used the term "race" instead of "peoples," and the drafters *expressly recognized the racial purpose*. *Id*. at 515–16.

The case at bar is readily distinguishable from *Rice*. The Commonwealth concedes that the voting restriction at issue here has ancestral aspects. However, the restriction is distinguishable from the provision that was struck down in *Rice*. First, Article XII, § 2's definition of NMD does not rely *exclusively* on ancestry from a dubious date. The definitions at issue in *Rice* referred to 1778, the year Europeans first made contact with Hawaii. 528 U.S. at 514. In this case, the operative years are 1950 and 1986. The year 1950 is rational as it corresponds to the period of time after which the Japanese colonizers had been repatriated, and the movement of displaced islanders, including Chamorros in Yap and Palau to the Northern Marianas, had concluded. Office of the Chief of Naval Operations, *Handbook on the Trust Territory of the Pacific Islands* 50 (Navy Dep't 1949). Furthermore, the materials of which the this Court took judicial notice demonstrate that there were individuals, though small in number, domiciled on Saipan in 1950 that were not Chamorro or Carolinian. *See* Alexander Spoehr, *Saipan: The Ethnology of a War-Devastated Island*, Feldiana: Anthropology Vol. 41 (1954).

Second, Article XII, § 4's definition does not rely exclusively on race or ancestry. The definitions at issue in *Rice* were clearly racial: in one case, the definition of "Native Hawaiian" used the word "race," and the committee that drafted the definition of "Hawaiian" explicitly recognized that the term "aboriginal peoples" meant "races." 528 U.S. at 509–10, 515–16. Article XII, § 4's definition relies on neutral aspects of birth, domicile, and citizenship which serve to identify the community that rebuilt the Northern Marianas after the devastation of war, and exercised its right to self-determination through its duly elected representatives by negotiating the Covenant.

Third, Article XII, § 4's definition allows for adoption. Adoption of a non-Hawaiian by

9

Hawaiian or Native Hawaiian parents would not impart that status on the adoptee. In the present case, Article XII, § 4's adoption provision grants an adoptee of any race or ethnicity the same NMD status as the children of the adoptive parents. The voting restriction here is distinguishable from *Rice*—it is race neutral and does not violate the Fifteenth Amendment or 52 U.S.C. § 10101.

### 2. Article XVIII, § 5(c) and PL 17-40 do not violate the Fourteenth Amendment

This Court erred in finding that Article XVIII, § 5(c) and PL 17-40 violate the Fourteenth Amendment because the right to vote on amendments to Article XII is not "fundamental in the international sense." The U.S. Constitution only applies of its own force to incorporated territories. *Wabol v. Villacrusis*, 958 F.2d 1450, 1459 (9th Cir. 1990). Only rights that are "fundamental in an international sense" apply in unincorporated territories. *Id*. at 1459–60. Neither the right to own real property nor the "one person, one vote rule" are rights that are "fundamental in an international sense," nor are they "rights that are the basis of free government." *Id*. at 1462; *Rayphand v. Sablan*, 95 F. Supp. 2d 1133, 1140 (D.N. Mar. I. 1999). Article XVIII, § 5(c) is a reasonable application of those principles. If neither the right to own land, nor the right to "one person, one vote" are rights that are the "basis of free government," then it stands to reason that equal voting rights are not "fundamental" as to proposed amendments to Article XII. Even if equal voting rights are deemed to be fundamental in an international sense, this Court erred in finding that Article XVIII, § 5(c) and PL 17-40 violate the Fourteenth Amendment because the voter qualifications are narrowly tailored to serve the Commonwealth's compelling interest in preserving protections afforded to NMDs under integral provisions of the Covenant.

Fundamental rights are not absolute or inviolable. *See, e.g.*, *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 (1961). When a State places a limitation on a fundamental right, the

limitation is valid if the State proves that it is narrowly tailored and necessary to achieve a compelling governmental interest. *E.g.*, *Roe v. Wade*, 410 U.S. 113, 155 (1973); *Kramer v. Union Free Sch. Dist.*, 395 U.S. 621, 627 (1969); *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965). The Commonwealth has a compelling interest in ensuring that any change to integral provisions of the Covenant is decided by the individuals the Covenant and Article XII seek to protect. The voter qualifications in Article XVIII, § 5(c) and PL 17-40 are necessary to achieve this objective.

The voter qualifications are narrowly tailored to achieve the Commonwealth's compelling interest. "[A] statute is narrowly tailored only if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Ward v. Rock Against Racism*, 491 U.S. 781, 804 (1989). Article XVIII, § 5(c)'s voter qualifications seek to prevent individuals who have no connection to the community protected under Covenant § 805 from deciding the future of Article XII. Article XVIII, § 5(c) accomplishes this task by basing the voter qualifications on Article XII's definition of "person of Northern Marianas descent." NMI Const. art. XVIII, § 5(c). Only those individuals that are protected by Covenant § 805 and Article XII are entitled to vote on a fundamental issue that affects their rights as negotiated under the Covenant.

As this Court disagreed with the foregoing arguments during briefing the Court may understandably disagree that the Commonwealth's arguments for reversal are likely to succeed on the merits. However, there are also serious questions going to the merits and the balance of hardships tip sharply in favor of the Commonwealth, and the other two *Winter* factors are satisfied. All in all, this case presents questions that are practically unique in U.S. Constitutional jurisprudence owing to the unique position occupied by the Commonwealth in the U.S. legal system.

