JEANNE H. RAYPHAND
Box 502020
Saipan, MP 96950
   Telephone Nos.:  (670) 287-9807
   E-Mail:  jeanneesq@yahoo.com

Attorney for Plaintiff

F I L E D
Clerk
District Court

OCT 21 2014

for the Northern Mariana Islands
By_____
(Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| JOHN H. DAVIS, JR., ] | CIVIL ACTION NO. 14-0002 |
| ] | |
| Plaintiff, ] | |
| ] | PLAINTIFF'S OPPOSITION |
| vs. ] | TO MOTION FOR SEQUESTRATION |
| ] | OF BALLOTS PENDING APPEAL |
| COMMONWEALTH ELECTION ] | |
| COMMISSION; FRANCES M. SABLAN, ] | |
| Chairperson of Commonwealth Election ] | |
| Commission; ROBERT A. GUERRERO, ] | |
| Executive Director of Commonwealth ] | |
| Election Commission; ELOY INOS, ] | Judge: Ramona V. Mangona |
| CNMI Governor ] | |
| ] | Date: October 27, 2014 |
| Defendants. ] | |
| _____] | Time: 1:30 p.m. |

# PLAINTIFF'S OPPOSITION TO
# MOTION FOR SEQUESTRATION OF BALLOTS
# PENDING APPEAL

Plaintiff Davis opposes the defendants' motion to enjoin the Commonwealth Election Commission "from tabulating the votes on House Legislative Initiative 18-1 and sequestering the ballots until resolution on appeal." Memorandum in Support of Defendants' Motion for Sequestration of Ballots Pending Appeal [hereinafter "Defendants' Memorandum"], p. 1 (Oct. 15, 2014).

As a part of this Court's decision in this case, the Court ordered that "[t]he Commonwealth is permanently enjoined from enforcing Article XVIII, § 5( c), and from enforcing Public Law 17-40 and any CEC rules and regulations implementing that law, insofar as such enforcement would prevent or hinder Plaintiff and other qualified voters who are not NMDs from voting on Article XII ballot initiatives." Memorandum Decision and Order Granting in Part and Denying in Part Plaintiff's Motion and Defendant's Cross Motion for Summary Judgment [hereinafter "Decision and Order"], p. 51 ¶ 6 (May 20, 2014).

The term "vote" includes "all action necessary to make a vote effective including, but not limited to, registration or other action required by State Law prerequisite to voting, casting a ballot, or *having such ballot counted and included in the appropriate totals of votes cast* with respect . . . propositions for which votes are received in an election . . . ." 52 U.S.C. § 10101(a)(3)(A); 52 U.S.C. § 10101(e) (emphasis added).

Contrary to defendants' assertion that "[t]he Commonwealth does not seek to enjoin or otherwise stay the Order," Defendants' Memorandum, p. 2, the injunction defendants request clearly

1

seeks to enjoin and stay this Court's May 20, 2014, Decision and Order.

Defendants' motion should be denied because (1) defendants are unlikely to succeed on the merits and do not raise serious questions going to the merits; (2) the Commonwealth will not suffer irreparable harm if an injunction does not issue; (3) the balance of hardships does not tip sharply in favor of the Commonwealth; and (4) the public interest will not be furthered by the issuance of an injunction.

1.

## DEFENDANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS

**A. The District Court correctly determined that Article XVIII § 5( c) of the Commonwealth Constitution and PL 17-40 violate the Fifteenth Amendment of the United States Constitution and 52 U.S.C. § 10101 by denying the right to vote on a Commonwealth Constitutional amendment to persons who are not of "Northern Marianas Descent."**

Article XVIII § 5 ( c) limits eligible voters to persons of Northern Marianas descent in the case of a proposed amendment to Article XII of the Commonwealth Constitution.  Article XVIII § 5( c) disenfranchises plaintiff and other United States citizens who are not of Northern Marianas descent from voting on any proposed amendment to Article XII of the Commonwealth Constitution.

Public Law 17-40 was intended to restrict voting on any amendment to the Commonwealth Constitution regarding land alienation to "only" persons of Northern Marianas descent, i.e., persons of Northern Marianas Chamorro and Carolinian descent.