     **B.**    *Irreparable Harm*

The Commonwealth is likely to suffer irreparable harm if an injunction is not issued. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.1991). The Commonwealth does not have a legal remedy for the harm it is likely to suffer if an injunction is not issued.

Harm is certain if tabulation and certification proceeds and this Court is later reversed—the votes cast and certified will be nullified. Proponents and opponents alike will suffer in that their certified vote will be reversed—an intangible, irreparable harm that cannot be remedied by monetary damages. *See Ariz. Dream Act Coal.*, 757 F.3d at 1068 ("Because intangible injuries generally lack an adequate legal remedy, 'intangible injuries [may] qualify as irreparable harm.'") (quoting *Rent-A-Ctr., Inc.*, 944 F.2d at 603).

Further, if CEC proceeds to tabulate the votes and the Article XII initiative is approved, it will take effect immediately. *See* NMI Const. art. XVIII § 5(b). The Commonwealth will need to expend resources to implement the amendment. As an example, the Commonwealth has a homestead program under which public land is made available to NMDs for use as a homestead. *See* 1 CMC §§ 2806(b), 2809; 2 CMC § 4303. The amendment—by lowering the blood quantum requirement—will create a new stream of individuals who will be eligible for homesteads. The Commonwealth Department of Public Lands will need to devote resources and employees to handle new applications and to determine whether the applicants have some trace of NMD "blood." The resources and time expended to implement an approved change to Article XII cannot be recovered if this Court is ultimately reversed.

Further exemplifying the irreparable effects of an amendment, land transactions that are executed in reliance upon the amendment may very well need to be undone if the Court of

Appeals reverses this Court. The Commonwealth courts will be burdened by litigation arising from such transactions if buyers and sellers have a dispute about rights and repayment of funds that may have been exchanged. The cost of implementing these changes (*e.g.*, time, wages, etc.) and undoing them cannot be recovered if this Court is ultimately reversed on appeal.

While it is true that harm to public resources will not be as great if H.L.I. 18-1 is not approved, there will still be the irreparable harm of vote nullification.

### C. Balance of Hardships and Public Interest

The balance of hardships tips strongly in favor of the Commonwealth. If the tabulation of votes for H.L.I. 18-1 is not enjoined while the appeal is pending, the harm will be great for the Commonwealth (and the public in general); whereas if the tabulation is enjoined, the Appellee's hardship—merely waiting until the disposition of the appeal—is negligible.

When the government is a party, the public interest factor merges with the balance of hardships. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The public interest will be furthered by the injunction as it will preserve order and promote the efficient use of the Commonwealth government's limited public resources.

As mentioned above, if H.L.I. 18-1 is approved, the public will be able to conduct land transactions in accordance with the new definition of NMD. If this Court is later reversed, the buyers and sellers of affected transactions will be burdened with the impact of the reversal. Enjoining the tabulation of H.L.I. 18-1 will avoid unduly burdening the public with the consequences of a reversal. Further, the public has interest in avoiding the nullification their votes after they are counted and certified. Finally, the public has an interest in preserving the public fisc. *See e.g., Brock v. Pierce Cnty.*, 476 U.S. 253, 262 (1986) ("the protection of the public fisc is a matter that is of interest to every citizen"). Implementing an amendment to

Article XII and later undoing it if this Court is reversed will waste public funds and time. The balance of hardships and the public interest weigh sharply in favor of issuing an injunction.

### D. Scope of Injunction

The Commonwealth seeks a narrowly tailored injunction to address the irreparable injury and hardship if this Court is reversed on appeal. The injunction sought would direct CEC to refrain from tabulating and certifying the votes cast for H.L.I. 18-1 and to securely store all the ballots while the appeal is pending. The Commonwealth has ensured that it will be able to securely store such ballots, as outlined by the Declaration of Robert A. Guerrero, filed contemporaneously herewith. If the Court of Appeals affirms this Court's order allowing all persons qualified to vote in the Commonwealth to cast a vote on H.L.I. 18-1, the votes would be counted by hand and given effect. If the Court of Appeals reverses this Court's order, the votes would not be counted and the Commonwealth Legislature would need to call a special election for H.L.I. 18-1 where only registered voters of Northern Marianas descent would be eligible to vote on the measure. *See* 1 CMC § 6505. This narrow injunction allows Appellee to cast a vote on H.L.I. 18-1 while avoiding irreparable harm to the Commonwealth by preserving the status quo pending appeal.

### V. POSITION OF OPPOSING COUNSEL

Opposing counsel has indicated that she will oppose this Motion.

### VI. CONCLUSION

An injunction pending appeal is warranted. Accordingly, the Commonwealth respectfully requests that this Court issue a preliminary injunction to delay the Commonwealth Election Commission's tabulation and certification of votes cast for House Legislative Initiative 18-1, and sequester the ballots pending the disposition of this appeal.

1  RESPECTFULLY SUBMITTED.

2  DATED: October 15, 2014                    OFFICE OF THE ATTORNEY GENERAL

3                                              /s/_____
                                                Charles E. Brasington
4                                               Attorney for Defendants

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been electronically filed this 15th day of October 2014, with service requested to all parties of record.

OFFICE OF THE ATTORNEY GENERAL

/s/_____
Charles E. Brasington
Assistant Attorney General