By enacting Public Law 17-40, the Legislature intended that "only" persons of Northern

2

Marianas descent, i.e., persons of Northern Marianas Chamorro and Carolinian descent, be allowed to vote on any constitutional amendment affecting the protection against alienation of lands. Public Law 17-40 § 1; *see also* Public Law 17-40 § 2 ( c)(1) ("official registry of persons of Northern Marianas descent in any and all elections . . . that requires only persons of Northern Marianas descent to vote in any election pursuant to the said article XVIII § 5 of the Northern Mariana Islands Constitution . . . .").

As a part of the scheme to deny United States citizens who are not Chamorro or Carolinian the right to vote, the Legislature established "a Northern Marianas Descent Registry," Public Law 17-40 § 2, and further provided that the Election Commission may require a "copy of the original birth record showing the natural parents or ancestors of the person registering" and further that "[s]uch birth record shall identify the nationality and race of the parents, i.e., NMD Chamorro or Carolinian or part NMD, etc., " Public Law 17-40 § 2( c)(5).

The purpose of Public Law 17-40 is the "establishment and control of the registry of persons of Northern Marianas descent within the Office of the Commonwealth Election Commission," Public Law 17-40 § 1, and specifically to insure that "only" persons of Northern Marianas Chamorro and Carolinian descent "can vote on Constitutional amendments affecting the protection against alienation of lands," Public Law 17-40 § 1, and to be used "in any and all elections . . . that requires only persons of Northern Marianas descent to vote in such election pursuant to Article XVIII § 5 of the Northern Marianas Constitution." Public Law 17-40 § 2( c)(1).

In *Rice v. Cayetano*, the United States Supreme Court considered the constitutionality of a limitation of the right to vote wherein the right to vote was limited to "Hawaiians." "Hawaiians" were defined as "any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which people thereafter have continued to reside in Hawaii." *Rice v. Cayetano*. 528 U.S. 495, 509 (2000). The United States Supreme Court held that denying plaintiff who was not "Hawaiian" the right to vote violated the Fifteenth Amendment of the United States Constitution. *Rice v. Cayetano*, 528 U.S. 495, 511-524 (2000)

"The Fifteenth Amendment was quite sufficient to invalidate a scheme which did not mention race but instead used ancestry in an attempt to confine and restrict the voting franchise." *Rice v. Cayetano*, 528 U.S.495, 513 (2000), citing *Guinn v. U.S.*, 238 U.S. 347, 364-365 (1915), and it sufficed to strike down white primary cases "designed to exclude one racial class (at least) from voting." *Rice v. Cayetano*, 528 U.S.495, 513-514 (2000), citing *Terry v. Adams*, 345 U.S. 461, 469-479 (1953) and *Smith v. Allright*, 321 U.S. 649, 663-666 (1944).

As in the case of *Rice v. Cayetano,* "the voting structure now before us is neither subtle nor indirect." See *Rice v. Cayetano*, 528 U.S.495, 514 (2000). Article XVIII(5)( c) and Public Law 17-40 are "specific in granting the vote to persons of a defined ancestry and to no others." See *Rice v. Cayetano*, 528 U.S.495, 514 (2000).

"In the interpretation of the Reconstruction era civil rights laws we have observed that 'racial discrimination' is that which singles out 'identifiable classes of persons . . . solely because of their ancestry or ethnic characteristics." *Rice v. Cayetano*, 528 U.S.495, 515 (2000), quoting *Saint*

4

*Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987).[1]

The ancestral inquiry mandated by Article XVIII and Public Law 17-40 "is corruptive of the whole legal order democratic elections seek to preserve. The law itself may not become the instrument for generating the prejudices and hostility all too often directed against persons whose particular ancestry is disclosed by their ethnic characteristics and cultural traditions." *Rice v. Cayetano,* 528 U.S.495, 517 (2000).

> Throughout the history of the Northern Mariana Islands, those who considered themselves as the people of the Northern Mariana Islands have been the Chamorros and the Carolinians who settled on the various islands, formed a cohesive social group, worked for the political and economic betterment of the Northern Mariana Islands, and considered these islands to be their home.

Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands [hereinafter "Analysis"], p. 171 (Dec. 6, 1976).

"Ancestry can be a proxy for race." *Rice v. Cayetano*, 528 U.S.495, 514 (2000). And, as in the *Rice v. Cayetano* case, "[i[t is that proxy here." *See Rice v. Cayetano*, 528 U.S.495, 514 (2000).

Although the Analysis states that the "Convention did not use a racial or ethnic classification" "to define what is meant by a person of at least one-quarter Northern Marianas Chamorro or Northern Marianas Carolinian blood," the classification of persons of Northern Marianas descent is clearly a

---

[1] *See Saint Francis College v. Al-Khazraji,* 481 U.S. 604 (1987), for discussion by the United States Supreme Court on the meaning of "race" and "racial discrimination."

5

racial classification. Discussion in Analysis, pp. 171-175.

The Convention carefully excluded from the definition anyone who was not Northern Marianas Chamorro or Northern Marianas Carolinian blood, eliminating anyone from countries other than the Trust Territory, anyone born in the Trust Territory who at birth or otherwise acquired another nationality, and even eliminating Trust Territory citizens who were from other districts within the Trust Territory. *See* Analysis, p. 171-175.

As this Court correctly concluded, "Article XII's ancestry test is an effective substitute or proxy for race because it excludes nearly all persons whose ancestors were not Chamorro or Carolinian." Decision and Order, p. 26, lines 4-5.

The very object of the drafters of the Commonwealth Constitution was to treat early Carolinian and Chamorro people "as a distinct people, commanding their own recognition and respect," *see Rice v. Cayetano,* 528 U.S. 495, 515 (2000), thereby creating a racial classification.

The Legislature, in enacting Public Law 17-40, likewise made it clear that it was referring to "natural persons of Chamorro and Carolinian" descent, and that the "people of the Northern Mariana Islands" were Chamorro and Carolinian people. *See* Public Law 17-40 § 1. Again, like the Convention in drafting Article XII, the Legislature clearly intended that the Northern Marianas Descent Registry be a registry of persons of Chamorro and Carolinian persons; in other words, a race-based registry for Chamorro and Carolinian persons who were blood descendants of those Chamorro and Carolinian persons who were born and domiciled in the Northern Marianas prior to 1950. In doing so, and in claiming that it was only "persons of Northern Marianas Chamorro and Carolinian descent who negotiated and voted for the Covenant," Public Law 17-40 § 1, the Legislature ignored the fact

6

that citizens of the Trust Territory from other districts owned land in the Northern Marianas Islands, had purchased land, built homes, raised families, and had become a part of the community that negotiated and voted for the Covenant. *See* Analysis, p. 166 ["From the end of World War II to the effective date of the Constitution, the law enforced in the Northern Mariana Islands has forbidden alienation of land to persons not citizens of the Trust Territory of the Pacific Islands."]; *see also* 51 TTC § 11 (1970 Supp. No. 1); 51 TTC § 11 (1980). At the time the Covenant was negotiated and voted on, every Trust Territory citizen who was 18 years old or older and met requirements of residence in the Trust Territory and in the Northern Mariana Islands were eligible to vote on the Covenant and subsequently on the Commonwealth Constitution. *See* 43 TTC §§ 1 & 251 (1970); 43 TTC §§ 1 & 251 (1980).

Furthermore, the definition of "Native Hawaiian" at issue in the *Cayetano* case was based on residence in Hawaii as of a certain date and continued residence thereafter, just as the definition of "Northern Marianas descent" is based on residence in the Northern Mariana Islands as of a certain date and thereafter Trust Territory citizenship.

Both definitions are based on ancestry, and ancestry is a proxy for race in both the *Cayetano* case and in this case. Therefore, denying voting rights to persons who are not of Northern Marianas descent is denial of the right to vote on account of race and violates the Fifteenth Amendment of the United States Constitution and 52 U.S.C. §10101(e).

After careful and thorough analysis, this Court correctly concluded that "the NMD classification is racial" and "the race-based restrictions on the voting rights of non-NMDs" violate the Fifteenth Amendment. Decision and Order, p. 36, lines 1-3.

**B. The District Court correctly held that Article XVIII § 5( c) of the Commonwealth Constitution and PL 17-40 violate the Fourteenth Amendment of the United States Constitution by denying the right to vote on a Commonwealth Constitutional amendment.**

### Insular Affairs Doctrine

The test is not whether the right to vote on a Commonwealth Constitutional amendment is "fundamental in the international sense." Compare Defendants' Memorandum, p. 10.

The defendants rely on *CNMI v. Atalig* (jury trial), *Wabol v. Villacrusis* (land alienation), and *Rayphand v. Sablan* (Senate apportionment), cases which considered whether the United States Congress acted within its authority in agreeing to certain provisions of the Covenant and whether the implementation of those Covenant provisions in Commonwealth law were unconstitutional.

The Insular Cases provided "the legal framework and justification for allowing otherwise unconstitutional practices to continue in U.S. territories." *Rayphand v. Sablan*, 95 F.Supp. 1133, 1139 (D.N. 1999).

This, however, is not such a case. The Covenant and its terms are not at issue in this case. Although the Covenant allows the "Government of the Northern Mariana Islands" to regulate the alienation of land in the Commonwealth, the Covenant does not restrict the right to vote. And, the "Government of the Northern Mariana Islands" is not limited to persons of Northern Marianas descent.

The only issue in this case is whether a United States citizen and registered voter who is not of Northern Marianas descent can be denied the right to vote on a public issue, i.e., the amendment of the Commonwealth Constitution.

The Insular Affairs Doctrine is not applicable in this case to deny United States citizens the right to vote on a public issue, i.e., amendment of the Commonwealth Constitution, and no majority of voters can be allowed to deny other United States citizens the right to vote.

### Fourteenth Amendment

The United States Supreme Court in *Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 607 fn. 5 (1987) noted "that under prior cases, discrimination by States on the basis of ancestry violates the Equal Protection Clause of the Fourteenth Amendment" [citations omitted].

The Fourteenth Amendment of the United States Constitution is applicable within the Northern Mariana Islands as if the Northern Mariana Islands were one of the several states. Covenant, Section 501(a).

"[I]f a challenged statute grants the right to vote to some *bona fide* residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest.' [citations omitted]." *Kramer v. Union Free School Dist. No. 15,* 395 U.S. 621, 627 (1969); *Dunn v. Blumstein,* 405 U.S. 330, 337 (1972).

### No Compelling Interest

"[I]n an election of general interest restrictions on the franchise other than residence, age, and citizenship must promote a compelling state interest in order to survive constitutional attack." *Hill v. Stone*, 421 U.S. 289, 295 (1975), citing *Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621 (1969).

Article XVIII(5)( c) and Public Law 17-40 "erect[] a classification that impermissibly disenfranchises persons otherwise qualified to vote," solely on the basis of race and the date they or their ancestors were living in the Commonwealth, and violate the Equal Protection Clause of the Fourteenth Amendment.  *See Hill v. Stone*, 421 U.S. 289, 300 (1975).  *See also Hernandez v. Texas,* 347 U.S. 475, 479 (1954) ("exclusion of otherwise eligible persons from jury service solely because of their ancestry or national origin is discrimination prohibited by the Fourteenth Amendment").

The Commonwealth Supreme Court has held that the right to vote is a fundamental right in the Commonwealth of the Northern Mariana Islands.  *Charfauros v. Board of Elections,* 1998 MP 16, 5 N.M.I. 188 (1998), *aff'd* 249 F.3d 941 (9th Cir. 2001).

> The right to vote in a Commonwealth election is a fundamental right of citizenship and restrictions placed on that right are protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and by Article I, Section 6 of the Commonwealth Constitution.

*Charfauros v. Board of Elections,* 1998 MP 16, 5 N.M.I. 188, 197 ¶ 40 (1998).

The United States Court of Appeals affirmed the Commonwealth Supreme Court and further stated:

> [i]n addition to being guaranteed the right to vote, every United States "citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."  *Dunn*, 405 U.S. at 336.

*Charfauros v. Board of Elections,* 1998 MP 16, 5 N.M.I. 188 (1998), *aff'd* 249 F.3D 941 (9th Cir. 2001).

The Commonwealth has no compelling interest in dividing its United States citizens into two classes based on race and discriminating against those United States citizens of one class and favoring those in the other.  See *Hill v. Stone,* 421 U.S. 289, 290-291 (1975).

The Commonwealth has no compelling interest in dividing its United States citizens into two classes based on whether they or their ancestors were born or domiciled in the Northern Mariana Islands prior to 1950 and denying the right to vote to citizens of one class and granting the right to vote to the other class.

As this Court pointed out, "the exclusion of non-NMDs from voting on Article XII risks perpetuating the sort of outdated and overbroad stereotypes about NMDs and non-NMDs that the Equal Protection Clause is designed to combat."  Decision and Order, p. 43, lines11-14.

All persons residing in the Commonwealth, whether Northern Marianas descent or not, have an interest in any amendment to the Commonwealth Constitution.  In fact, all persons residing in the Commonwealth have an interest in any land alienation restrictions applicable in the Commonwealth.

"An inquiry into ancestral lines is not consistent with respect based on the unique personality each of us possesses, a respect the Constitution itself secures in its concerns for persons and citizens" *Rice v. Cayetano,* 528 U.S. 495, 517 (2000)

"Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."  *Rice v. Cayetano*, 528 U.S. 495, 517 (2000), quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943).

There is no compelling state interest in granting the right to vote to one group of eligible voters and denying the right to vote to another group of eligible voters based solely on whether that person or

his ancestors were born or domiciled in the Northern Mariana Islands by 1950.

**2.**

### THE COMMONWEALTH WILL NOT SUFFER IRREPARABLE HARM
### IF AN INJUNCTION DOES NOT ISSUE

If the injunction is granted, it is the plaintiff and other United States citizens who are not of Northern Marianas descent who will suffer irreparable harm in being denied the right to vote.

As stated above, the term "vote" "includes "having such ballot counted and included in the appropriate totals of votes case with respect to . . . propositions for which votes are received in an election . . . ."  52 U.S.C. § 10101(a)(3)(A); 52 USC § 10101(e).

In the event that Initiative 18-1 is not approved, then there is no change and the Commonwealth incurs no extra expenses.

In the event that Initiative 18-1 is approved, then the Superior Court[2] could stay all proceedings regarding claims under in Initiative 18-1 pending resolution of this case on appeal, and again the Commonwealth need not incur the expenses of implementing Initiative 18-1 until the appeal is decided.

On the other hand, the proposed sequestration of ballots not only deprives Davis and other United States citizens who are not of Northern Marianas descent of the right to vote but will also result in a risk to the security of the ballots and increase the expenses to the Commonwealth in altering the counting mechanism and in subsequently requiring counting the ballots by hand in the future after a Ninth Circuit decision.

---

[2] House Legislative Initiative 18-1 requires certification by the Superior Court that a person "who has less than one quarter Northern Marianas Chamorro or Northern Marianas Carolinian blood or a combination thereof" is "a persons of Northern Marianas descent." H.L.I. 18-1 §4(a).

### 3.

### THE BALANCE OF EQUITIES DOES NOT TIP SHARPLY
### IN FAVOR OF THE COMMONWEALTH

The balance of equities does not tip sharply in favor of the Commonwealth. The Commonwealth need not spend any resources while awaiting the decision of the Court of Appeals for the Ninth Circuit, yet plaintiff Davis and other United States citizens who are not of Northern Marianas descent will continue to be denied the right to vote.

### 4.

### THE INJUNCTION SOUGHT IS NOT
### IN THE PUBLIC INTEREST

There is no public interest in denying a United States citizen the right to vote.

The right to vote is a fundamental right in the Commonwealth.

The right to vote is preservative of all rights. *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064,1071, 30 L.Ed. 220 (1886).

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges the right.

*Westberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 534, 11 L.Ed.2d 481 (1964).

> [T]he right of suffrage is a fundamental matter in a free and democratic society.

13

Especially since the right to exercise the franchise in a free and unpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

*Reynolds v. Sims*, 377 U.S. 533, 561-562, 84 S.Ct. 1362, 1381, 12 L.Ed. 506 (1964).

## CONCLUSION

For the reasons stated herein, the defendants' motion for sequestration of the ballots should be denied.

Respectfully submitted,

/s/

JEANNE H. RAYPHAND
Attorney for Plaintiff